1  Eugene G. Iredale,  SBN:  75292
   Julia Yoo,  SBN: 231163
2  105 West F Street, Fourth Floor
   San Diego, CA 92101-6036
3  Telephone:   (619) 233-1525
   Facsimile:    (619) 233-3221
4  Attorney for Plaintiffs, DANIEL HERNANDEZ, a minor, DANIELA HERNANDEZ, a minor,
   FABIAN HERNANDEZ, a minor, by and through their guardian *ad litem*, MARIA PUGA
5  MORAN, YEIMI HERNANDEZ, an individual, and  DAISY HERNANDEZ, an individual

6  Guadalupe Valencia, (SBN: 197831)
   105 West F Street, Suite 309
7  San Diego, CA 92101-6036
   Telephone:    (619) 232-2588
8  Facsimile:     (619) 232-2158
   Attorney for Plaintiff, ESTATE OF ANASTACIO HERNANDEZ-ROJAS, by its personal
9  representative, DAISY HERNANDEZ

10                 UNITED STATES DISTRICT COURT
        IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA
11

12  THE ESTATE OF ANASTACIO                   )   Case No.   11-CV-0522-L  NLS
    HERNANDEZ-ROJAS, by its personal          )
13  representative, DAISY HERNANDEZ,          )   **THIRD AMENDED COMPLAINT**
    DANIEL HERNANDEZ, a minor, DANIELA )
14  HERNANDEZ, a minor, and FABIAN           )   (1)  *Bivens*:  Retaliation for Exercise
    HERNANDEZ, a minor, by and through their )        of Constitutional Rights;
15  guardian ad litem MARIA PUGA MORAN,      )   (2)  *Bivens*: Fifth Amendment Due Process
    YEIMI HERNANDEZ, an individual, and      )        Violation for Denial of Removal
16  DAISY HERNANDEZ, an individual,          )        Hearing;
                                              )   (3)  *Bivens*: Wrongful Death;
17                Plaintiffs,                 )   (4)  *Bivens*: Failure to Properly Supervise;
                                              )   (5)  *Bivens*: Right of Association;
18                                            )   (6)  *FTCA*: Excessive Force in Violation of
                                              )        the Fourth Amendment;
19  Customs and Border Protection Agent 7663; )   (7)  *FTCA*: Torture by Taser as a Violation
20  Border Patrol Agent V325; Border Patrol   )        of the Fourth Amendment;
    Agent V315; Immigration Enforcement       )   (8)  *FTCA, ATCA*: Torture by Taser in a
21  Agent 2054; Immigration Enforcement Agent )        Violation of the Law of Nations;
    7G2186; Border Patrol Agent L (d.o.b      )   (9)  *FTCA*: Wrongful Death (CCP 377.60);
22  11/4/1969); Customs and Border Protection )   (10) *FTCA*: Assault and Battery;
23  Agent B (d.o.b. 7/8/1969); Customs and    )   (11) *FTCA*: Intentional Infliction of
    Border Protection Officer S (d.o.b.       )        Emotional Distress;
24  10/27/1971); Border Patrol Supervisor V61; )  (12) *FTCA*: Negligence;
    Border Patrol Supervisor I199; Border      )  (13) *FTCA*: Negligent Infliction of Emotional
25  Patrol Supervisor I68; Customs and Border )        Distress, and;
26  Protection Supervisor CAQ03175, UNITED    )   (14) *FTCA*: California Civil Code § 52.1
    STATES, and DOES 1-25, INCLUSIVE,         )
27                                            )
                  Defendants.                 )   JURY TRIAL IS HEREBY DEMANDED
28

1

COME NOW, the ESTATE OF ANASTACIO HERNANDEZ-ROJAS, through its personal representative, DAISY HERNANDEZ, by its attorney of record, Guadalupe Valencia, DANIEL HERNANDEZ, a minor, and DANIELA HERNANDEZ, a minor,  FABIAN HERNANDEZ, a minor, the minors by and through their guardian *ad litem*, MARIA PUGA MORAN, DAISY HERNANDEZ, and YEIMI HERNANDEZ, by their attorney of record, Eugene G. Iredale, and allege and complain as follows:

**I.**

**<u>GENERAL ALLEGATIONS</u>**

1.      Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 (Federal Question) and 28 U.S.C. §1346(b)(1), <u>et. seq.</u> (United States as Defendant), and 28 U.S.C. §1350 (Alien Tort Claims Act)

2.      This Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367(a).

3.      Plaintiffs' claims under 28 U.S.C. §§ 1346, and 2671-2680 (Federal Tort Claims Act) were timely filed on June 15, 2010.   The claims were formally denied in an undated letter that was signed by the Director of the National Finance Center.  It was received by the plaintiffs in February of 2011.

4.      Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California.

5.      The individual defendants named were law enforcement agents and employees of the United States.  They were acting within the scope of their employment at all times relevant to this complaint.

6.      At all times relevant to this complaint, Plaintiffs were individuals residing in San Diego County, California.

7.      At all times relevant to this complaint, the Department of Homeland Security  was a federal agency of defendant UNITED STATES OF AMERICA and was operating in San Diego County, California.

///

1         8.      Plaintiffs are truly ignorant of the true names and capacities of DOES 1 through

2 25, inclusive, and/or are truly ignorant of the facts giving rise to their liability and will amend

3 this complaint once their identities have been ascertained as well as the facts giving rise to their

4 liability.

5         9.      These defendants were agents, servants and employees of each of the other named

6 defendants and were acting at all times within the full course and scope of their agency and

7 employment, with the full knowledge and consent, either expressed or implied, of their principal

8 and/or employer and each of the other named defendants. Each of the defendants had approved or

9 ratified the actions of the other defendants, thereby making the currently named defendants liable

10 for the acts and/or omissions of their agents, servants and/or employees.

11 **II.**

12 **PARTIES**

13 **PLAINTIFFS**

14       10.     Plaintiff Yeimi Judith Hernandez is 21 years old.  She is Anastacio Hernandez

15 Rojas' oldest child.

16       11.     Anastacio's second child is Daisy Alejandra Hernandez, age 19.

17       12.      Fabian Anastacio Hernandez, age 12, is Anastacio's third child.

18       13.     Anastacio's twins, Daniel and Daniela, are 4 years old.

19       14.     Mr. Hernandez-Rojas' five children, Daniel Hernandez, Daniela Hernandez,

20 Fabian Anastacio Hernandez, Yeimi Hernandez, and Daisy Alejandra Hernandez bring these

21 causes of action under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Federal

22 Tort Claims Act, and California state law.

23 **DEFENDANTS**

24       15.     Border Patrol Agent (BPA) V325 was involved in acts beginning with minor

25 violence and insults and escalating into the brutal use of excessive force.

26       16.     Border Patrol Agent (BPA) V315 used excessive force and aided defendant V325.

27       17.     Border Patrol Supervisor V61 refused medical care to Anastacio, denied him the

28 right to communicate with his family, failed to advices Anastacio of his right to consult with the

Mexican Consulate, denied him the right to remain in the United States pending a hearing before an Immigration judge, refused to take any complaints for the misconduct of BPA V325 and ordered Anastacio removed without legal process in retaliation for Anastacio's attempted exercise of his First, Fourth and Fifth Amendment rights.

18.     Immigration Enforcement Agent (IEA) 2054 beat Anastacio with a baton and thereafter beat and restrained Anastacio.

19.     Immigration Enforcement Agent (IEA) 7G2186 beat Anastacio with a baton and thereafter beat and restrained Anastacio.

20.     Border Patrol Agent L (d.o.b. 11/04/1969) beat and kicked Anastacio.

21.     Customs and Border Protection Agent (CBP) 7663 Tased Anastacio Hernandez with the X-26 Taser, electrocuting Anastacio four times through wires with barbs, and at least once with the Taser drive-stun mode applied directly to Anastacio's body.  His actions resulted in Anastacio's losing consciousness, suffering a heart attack, and coupled with the actions of the other defendants, caused brain death.

22.     CBP Officer S (d.o.b. 10/27/1971) beat and kicked Anastacio, and, with others, placed him in a "hog-tied" position that compromised his respiration.

23.     CBP Officer B (d.o.b. 07/08/1969) struck Anastacio and placed him in the "hog-tied" position.

24.     Supervisory Officer CAQ03175 was present, witnessed the excessive force and brutality at the Port of Entry, and with deliberate indifference made no intervention and ratified the excessive force.

25.     Border Patrol Supervisory Officer I68 was present, witnessed the excessive force and brutality at the Port of Entry, and with deliberate indifference made no intervention and ratified the excessive force.

26.     Border Patrol Supervisory Officer I199 was present, witnessed the excessive force and brutality at the Port of Entry, and with deliberate indifference made no intervention and ratified the excessive force.

///

27.     Defendants and Does 1-25 attempted to conceal and cover up the illegal actions of the defendants, by ordering bystanders to leave, by erasing photos and videos from cell phones they seized from spectators, and by standing en masse to block the view of the public as Anastacio was beaten.

### FACTS

### INTRODUCTION

28.     On May 28, 2010, Anastacio Rojas Hernandez ("Anastacio") died at the hands of U.S. law enforcement agents and officers after he complained of physical abuse by a U.S. Border PatrolAgent; requested medical treatment; refused to consent to be returned to Mexico without a due process hearing; and cried out for agents to stop beating and brutalizing him.

29.     Anastacio was 42 years of age at the time of his death.

### ANASTACIO'S FAMILY AND WORK BACKGROUND.

30.     Anastacio was born in the city of San Luis Potosi, Mexico.

31.     Anastacio was raised by his father, Porfirio Hernandez Arellano  and his mother, Maria de la Luz Rojas Olivo.

32.     He completed elementary school in his hometown.

33.     Anastacio lived in San Luis Potosi with his parents and siblings until he was 15 years of age.

34.     In an effort to help his parents to support their large family, Anastacio moved to San Diego, California, in search of work.

35.     Anastacio worked hard in the U.S.

36.     He sent most of his earnings to his parents in San Luis Potosi, and kept enough money to survive in California.

37.     After many years of working in construction-related projects, Anastacio became a skillful drywaller and plasterer.

38.     During the last couple of years before his death, Anatacio worked in the demolition and pool construction business.

///

39.     When he was approximately 21 years of age, Anastacio met Maria Puga, his lifetime partner, in San Diego.

40.     Anastacio and Maria had five children: Yeimi Judith, age 21; Daisy Alejandra, age 19; Fabian Anastacio, age 12; and Daniel and Daniela, both age 5.

41.     The children were born in San Diego, California.

42.     Anastacio loved his family.

### THE MAY 28, 2010 INCIDENT - KILLING OF ANASTACIO

43.     On May 28, 2010, at about 5:00 p.m., Border Patrol agents saw Anastacio and Pedro Hernandez Rojas ("Pedro"), Anastacio's youngest sibling, in the United States, in the mountainous area near Otay Mesa.

44.     A Border Patrol Agent arrested Pedro.

45.     While restraining Pedro, the Agent called for Anastacio to surrender.

46.     Anastacio obeyed the agent's command, walked 15 feet from his location over to the agent and his brother, and knelt down to allow the Agent to handcuff him to his brother.

47.     Anastacio and Pedro were compliant with the Border Patrol agent's commands and requests, they did not resist in any way.

48.     After the agent handcuffed Anastacio and Pedro, he led them to the location where he had left the Border Patrol vehicle.

49.     Half way to the vehicle, another agent approached Anastacio, Pedro and the first agent.

50.     Anastacio and Pedro were searched, and their information recorded.

51.     They were patted down for weapons or unlawful items by one agent while a second agent searched a backpack Anastacio was carrying.

52.     No unlawful items were found on Anastacio nor in the backpack.

53.     Neither Anastacio nor Pedro had difficulty walking or complained of pain during their detention and search.

54.     The Border Patrol agents turned over Anastacio and Pedro to agents of the Wackenhut Company.

55.    One Wackenhut employee patted down Anastacio and Pedro.

56.    The second employee secured Anastacio and Pedro on the Wackenhut transportation bus.

57.    The Wackenhut employees transported Anastacio and Pedro to the Border Patrol Detention Facility ("Barracks Five").

58.    Anastacio and Pedro followed the directions given by the Wakenhut employees.

59.    Upon arrival at the Detention Facility, the Wackenhut officers turned Anastacio and Pedro over to Border Patrol Agent  V315 and Border Patrol Agent V325.

60.    Anastacio and Pedro were directed to the Barracks 5's search area.

61.    Anastacio was carrying a large plastic jug of water in his hand.

62.    Agent V325 ordered Anastacio to dispose of the water and drop the jug into a nearby trash can.

63.    Anastacio poured the water into a trash can.

64.    As Anastacio emptied the jug, in compliance with what he perceived to be the agent's order, Agent V325, violently and without warning, slapped the jug from Anastacio's hand.

65.    Anastacio complained to Agent V325 about the slap on the hand.

66.    In response, Agent V325 grabbed Anastacio and pushed him toward a nearby wall.

67.    While Anastacio was facing the wall, Agent V325 repeatedly kicked the inside of Anastacio's ankles.

68.    Anastacio cried out in pain, and complained about the kicking.

69.    In response, Agent V325 mocked and ridiculed Anastacio, then handcuffed him.

70.    Anastacio wanted to receive medical treatment for the injury caused by Agent V325 and desired an opportunity to appear before an Immigration judge.

71.    Anastacio limped from the Barracks 5's search area into Agent V325's office.

72.    Inside the office, Anastacio complained about the slap and kicks and requested medical assistance.

73.    Anastacio requested an opportunity to appear before an Immigration judge to resolve his immigration status.

74.     Agent V325 disregarded Anastacio's complaints and requests.

75.     Anastacio was then taken to the Barracks 5's processing area.

76.     Once there, Anastacio complained to two other Border Patrol Agents about the physical abuse by Agent V325 and requested medical assistance and an opportunity to appear before an Immigration judge.

77.     Border Patrol Supervisor V61 spoke with Anastacio.

78.     Anastacio complained to Supervisor V61 about Agent V325's physical abuse of him and requested medical treatment and the right to appear before an Immigration judge.

79.     Anastacio explained that his ankle, which Agent V325 had repeatedly kicked, had been broken in the past and had a metal pin in it.

80.     Anastacio showed Supervisor VC1 the purple bruising on his ankle and explained that he was in pain because of V325's actions and needed medical care.

81.     Supervisor V61 declined to process Anastacio's complaint against Agent V325, denied Anastacio medical assistance for his injuries and rejected Anastacio's request to appear before an Immigration judge.

82.     Instead, in retaliation for Anastacio's complaint, Supervisor V61 ordered Agents V315 and V325, the latter being the agent who had assaulted Anastacio just a few minutes before, to immediately remove Anastacio from the U.S.

83.     Anastacio refused to waive his right to appear before an Immigration judge.

84.     Agent V315 handcuffed Anastacio.

85.     Agents V315 and V325 escorted Anastacio out of the detention facility's offices and into a Border Patrol car.

86.     Upon arrival at a border area designated by law enforcement as "Whiskey 2", located within the San Ysidro Port of Entry, V315 and V325 took Anastacio out of the car.

87.     Anastacio again requested medical treatment and asked to be heard by an Immigration judge before being removed from the U.S.

88.     In response, Agents V315 and V325 pushed Anastacio against the vehicle and tried to throw him to the ground.

89.     Immigration Enforcement Agent (IE) 7G2186, and Immigration Enforcement Agent 2054 (IE), arrived at the scene and repeatedly struck Anastacio's body with their batons.

90.     Border Patrol Agent L (d.o.b. 11/04/1969) arrived at the scene and repeatedly punched Anastacio.

91.     BP Agent V315, BP Agent V325, BP Agent L,( d.o.b. 11/04/1969), (IE) Agent 7G2186 and IE Agent 2054 threw Anastacio to the ground, and handcuffed him.

92.     While Anastacio was handcuffed and lying on his stomach, BP Agent V315, BP Agent V325, BP Agent L (d.o.b. 11/04/1969), IE Agent 7G2186 and IE Agent 2054 repeatedly punched, kicked and stepped on Anastacio's head and body.

93.     While these events occurred, a group of civilian bystanders observed the agents beating Anastacio.

94.     Many of those bystanders screamed for the agents to stop beating Anastacio.

95.     Some of those civilians took photographs and cell phone videos of the agents and officers beating Anastacio.

96.     U.S. Customs and Border Protection Supervisor CAQ03175, and a CBP Officer, among others, confiscated bystanders' telephones and cameras and erased the photographs and videos depicting the beating.

97.     Agents and officers were stepping on the back of Anastacio's neck and on his back while others punched and kicked Anastacio.

98.     Anastacio cried out for help, begging for his life and asking the agents to stop, saying "Please.  Stop.  Do not hurt me,"  "Help me," and "Please, no."

99.     In response to Anastacio's pleas for help, the BP, CBP and IEA agents tried to remove Anastacio from the publicly visible area where they were beating him.

100.    Approximately 20 to 25 agents were in the area of these events.

101.    Some of these agents stood so as to block the beating from public view.

102.    Agents B (d.o.b. 07/08/1969) and S (d.o.b. 10/27/1971) struck and battered Anastacio together with the original five agents who had beaten him.

103.    BP Supervisor I199, arrived at the scene in his marked vehicle.

104.    BP Supervisor I68, and BP Agent 1212, arrived at the scene.

105.    Instead of supervising and directing the intervening agents not to use excessive force upon Anastacio, BP Supervisor I199 and BP Supervisor I68 permitted and encouraged the agents to continue abusing Anastacio.

106.    CBP Officer V7663 yelled to the rest of the agents and officers of his intention to use his Taser gun.

107.    When the agents and officers jumped off of Anastacio's body, CBP Officer V7663 shot his Taser gun toward Anastacio.

108.    CBP Officer V7663 shot two darts attached to wires into Anastacio's body.

109.    CBP Officer V7663 then electrocuted Anastacio repeatedly by pulling the X-26 Taser's trigger.

110.    CBP Officer V7663 shot electricity for five seconds; then applied the electric voltage for another five seconds.

111.    He then electrocuted Anastacio a third time, sending thousands of volts of electricity into Anastacio's body for thirteen seconds.

112.    CBP Officer V7663 then shot the X-26 Taser a fourth time, for twelve seconds.

113.    During this electrocution, Anastacio Hernandez writhed in pain, screamed intermittently begging for help, and pleaded that the electrocution stop, by crying out "No, no" and "Please, no."

114.    CBP Officer V7663, after the fourth burst of electricity, then changed the mode of the Taser to "drive-stun" mode, and applied the electricity directly by placing the Taser directly against Anastacio's body and shocking him again.

115.    After the Tasering, multiple defendants, now including Border Patrol Agent L (d.o.b. 11/4/1969) Customs and Border Protection Agent B (d.o.b. 7/8/1969) and Customs and Border Protection Officer S (d.o.b. 10/27/1971) beat Anastacio, and ziptied his legs to his already handcuffed hands, putting him in a "hog tied" position on his stomach, further restricting Anastacio's ability to breathe.

116.    As a result of the beating, the restraint, the Tasering and the hog tie, Anastacio

1    suffered a heart attack.

2         117.    Anastacio was without oxygen to the brain for at least 8 minutes, as a result of

3    which he suffered brain death.

4                                      **AUTOPSY RESULTS**

5         118.    Dr. Marvin Pietruszka, M.D., J.D., F.C.A.P., a board certified clinical pathologist

6    conducted an autopsy of Anastacio Hernandez Rojas.  Dr. Pietruszka made the following findings:

7              a.       There is a hematoma above the right frontal incisor. Several teeth
            were loose.  There are hemorrhages in the gums under the incisors in the midline
8            inferiorly.

9              b.       The left upper anterior chest had a hematoma over an area
            measuring 6 x 8 cm.  There were linear markings giving a railroad track
10           appearance to the hematoma.  There is a hematoma of the left upper abdomen
            measuring 12 cm x 1.5 cm.  There is a hematoma of the right pelvis over an area
11           that measures 11 cm x 7 cm.

12             c.       An incision of the right hand reveals there to be subcutaneous
            hemorrhage, as well as in the right knee around the soft synovial tissue.

13             d.       An incision into the subcutaneous tissues of the upper back reveals
14           extensive hemorrhage extending deep to the muscle layer over a large area of the
            thorax.

15             e.       There are hematomas of both upper and lower lips, primarily on the
16           right.  As mentioned above, there are multiple contusions and abrasions of the head
            and face.  There are hematomas of the left temporal region.  There is a hematoma
17           on the left upper eyelid.  There is a subgaleal hemorrhage in the right occipital
            region, which extends to involve the entire occipital area.

18             f.       There is hemorrhage of the tissues surrounding the left 4th and 5th
19           ribs and hemorrhage of the 3rd, 4th and 5th ribs on the left.

20             g.       There is hemorrhage of the superior aspect of the dome of the liver.

21             h.       An x-ray of the chest (one view) reveals fractures of the 9th and 12th
            ribs on the right and fractures of the 8th, 11th and 12th ribs on the left.  There is
22           widening of the articulation of the thoracic vertebrae on the left.

23        119.    The Office of the Medical Examiner of San Diego County performed an autopsy.

24   The Medical Examiner found the manner of death to be homicide and the cause of death to be

25   lack of oxygen to the brain brought on by a heart attack.

26   ///

27   ///

28   ///

**FIRST CAUSE OF ACTION**
**(Retaliation For Exercise of Constitutional Rights: *Bivens*)**
**(By Estate of Anastacio Hernadez against all Defendants Except the United States)**

120.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full.

121.    The Constitution protects persons from the unnecessary and excessive use of force by government agents.  It permits persons whose rights have been violated to complain against those who have mistreated them.  The law permits prisoners to request necessary medical care from those who hold them in custody.  Federal statutory law provides a right to a hearing by an Immigration judge before removal from the United States.  The Constitution prohibits government officials from retaliating against a person for the exercise of constitutional or statutory rights.  This prohibition against retaliation, retaliatory action or retaliatory punishment is clearly established law.

122.    The actual operation of the Border Patrol relies upon the waiver of the right to a removal hearing and the return of apprehended persons without administrative or judicial process.  More than 90 percent of all Border Patrol arrestees are "v.r.ed" or returned to Mexico without process.  If any significant portion of the arrestees invoked their statutory right to a hearing, the enforcement mechanism would break down for lack of space and personnel.  Consequently, the system works only if arrestees quietly obey and waive their due process rights.

123.    The culture of the Border Patrol is critical of arrestees who seek to invoke their rights.  Border Patrol personnel characterize such persons (a small minority of arrestees) as "disruptive," "argumentative," or as "having a bad attitude."  This is in contrast to the majority of detainees who are "compliant."

124.    Defendants BPA V325, BPA V315, BP Supervisor V61 and CBP Agent 7663 retaliated against Anastacio Hernadez because of Anastacio's exercise of his Constitutional and statutory rights.

125.    The officials took these retaliatory actions in order to punish Anastacio for the exercise of those rights and to chill the exercise of those rights.  The actions that they took would chill or silence a person of ordinary firmness from future First Amendment activities.

126.    The actions alleged in this Complaint that defendants took were designed to, and did, inflict punishment on Anastacio Hernandez because he exercised his Constitutional and statutory rights including: seeking to press a grievance regarding mistreatment; requesting medical care; requesting a hearing before an Immigration judge to contest his removal from the United States; objecting to and protesting the actions of government agents in removing him illegally from the United States; and protesting the brutality inflicted on him at the Port of Entry.

127.    Defendant CPB Agent 7663 used the Taser against Anastacio to silence him during the imposition of brutality by other agents.

128.    The retaliation was immediate, physical and brutal.  Ultimately, it was fatal.

129.    Mr. Hernadez's first exercise of his Constitutional rights was his mild protest and request for an explanation after defendant BPA V325 smashed the water jug from Anastacio's hand.  This occurred after Anastacio had complied with defendant's order and poured water out of the jug and had begun to dispose of it.

130.    In response to this protest and to Anastacio's request for an explanation, defendant BPA V325 roughed up Anastacio.  He pushed Anastacio against a wall, kicked the insides of Anastacio's ankles and mocked and insulted Anastacio.

131.    Anastacio complained of BPA V325's misconduct and brought it to the attention of his supervisor, defendant BP Supervisor V61.

132.    Anastacio complained of pain in his ankle and repeatedly requested medical care. Anastacio refused to agree to a "voluntary departure" and sought to exercise his right to a removal hearing before a judge.

133.    Anastacio requested to be allowed to communicate with his family by telephone.

134.    Defendant BPA V325 retaliated against Anastacio by insulting him, pushing him, kicking his ankle and later by beating Anastacio and using excessive force against him.

135.    Defendant BP Supervisor V61 retaliated against Anastacio by denying him access to the established procedure for making complaints against mistreatment; by denying Anastacio his ability to obtain a hearing before removal; and by ordering Anastacio to be summarily and illegally removed from the U.S.

136.     V61 arranged to have BPA V325, who had already used excessive force against Anastacio, take Anastacio to the border and expel him from the United States.

137.     Defendant BPA 315 aided and abetted the actions of defendant V61 by assisting in Anastacio's removal with knowledge of its retaliatory and punitive purpose.

138.     CBP Agent 7663 and the other defendants escalated their brutalization of Anastacio because he was loudly crying out for them to stop their brutalization.

139.     The actions of the defendants at the Port of Entry were motivated by their desire to silence and to punish Anastacio for his crying out and for seeking to voice his pain and dismay at their treatment of him.

140.     Ultimately, their escalating brutality and retaliation resulted in Anastacio's voice being silenced forever.

**SECOND CAUSE OF ACTION**
**(Fifth Amendment Due Process Violation for Failure to Provide a Removal Hearing: *Bivens*)**
**[Estate of Anastacio Hernandez-Rojas against Defendants V61, V315, and V325]**

141.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full.

142.     Under the Fifth Amendment, aliens are entitled to due process of law in deportation proceedings.  Aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.

143.     During removal proceedings due process demands that the government provide the alien with the following: fair notice; a full and fair hearing; the opportunity for the alien to make arguments on his own behalf; and the right to an individualized determination by a neutral and impartial decision maker.

144.     A complete lack of process is inherently prejudicial.

145.     During his detention, Anastacio repeatedly requested to be permitted a hearing before an Immigration judge.

///

14

146.     Defendants V61, V315, and V325 rejected Anastacio's demands for a hearing and forcibly removed Anastacio without due process of law, and in violation of his statutorily guaranted right to a removal hearing.

147.     Defendants' denial of Anastacio's request for a full and fair removal hearing before an impartial decision maker violated his right to due process under the Fifth Amendment.

### THIRD CAUSE OF ACTION
(Wrongful Death: *Bivens* Action)
[By Estate of Anastacio Hernandez-Rojas Against all Defendants Except the United States]

148.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full.

149.     Defendants and DOES 1-25, inclusive, acting under color of federal law, committed wrongful acts which proximately caused the death of Anastacio Hernandez-Rojas. Specifically, the defendants and DOES 1-25, inclusive, deprived Anastacio Hernandez-Rojas of his rights under the United States Constitution to be free from the use of excessive force by law enforcement and punishment without due process.

150.     These acts resulted in the death of Anastacio Hernandez-Rojas.

151.     By these acts, the defendants violated Anastacio Hernandez-Rojas' constitutional rights to be free from excessive force, and from punishment without due process of law, rights guaranteed under the Fourth and Fifth Amendments.

152.     The officers used excessive force against Anastacio Hernandez-Rojas.  The force used was unreasonable and performed with a deliberate indifference to the safety and welfare of Anastacio Hernandez-Rojas.

153.     The conduct resulted in a deprivation of Plaintiffs rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiffs to suffer emotional distress, pain and suffering, and further general and special damages according to proof at the time of trial.

154.     The conduct was done in deliberate or reckless disregard of decedent's and plaintiffs' Constitutionally protected rights; justifying the award of exemplary damages against

defendants in an amount according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment. Plaintiffs are also entitled to attorney fees and costs of suit herein.

**FOURTH CAUSE OF ACTION**
**(Failure to Properly Supervise and Failure to Intervene: *Bivens* Action)**
**[By Estate of Anastacio Hernandez Rojas Against Defendants Border Patrol Supervisor I199, Border Patrol Supervisor I68, Customs and Border Patrol Supervisor CAQ03175]**

155.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full.

156.    Supervising officers had a duty to Plaintiffs to properly supervise employee officers that hold the power, authority, insignia, equipment and arms entrusted to them.

157.    Law enforcement officers who have a realistic opportunity to prevent a follow officer from violating a citizen's Constitutional rights have a duty to intervene to protect the victim from the unconstitutional retaliation, use of force or violation of due process of law.

158.    This was clearly established law.

159.    Defendant supervisors I199, CAQ03175 and I68, witnessed the excessive force, retaliatory beating, Tasing and hog tying of Anastacio.

160.    Defendant supervisors I199, CAQ03175, and I68 were present and witnessed the beating of Anastacio after he was handcuffed.

161.     Defendant supervisors I199, CAQ03175, and I68 saw Agent 7663 approach, announce that he was going to use his Taser and then employ it repeatedly.

162.    Defendant supervisors I199, CAQ03175, and I68  saw Anastacio was hog tied and placed face down.

163.    Defendant supervisors I199, CAQ03175, and 168 had sufficient time and opportunity to order that these wrongful actions be stopped.

164.    Defendant supervisors I199, CAQ03175, and 168  failed to intervene despite their legal obligation to do so in their supervisory position, which resulted in damage, including pain and suffering and death.

165.    In failing to intervene these three defendants acted with, at minimum, deliberate indifference to the Constitutional violations they witnessed.

166.    Defendant supervisors I199, CAQ03175, and 168 failed to properly supervise their employees.

167.    They were deliberately indifferent to the excessive force used by their subordinates, and failed to prevent the infliction of fatal injuries.

168.    As a result of the Defendants' failure to properly supervise, decedent suffered pain, suffering and ultimately, death.

**FIFTH CAUSE OF ACTION**
**(Right of Association: *Bivens* Action)**
**[By DAISY HERNANDEZ, YEIMI HERNANDEZ, FABIAN HERNANDEZ, DANIEL HERNANDEZ, and DANIELA HERNANDEZ against all defendants except the United States]**

169.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full.

170.    Defendants and DOES 1-25, inclusive, deprived Anastacio Hernandez-Rojas of his rights under the United States Constitution to be free from the use of excessive force by law enforcement and punishment without due process.

171.    By these acts, the defendants violated Anastacio Hernandez-Rojas' constitutional rights to be free from excessive force and punishment without due process of law.  The improper and unjustified use of deadly force used was objectively unreasonable and excessive and performed with a deliberate indifference to the safety and welfare of Anastacio Hernandez-Rojas.

172.    The deprivation of the rights alleged violated the Constitutional rights of Anastacio's five children, Daisy,  Yeimi, Fabian, Daniel, and Daniela to the familial love, society and companionship of their father, Anastacio Hernandez-Rojas, protected by the First and Fifth Amendments.

173.    The conduct violated Plaintiffs' associational rights and has actually caused Plaintiffs to suffer emotional distress, pain and suffering, and further general and special damages according to proof at the time of trial.

174.    The conduct alleged herein was done in deliberate or reckless disregard of decedent's and plaintiffs' Constitutionally protected right to familial association justifying the award of exemplary damages against defendants in an amount according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiffs are also entitled to attorney fees and costs of suit herein.

**SIXTH CAUSE OF ACTION**
**(Excessive Force in Violation of the Fourth Amendment: *Bivens*)**
**[Estate of Hernandez Rojas against Defendant BP Agent V352, BP Agent V315, IE Agent 2054, IE Agent 7G2186, BP Agent L, CBP Officer S, CBP Officer B, and Does 1-25]**

175.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full herein.

176.    BP Agent V325, BP Agent V315, IE Agent 2054, IE Agent 7G2186, BP Agent L, CBP Officer S, CBP Officer B, and Does 1-25 used excessive force against Anastacio Hernandez Rojas.

177.    The use of excessive force by these defendants was clearly in violation of the Fourth Amendment to the U.S. Constitution, and was in violation of clearly established law.

178.    As a result of these defendants' use of excessive force, Plaintiffs suffered damages as alleged in this complaint.

**SEVENTH CAUSE OF ACTION**
**(Torture by Taser as a Violation of the Fourth Amendment: *Bivens*)**
**[Estate of Hernandez Rojas against the United States]**

179.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full herein.

180.    The repeated electrocution by Taser of Anastacio Hernandez constituted the excessive use of force under the Fourth Amendment of the Constitution.

181.    This use of force was unnecessary and objectively unreasonable.  Anastacio was handcuffed and prone on the ground when Defendant 7663 Tased him four separate times, with bursts of electricity of five seconds, five seconds, thirteen seconds and twelve seconds.

182. After these four separate electrocutions, Defendant 7663 then used the "drive-stun" mode of the Taser to Tase Anastacio one more time.

183. In plain language, Defendant 7663's repeated application of electric shocks caused a heart attack, which caused lack of oxygen for a prolonged period, resulting in brain death.

**EIGHTH CAUSE OF ACTION**
**(Torture by Taser as a Violation of the Laws of Nations)**
**(FTCA and ATCA)**
**[Estate of Anastacio Hernandez-Rojas against The United States]**

184. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full. This cause of action is brought against Customs and Border Protection Agent 7663 under the Federal Tort Claims Act (28 U.S.C. §§ 2671-2680) and the Alien Tort Claims Act (28 U.S.C § 1350). As such the proper defendant is the United States.

185. The Detainee Treatment Act of 2005, in effect at the time of these events, provides in relevant part as follows:

"(a)    In General. No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.

(d)    Cruel, Inhuman, or Degrading Treatment or Punishment Defined. In this section, the term "cruel, inhuman, or degrading treatment or punishment" means the cruel , unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defended in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984." (42 U.S.C. § 2000 dd.)

The Military Commissions Act of 2006 provides in relevant part as follows:

"( c)    ADDITIONAL PROHIBITION ON CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT.

(1)    In General. No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman,

or degrading treatment or punishment.

(2)     Cruel, Inhuman, or Degrading Treatment or Punishment Defined. – In this subsection, the term "cruel, inhuman, or degrading treatment or punishment" means cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984.

(3)     Compliance. – The President shall take action to ensure compliance with this subsection, including through the establishment of administrative rules and procedures."

186.     The United States is a signatory to the Convention Against Torture.  That international convention provides in relevant part as follows:

"PART I
Article 1

1.     For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.  It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Article 2

1.     Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.

2.     No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.

3.     An order from a superior officer or a public authority may not be invoked as a justification of torture.

Article 11

Each State Party shall keep under systematic review interrogation rules, instructions, methods and practices as well as arrangements for the custody and treatment of persons subjected to any form of arrest, detention or imprisonment in any territory under its jurisdiction, with a view to preventing any cases of torture.

///

Article 12

Each State Party shall ensure that its competent authorities proceed to a prompt and impartial investigation, wherever there is reasonable ground to believe that an act of torture has been committed in any territory under its jurisdiction.

Article 13

Each State Party shall ensure that any individual who alleges he has been subjected to torture in any territory under its jurisdiction has the right to complain to, and to have his case promptly and impartially examined by, its competent authorities.  Steps shall be taken to ensure that the complainant and witnesses are protected against all ill-treatment or intimidation as a consequence of his complaint or any evidence given.

Article 14

1.      Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible.   In the event of the death of the victim as result of an act of torture, his dependants shall be entitled to compensation.  While the Senate ratification provided that the Convention is not self-executing, there is no question that it embodies the customary and universally accepted right to be free from torture."

187.    International law affords substantive rights to individuals and places limits on a state's treatment of those within its borders.

188.    Official torture is prohibited by the law of nations.

189.    In November, 2007, the United Nations Committee Against Torture, which assists in the interpretation and application of the Convention, pursuant to the Convention Against Torture found that the use of the Taser X-26 causes acute pain, and constitutes a form of torture. In certain cases, the X-26 can even cause death, as has been shown by reliable studies and recent real-life events, the Committee noted.

190.    In July, 2006, the Committee Against Torture expressed concern about the use by United States law enforcement personnel use of electroshock devices, which have caused several deaths.  The Committee stated that the United States should carefully review the use of electroshock devises, strictly regulate their use, restrict their use to that of being a substitute for lethal weapons, and eliminate the use of these devices to restrain persons in custody.

///

///

191.    Anastacio was handcuffed and prone on the ground, surrounded by twenty or more officials, when Defendant 7663 Tased him four separate times, with bursts of electricity of five seconds, five seconds, thirteen seconds and twelve seconds.

192.    After these four separate electrocutions, Defendant 7663 then used the "drive-stun" mode of the Taser to tase Anastacio one or two more times.

193.    The Taser caused a heart attack, which in turn caused Anastacio to cease breathing. Brain death resulted.

194.    Defendant 7663's use of the Taser on Anastacio in the way in which the use occurred constituted torture in violation of the law of nations.

**NINTH CAUSE OF ACTION**
**(Wrongful Death: CCP 377.60)**
**[All Plaintiffs Against The United States]**

195.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full.

196.    Anastacio Hernandez-Rojas' death was caused, in whole or part, by the conduct of the defendants, who owed decedent and plaintiffs a duty to act without unreasonable risk of harm or death to others.

197.    Defendants acted intentionally and/or negligently in causing the death of Anastacio Hernandez. Under the Federal Tort Claims Act, the United States is the Proper defendant for this cause of action.

198.    Anastacio Hernandez-Rojas is survived by his children, Daisy Hernandez, Yeimi Judith Hernandez, Fabian Hernandez,  a minor, Daniel Hernandez, a minor, and Daniela Hernandez, a minor.

199.    Monetary damages have resulted from Anastacio Hernandez-Rojas' death including but not limited to loss of support, services, and funeral expenses.

///

///

///

**TENTH CAUSE OF ACTION**
**(Assault and Battery)**
**[By the Estate of Anastacio Hernandez Rojas Against The United States]**

200.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full.

201.    The Defendants, and each of them, acted with an intent to cause harmful or offensive contact with the person of Anastacio Hernandez-Rojas and the intended harmful or offensive contact did in fact occur. Under the Federal Tort Claims Act, the United States is the Proper defendant for this cause of action.

202.    The harmful or offensive contact was not privileged nor consented to and was excessive, unreasonable and done with deliberate indifference to the rights and safety of Anastacio Hernandez-Rojas and was done with the intent to inflict punishment, above and beyond the reason for using the force in the first place.

203.    As a result of the Defendants' intent to cause harmful or offensive contact with the person of Anastacio Hernandez-Rojas and the fact that the intended harmful or offensive contact did in fact occur, Anastacio Hernandez-Rojas has suffered damages according to proof at the time of trial.

**ELEVENTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**
**[By the Estate of Anastacio Hernandez Rojas Against The United States]**

204.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full herein.

205.    By engaging in the acts alleged herein, the defendants engaged in outrageous conduct with an intent to or a reckless disregard of the probability of causing Anastacio Hernandez Rojas to suffer emotional distress. Under the Federal Tort Claims Act, the United States is the Proper defendant for this cause of action.

206.    As a direct, proximate and foreseeable result, Anastacio Hernandez Rojas suffered severe emotional distress and the outrageous conduct was the cause of the emotional distress suffered by Plaintiffs.

**TWELFTH CAUSE OF ACTION**
**(Negligence)**
**[By Estate of Anastacio Hernandez Against The United States]**

207.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full herein.

208.    Defendants had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Anastacio.

209.    By engaging in the acts alleged herein, the Defendants failed to act with ordinary care and breached their duty of care owed to Anastacio Hernandez-Rojas. Under the Federal Tort Claims Act, the United States is the proper defendant for this cause of action.

210.    As a direct, proximate and foreseeable result of the Defendants breach of their duty of care, Plaintiffs suffered damages in an amount according to proof at the time of trial.


**THIRTEENTH CAUSE OF ACTION**
**(Negligent Infliction of Emotional Distress)**
**[By Estate of Anastacio HernandezAgainst The United States]**

211.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full herein.

212.    By engaging in the acts alleged herein, the Defendants engaged in negligent conduct causing Plaintiffs to suffer serious emotional distress. Under the Federal Tort Claims Act, the United States is the Proper defendant for this cause of action.

213.    As a direct, proximate and foreseeable result, Plaintiffs suffered serious emotional distress and the outrageous conduct was the cause of the emotional distress suffered by Plaintiffs


**FOURTEENTH CAUSE OF ACTION**
**(Violation of the Unruh Act, California Civil Code 52.1)**
**[By Estates of Anastacio Hernandez Against The United States]**

214.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if those paragraphs were set forth in full herein.

215.    Anastacio Hernandez had a firmly established right to be free from excessive force under the Fourth Amendment to the United States Constitution, and to be free from retaliation for

expression of disapproval of police action under the First Amendment.  He had these same rights under the State Constitution of California.

216.    The California Legislature has declared that it violates the state civil rights act for any person to interfere with the exercise or enjoyment by any individual of his rights secured by the United States Constitution or state or federal law.  This includes any interference of these rights by threats, intimidation, coercion or attempted threats, intimidation or coercion.

217.    The defendants interfered with Anastacio Hernandez's right to be free from excessive force; to be free from retaliation for the exercise of his constitutional rights; and to be free from torture. Under the Federal Tort Claims Act, the United States is the proper defendant for this cause of action.

218.    This interference with Plaintiff's rights was perpetrated by the defendants in violation of section 52.1 and his rights under the First, Fourth and Fifth Amendments.

219.    Due to the violation of Plaintiffs' and decedent's rights by all defendants, Plaintiffs suffered economic damages and non-economic damages, including, but not limited to, emotional distress, pain and suffering, medical expenses and fear caused by the acts complained of herein according to proof at the time of trial.

220.    Plaintiffs are also entitled to the statutory civil penalties set forth in Civil Code § 52.1, attorneys' fees and costs of suit incurred herein.

**COLOR OF LAW**

Defendants acted under color of their authority as federal law enforcement agents.

**COMPENSATORY DAMAGES**

Plaintiffs were harmed by defendants' actions which caused monetary damage, pain and suffering and loss of companionship and support of the decedent.

**PUNITIVE DAMAGES**

The defendants, with respect to their actions as set forth in all causes of action, acted with

1   malice, oppression and fraud; and with reckless indifference to the Constitutionally protected

2   rights of Anastacio and his family, justifying punitive damages.

3

4                                    **PRAYER FOR RELIEF**

5          WHEREFORE, Plaintiffs pray as follows:

6          1.     For general and special damages according to proof at the time of trial;

7          2.     For costs of suit and interest incurred herein;

8          3.     For punitive damages;

9          4.     For attorneys' fees; and

10         5.     For injunctive or declaratory relief this Court deems just and proper, including an

11  injunction requiring the institution of appropriate supervision and prohibition of the unjustified

12  use of force because of the arrestees' expression of complaints.

13

14  Dated:   March 6, 2012              Respectfully submitted,

15                                      **LAW OFFICES OF EUGENE G. IREDALE**

16
                                        /s/   Eugene G. Iredale
17                                      EUGENE G. IREDALE
                                        105 West F St., Fourth Floor
18                                      San Diego, CA 92101
                                        (619) 233-1525
19                                      Attorney for Plaintiffs
                                        DANIEL HERNANDEZ, a minor, DANIELA
20                                      HERNANDEZ, a minor,  FABIAN HERNANDEZ, a minor,
                                        by and through their guardian *ad litem*, MARIA PUGA
21                                      MORAN, YEIMI HERNANDEZ, and  DAISY
                                        HERNANDEZ
22

23                                      **LAW OFFICES OF GUADALUPE VALENCIA**

24                                      /s/   Guadalupe Valencia
                                        GUADALUPE VALENCIA
25                                      105 West F St., Third Floor
                                        San Diego, CA 92101
26                                      (619) 232-2158
                                        Attorney for Plaintiff
27                                      ESTATE OF ANASTACIO HERNANDEZ-ROJAS, by and
                                        through its personal representative DAISY HERNANDEZ

28