Eugene G. Iredale,  SBN:  75292
Julia Yoo,  SBN: 231163
Grace Jun, SBN: 287973
IREDALE and YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL:  (619) 233-1525     FAX:    (619) 233-3221
Attorneys for Plaintiffs, DANIEL HERNANDEZ, a minor, DANIELA HERNANDEZ, a minor,
FABIAN HERNANDEZ, a minor, by and through their guardian *ad litem*, MARIA PUGA
MORAN, YEIMI HERNANDEZ, an individual, and  DAISY HERNANDEZ, an individual

Guadalupe Valencia, (SBN: 197831)
105 West F Street, Suite 309
San Diego, CA 92101-6036
TEL:  (619) 232-2588 FAX:         (619) 232-2158
Attorney for Plaintiff, ESTATE OF ANASTACIO HERNANDEZ-ROJAS, by its personal
representative, DAISY HERNANDEZ

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
### (Hon. M. James Lorenz)

| | |
|---|---|
| THE ESTATE OF ANASTACIO HERNANDEZ-ROJAS, *et. al.*<br><br>        Plaintiffs,<br><br>**V**.<br><br>UNITED STATES, *et. al.*<br><br>        Defendants. | CASE NO.: 11-cv-00522-L-DHB<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br><br>Hearing Date: September 30, 2013<br>Time: 10:30 a.m. |

# TABLE OF CONTENTS

I.      THE COMPLAINT AND THE PARTIES ...........................................1
II.     SUMMARY OF FACTS ..........................................................................2
III.    SUMMARY OF ARGUMENT .................................................................9
IV.     THE FACTS ..........................................................................................12
        A. Background of Anastacio Hernandez Rojas and his Relationship
           To the Plaintiffs ...........................................................................12
        B. Defendants at the Chula Vista Border Patrol Station Punished
           Anastacio for His Complaint Against Defendant Ducoing
           And His Request for Medical Care ................................................13
           1. Ducoing and Finn ignored Anastacio's complaints about
              Defendant Ducoing's abusive actions......................................16
        C. Anastacio is Transported to "Whiskey 2" at the SanYsidro
           Port of Entry ................................................................................20
           1. Defendants Ducoing and Krasielwicz Grab Anastacio and
              Wrestle Him to the Ground .....................................................20
           2. Defendants Narainesingh's and Piligrino's Justifications
              For the Use of their Batons is Contradicted by Ducoing
              And Krasielwicz......................................................................20
              a. Narainesingh ......................................................................23
              b. Piligrino..............................................................................25
           3. Testimony of Independent Witnesses Regarding Defendant
              Officers' Treatment of Anastacio Before He was Repeatedly
              Tased .......................................................................................29
              a. Ashley Young ......................................................................29
              b. Humberto Navarrete.............................................................33
              c. Sergio Gonzalez ..................................................................38
              d. Osvaldo Chavez ..................................................................40
        D. Anastacio is Forcibly Restrained, Repeatedly Tased and Brutalized
           By a Swarm of Officers..................................................................41
           1. Perspective of Independent, Nonparty Witnesses ....................41
              a. Ashley Young ......................................................................41
              b. Humberto Navarrete.............................................................45
              c. Rafael Barriga-Pulido..........................................................45
              d. Salomar Ramirez .................................................................49
           2. Defendants' Statements...........................................................49
              a. Andre Piligrino....................................................................50

    b.  Alan Boutwell .................................................................50

    c.  Defendant Supervisor Ramon De Jesus...............................52

E.  Defendant De Jesus Purposely Destroyed Material Evidence
    Regarding the Violent Treatment and Death of Anastacio .............52

F.  Medical Evidence Shows that Defendants Caused
    Anastacio's Death............................................................................55

    1.  Evidence of Trauma to Anastacio's Body .............................56

    2.  Evidence Regarding Positional Asphyxia..............................62

    3.  Evidence Regarding Use of the Taser....................................63

    4.  Acidosis.................................................................................64

    5.  Cause of Death ......................................................................65

    6.  Evidence Suggests the Blood Sample Which Tested Positive
       For Methamphetamine is Not Actually Anastacio's Blood.......67

G.  Defendants' Self-Serving Testimony is Contradicted by
    Video and Audio Evidence and Undermined by Conflicting
    Witness Testimony ..........................................................................73

    1.  Ishmael Finn Immediately Deported Anastacio as Punishment
       For Anastacio's Complaints Regarding Ducoing's
       Misconduct ............................................................................73

       a.  Defendant Finn failed to follow established Border
          Patrol protocol governing the provision of medical care to
          Detainees .........................................................................76

       b.  Finn knowingly violated Border Patrol policy regulating
          Reports of officer misconduct against detainees .................77

       c.  Finn retaliated against Anastacio to punish him...................78

    2.  Defendants Narainesingh's and Piligrino's Account is
       Disputed by Their Co-Defendants' Testimony.........................80

    3.  Defendant Vales Repeatedly Tased Anastacio While He Lay,
       Unresisting, Handcuffed on the Ground ..................................84

       a.  Witness testimony and video evidence controvert
          Defendants' claims that Anastacio was kicking, thrashing
          And resisting during the Tasings ..........................................84

       b.  Anastacio did not kick, thrash, or resist Defendant Vales'
          Commands even when the Taser allegedly failed to
          Deliver an electrical current...............................................87

       c.  Vales knew his use of the Taser on a compliant and
          Unresisting Anastacio Hernandez-Rojas was lawful............90

    4.  Defendant Supervisors Failed to Intervene to Stop Officers

and Agents from Needlessly Brutalizing a Passive Unresisting Anastacio ......................................................................93

5. Defendant Avila Relies on Claims That are Not corroborated By Any Other Witness and that are Patently False in the Face Of Audio and Video Evidence ....................................................94

6. Defendant Llewellyn Knelt On Anastacio's Head and Neck After Vales Tased Anastacio......................................................97

7. Defendants Deliberately Subjected Anastacio to Positional Asphyxia, Despite Defendants' Training and Knowledge Regarding the Danger ..............................................................99

V.   DEFENDANTS HAVE THE BURDEN TO PROVE QUALIFIED IMMUNITY ......................................................................101

A. Defendants have failed to Meet Their Burden Pursuant to FRCP Rule 56.................................................................................102

B. Plaintiffs Move to Strike the Expert Opinions Submitted in Support of Defendants' Summary Judgment Motions.................103

VI.  THE MOTIONS TO DISMISS THE FIRST AMENDMENT RETALIATION CLAIM SHOULD BE DENIED ...........................106

VII. THE DEFENDANS HAVE NO VALID QUALIFIED IMMUNITY DEFENSE TO THE CLAIMS OF EXCESSIVE FORCE AND WRONGFUL DEATH.......................................................113

VIII. DEFENDANT VALES HAS NO LEGITIMATE CLAIM THAT HIS CONDUCT WAS NOT CLEARLY ILLEGAL........................120

IX.  THE APPROPRIATE STANDARD APPLICABLE TO THE FAMILIAL ASSOCIATION CAUSE OF ACTION IS "DELIBERATE INDIFFERENCE" ..............................................123

X.   BECAUSE DEFENDANTS' INTENTIONAL CONDUCT WAS A SUBSTANTIAL FACTOR IN CAUSING ANASTACIO'S DEATH, THEY ARE LIABLE FOR HIS DEATH..........................127

A. Proximate Cause Analysis In This Case Is Governed by Common Law Tort Principles.......................................................128

B. Substantial Factor Causation Applies in this Case........................128

C. Applicable Jury Instructions Set Forth the Applicable Causation Requirement .............................................................130

D. A Recent Ninth Circuit Opinion Precludes a Grant of Summary Judgment in Favor of Defendants on the Issue of Causation........131

E. On The Negligence Cause of Action Defendants are Also liable..................................................................................135

XI.  PLAINTIFFS MAY RECOVER FOR ANASTACIO'S PAIN

AND SUFFERING BEFORE HIS DEATH ......................................137

XII.  THE UNTED STATES' REQUEST TO DISMISS THE
      NEGLIGENCE CAUSE OF ACTION IS CONTRARY
      TO THE LAW ..................................................................142

XIII. THE COURT SHOULD DENY DEFENDANS' MOTION TO
      DISMISS A NON-EXISTENT "FOURTEENTH AMENDMENT"
      CLAIM REGARDING MEDICAL CARE........................................143

XIV.  CONCLUSION

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)  134

*Alexander v. City and County of San Francisco*,
    29 F.3d 1355 (9th Cir. 1994)  115

*Alexander v. Beale St. Blues Co.*, 108 F.Supp.2d 934 (W.D.Tenn.1999)  119

*Alvarado v. City of Santa Ana*,
    SACV 12-0328 JGB ANX (C.D. Cal. May 21, 2013)  126

*American Motorcycle Associate v. Superior Court*, 20 Cal.3d 578 (1978)  136

*Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696 (1966)  138

*Banks v. Yokemick,* 177 F.Supp.2d 239 (S.D.N.Y.2001)  140

*Bass by Lewis v. Wallenstein,* 769 F.2d 1173 (7th Cir.1985)  140

*Beck v. City of Upland*, 527 F.3d 853 (9th Cir.2008)  112

*Bell v. Milwaukee,* 746 F.2d 1205 (7th Cir.1984)  140

*Benigni v. City of Hemet*, 879 F.2d 473 (9th Cir. 1989)  102

*Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir.1990)  140

*Billington v. Smith,* 292 F.3d 1177 (9th Cir.2002)  142

*Bozeman v. Orum*, 199 F.Supp.2d 1216 (M.D.Ala.2002)  119

*Brawer v. Horowitz,* 535 F.2d 830 (3rd Cir. 1976)  139

*Brooks v. Seattle,* 661 F.3d 433 (9th Cir. 2011)  121

*Bryan v. MacPherson*, 590 F.2d 767 (9th Cir. 2009)  121, 122

*Bryan v. MacPherson*, 608 F.3d 614 (9th Cir. 2010)  121, 123

*Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010)  121, 122

*Cardinal v. Buchnoff*, 2010 WL 1337489 (S.D. Cal. Apr. 5, 2010). 138, 140, 141

*Carey v. Piphus,* 435 U.S. 247 (1978)  138

*Carlson v. Green*, 446 U.S. 14 (1980)                                                    138

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)                                 103, 134

*City of Houston v. Hill*, 482 U.S. 451 (1987)                                   110, 111

*Connell v. Signoracci*, 153 F.3d 74 (2d Cir. 1998)                                112

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998)                    124, 125, 127

*Crawford-El v. Britton*, 523 U.S. 574 (1998)                                      102

*Cudjo v. Ayers*, 698 F.3d 752 (9th Cir. 2012)                                      104

*Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001)                         112

*Cyrus v. Town of Mukwonago*, 624 F. 3d 856 (7th Cir. 2010)                        128

*Daniels v. Williams*, 474 U.S. 327 (1986)                                         142

*Davis v. City of Ellensburg,* 651 F. Supp. 1248 (E.D.Wash.1987)                   140

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir.2001)                    114, 115, 119

*Drummond v. City of Anaheim,*

    343 F.3d 1052 (9th Cir. 2003)                        116, 117, 118, 119, 120

*Dupris v. McDonald* 2012 WL 210722, 3 (D.Ariz., 2012)                              102

*Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990)                           111

*Egevary v. Young*, 366 F.3d 238 (3d Cir. 2004)                                     128

*Espinosa v. Little Co. of Mary Hosp.*,

    31 Cal. App. 4th 1304 (Ct. App. 1995)                                   130

*Estate of Kosakoff ex rel. Kosakoff v. City of San Diego*,

    460 F. App'x 652 (9th Cir. 2011)                                         126

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002)                        125

*Farmer v. Brennan* (1994) 511 U.S. 825                                             142

*Ford v. City of Yakima* 706 F.3d 1188 (9th Cir. 2013)                              110

*Garcia v. Whitehead,* 961 F. Supp. 230 (C.D.Cal.1997)                              140

*Gilbaugh v. Balzer,* No. 2001 WL 34041889 (D.Or. June 7, 2001)                     140

*Goka v. Bobbitt*, 862 F.2d 646 (7th Cir. 1988) 103

*Graham v. Connor* 490 U.S. 386 (1988) 108, 114, 115, 120

*Greene v. Barber* 310 F.3d 889 (6th Cir. 2002) 113

*Guerrero v. County of San Benito,*
2009 WL 4251435 (N.D.Cal. Nov. 23, 2009) 140

*Guyton v. Phillips,* 532 F.Supp. 1154 (N.D.Cal.1981) 139, 140

*Hammer v. Gross*, supra, 932 F.2d at 846 115

*Hayes v. Cnty. of San Diego,* 305 P.3d 252 (2013). 143

*Heath v. City of Hialeah*, 560 F. Supp. 840 (S.D. Fla. 1983) 140

*Hirschfield v. San Diego Unified Port Dist.,*
2009 WL 3248101 (S.D.Cal. Oct.8, 2009) 140, 141

*Hughey v. Candoli,* 159 Cal.App.2d 231 (Ct. App. 1958) 137

*Jaco v. Bloechle,* 739 F.2d 239 (6th Cir.1984) 140

*Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D.Ohio 1999) 119

*Jones v. Martel* 2011 WL 720066 (E.D.Cal., 2011) 102

*Jones v. Parmley* 465 F.3d 46 (2nd Cir. 2006) 113

*Jones v. Ralls*, 187 F.3d 848 (8th Cir.1999) 119

*Kosakoff v. City of San Diego*,
08-CV-1819UEGNLS, 2010 WL 1759455 (S.D. Cal. Apr. 29, 2010) 126

*Krechman v. County of Riverside*,
2013 WL 3824913 (9th Cir. 2013) 131, 134, 135

*LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000) 116

*Liston v. County of Riverside*, 120 F.3d 965 10[ (9th Cir.1997) 114, 115

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) 123

*McClurg v. Maricopa Cnty.,* 2011 WL 4434029 (D.Ariz. Sept. 23, 2011) 140

*Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283 (9th Cir.1999) 111

*Monroe v. Pape*, 365 U.S. 167 (1961)                                          128

*Moreno v. Baca*, 431 F.3d 633 (9th Cir. 2005)                                 102

*Morgan v. County of Nassau* 720 F.Supp.2d 229 (E.D.N.Y. 2010)                 113

*Moreland v. Las Vegas Metro. Police Dep't,*
  159 F.3d 365 (9th Cir.1998)                                        124

*Osborn v. Irwin Mem'l Blood Bank,*
  5 Cal. App. 4th 234 (Ct. App. 1992)                      129, 130, 135

*Peraza v. Delameter,* 722 F.2d 1455 (9th Cir.1984)                            139

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008)                             125

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)             134

*Rivas v. City of Passaic,* 365 F.3d 181 (3d Cir.2004)                         125

*Robertson v. Wegmann,* 436 U.S. 584 (1978)                                    139

*Russ v. Watts,* 414 F.3d 783 (7th Cir.2005)                                   140

*Rutherford v. Owens-Illinois, Inc.,*
  16 Cal. 4th 953 (1997)                         114, 115, 129, 130, 136

*Sanchez v. Pereira-Castillo*, 590 F. 3d 31 (1st Cir. 2009)                    128

*Santos v. Gates*, 287 F.3d 846 (9th Cir.2002)                                114

*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994)                          116, 121

*Tate v. Canonica* , 180 Cal.App.2d 898 (Ct. App. 1960)                       129

*T.D.W. v. Riverside Cnty.,* 2009 WL 2252072 (S.D.Cal. July 27, 2009)          140

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949)                           111

*Ting v. United States*, 927 F.2d 1504 (9th Cir. 1991)                        116

*Tofano v. Reidel*, 61 F.Supp.2d 289 (D.N.J.1999)                             119

*United States Fid. & Guar. Co. v. Am. Employer's Ins. Co.,*
  159 Cal. App. 3d 277, (Ct. App. 1984)                             130

*United States v. Bailey*, 444 U.S. 394 (1980)                                104

*United States v. Scheffer*, 523 U.S. 303 (1998)     104

*Van Strum v. Lawn*, 940 F.2d 406 (9th Cir. 1991)     139

**OTHER**

Ninth Circuit Pattern Jury Instruction §9.8 on Causation     130, 131

California Civil Jury Instruction (CACI) §3025     131

Jury Instruction §52.1     131

42 U.S.C. § 1988(a)     139

Fed. R. Evid. Rule 702     104

# I.
## THE COMPLAINT AND THE PARTIES

The Plaintiffs are the Estate of Anastacio Hernandez and four of his surviving children, the three youngest of whom are represented by their mother and guardian *ad litem*, Maria Puga.

This case involves *Bivens* claims against 12 federal officers and Federal Tort Claims Act causes of action against the United States. The defendants are Jerry Vales (Customs and Border Protection Agent 7663); Gabriel Ducoing (Border Patrol Agent V325); Philip Krasielwicz (Border Patrol Agent V315); Andre Piligrino (Immigration Enforcement Agent 2054); Harinzo Naraineisingh (Immigration Enforcement Agent 7G2186); Derrick Llewellyn (Border Patrol Agent L (d.o.b. 11/4/1969)); Alan Boutwell (Customs and Border Protection Agent B (d.o.b. 7/8/1969)); Kurt Sauer (Customs and Border Protection Officer S (d.o.b. 10/27/1971)); Ishmael Finn (Border Patrol Supervisor V61); Guillermo Avila (Border Patrol Supervisor I199); Edward Caliri (Border Patrol Supervisor I68); and Ramon De Jesus (Customs and Border Protection Supervisor CAQ03175).

The causes of action alleged under *Bivens* against the officials as individuals are: Retaliation for exercise of First Amendment rights; Wrongful death; Failure to supervise and failure to intervene (against three supervisory defendants); Violation of the right of familial association; excessive force; and torture by taser as a violation of the Fourth Amendment (against defendant Vales only).

The causes of action alleged under the Federal Tort Claims Act against the United States are: Torture by Taser as a violation of the Law of Nation and the Alien Tort Claims Act; Wrongful death; Assault and battery; negligence and violation of California Civil Code §52.

The plaintiffs have no objection to dismissal of the second cause of action which alleged a Fifth Amendment Due Process violation for denial of a removal hearing. The eleventh and thirteenth causes of action against the United States (negligent and intentional infliction of emotional distress) have been previously dismissed.

## II.
## SUMMARY OF FACTS

On May 28, 2010, at the San Ysidro Port of Entry, witness Humberto Navarrete captured on his cell phone video the sounds of Anastacio Hernandez Rojas, crying out in pain and pleading for help, in the last moments of his life:

> [Anastacio] "Que les hago?"  *( What did I do?)*
> [Anastacio]  "Ayudenme."  *(Help me)*
> [Anastacio]  "Ah. No! No! Ayuda!  Ayúdenme!  Ya! Por favor! Señores ayúdenme! Ay, ay, ay."
> *(Ah. No! No! Help! Help me! Please! People help me! Ay, ay, ay.)*
> [Male's voice] "Stop resisting"
> [Anastacio]  "Ayuden me por favor!" *(Help me please! )*
> [Anastacio]  "Me tratan como  un animal" "Ah, ah, ah.  No. Ayuda.  No!  Ay ay."  *("You're treating me like an animal")* *("Ah, ah, ah. No. Help. No! Ay ay.")*
> [Female voice] "Ya dejenlo!" *( Leave him alone!)*
> [Anastacio] "No!"

11-cv-00522-L-DHB

[Female voice] "Hay, esta madre!"   *(Damn, this shit!)*
[Anastacio]   "No. No. No. Ay! No. No!  Quitenmelo!  Mama!
Ay! No!" *(No. No. No. Oh! No. No! Take him off me! Mother!
Ay! No! ")*

(Exh. 15, video taken by Humberto Navarette on May 28, 2010, file "Vid
00004.AVI", beginning at 00:03; *see also* Exh. 18, transcript of video taken by
Humberto Navarette, file "Vid 00004.AVI".)

On that date, seven known independent witnesses watched as federal agents
swarmed Anastacio, smothering him with their weight as he lay on the ground in
handcuffs, kicking him, ripping off his pants, and repeatedly Tasing him.  The
officers only ceased brutalizing Anastacio when they realized he had stopped
breathing.  He was taken to a hospital that night and declared brain dead upon
admission.

Two witnesses, Ashley Young and Humberto Navarette, recorded video of
parts of the incident.  But for the actions of government agents, more video
evidence of the incident would have existed.  Defendant Ramon De Jesus, a
Customs and Border Protection supervisor, and other government agents seized
cell phones and deleted video evidence of the events that other members of the
public had recorded.

This case involves repeated Constitutional violations, with Defendants
exhibiting a pattern of increasing callousness and brutality.  Anastacio's contact
with Defendants began at the Chula Vista Border Patrol facility on May 28, 2010.
Anastacio was transported there after having been arrested with his brother, Pedro

11-cv-00522-L-DHB

Hernandez, crossing into the United States.  He and his brother were transported by bus from the border area to the facility.

At the outdoor entry of the Chula Vista facility, Defendant Ducoing, a Border Patrol agent, told Anastacio, who was carrying a jug of water, to "put the water in the trash."  Ducoing became angry because Anastacio poured the water into the trash can instead of putting the jug itself in the trash. Rather than attribute Anastacio's action to literal compliance with his order (or the result of the order's ambiguity), Ducoing chose to perceive it as defiance. Precipitously slapping the jug out of Anastacio's hands, he then roughly grabbed Anastacio, pushed him against a wall, kicked his ankles apart, and then kicked at one of Anastacio's belongings in anger. Ducoing handcuffed Anastacio, then marched him into a processing room.

The surveillance video taken at the station shows Ducoing hovering above the seated and handcuffed Anastacio, with Border Patrol agent Krasielwickz standing behind Anastacio. Although Ducoing knew he was required by regulation to report any accusations of a wrongdoing made against him by prisoners to his superiors, he never told anyone that Anastacio had asked him "Why did you hit me?", "Why did you kick me?" and that Anastacio complained that Ducoing had injured his ankle (which had been broken many years before and was held together by a metal screw).  Although Ducoing claimed that he spoke to Anastacio in a

small interview room for only five minutes, the video shows that he spoke with Anastacio in a large processing room for almost half an hour (Plaintiffs believe in an effort to talk Anastacio out of complaining about his conduct).  After Anastacio's handcuffs are removed, Anastacio is seen pointing to his ankle and rubbing it.

Anastacio was then taken to a different processing room, where video surveillance again shows him rubbing his ankle, and gesturing to it as he talks to officers.  The video shows him gesturing to Border Patrol Supervisor Finn. The statements of Robinson Ramirez, another agent, confirm that Anastacio asked for medical care, and complained that one of Finn's agents (Ducoing) kicked him and injured his ankle. Instead of providing the medical care as requested, or processing Anastacio's complaint as required, Finn took immediate retaliatory action: he ordered Anastacio removed forthwith to the border and immediately expelled to Mexico. Anastacio was never permitted to use the telephone to call a relative or to contact the Mexican Consulate, despite Finn's insistence at deposition that the use of the phone is permitted to any detainee who asks. Finn ordered agents Krasielwickz and Ducoing (the agent who had slapped the jug from Anastacio's hands, kicked his ankles, grabbed him roughly, and against whom he had complained to Finn) to take custody of Anastacio, transport and return him to Mexico. This order was in direct violation, not only of common sense, but of the

regulations of the Border Patrol, which require immediate separation of prisoners from officers about whom they have made complaints of misconduct.

At the border, just before walking to the gate to Mexico, Ducoing and Krasielwickz claim they un-handcuffed Anastacio, who lowered his hands. At this point both agents then suddenly "grabbed" Anastacio and a struggle ensued. Krasielwickz and Ducoing state that Anastcio never punched them or assumed a boxer's stance. Two defendant ICE Agents, Piligrino and Naraineisingh, insisted in written reports and at deposition that Anastacio punched all four agents: themselves and Border Patrol agents Ducoing and Krasielwickz. At his deposition, Defendant Piligrino insisted, despite the contradictory testimony of every other witness and despite his failure to ever mention a belt in his written report or during his interview with San Diego police investigators, that Anastacio was wildly swinging a belt at these agents.  Piligrino testified that Anastacio struck the Border Patrol agents with this belt (the Border Patrol agents, Ducoing and Krasielwicz, never saw a belt and never claimed to have been struck by one). Piligrino and Naraineisingh began whacking away with their batons, striking Anastacio in the diaphragm (the autopsy showed a long "railroad track" hematoma 3/4 of an inch deep and 1.5 inches long in his abdomen) and swinging so wildly that the Border Patrol agents yelled at them to stop hitting because the batons were striking the Border Patrol agents.

11-cv-00522-L-DHB

These four defendants (Ducoing, Krasielwickz, Piligrino, Naraineisingh) and a fifth Border Patrol agent, Llewellyn, forced Anastacio to the ground, handcuffed him behind his back and then began to press on his back, while Anastacio was face down on the pavement.

For the next twenty minutes, the events described by third party witnesses recount a continuous pattern of brutality and retaliation. Ashley Young and her friend, Mayra Salas, viewed the events. Ashley Young heard Anastacio's cries for help as she saw officers using "extreme force" on a man who was not resisting. She saw agents kneeling "on top" of Anastacio, who was not struggling. She witnessed Anastacio face down, handcuffed, on the ground. She saw, at one point, an officer with his knee in Anastacio's lower back and his right arm braced against Anastacio's shoulder. During the entire time Anastacio was completely passive. He only yelled for help, and said that he had done nothing.

Two officers, supervisory defendant Caliri and another officer, arrived on ATVs (all-terrain vehicles) in the area. Anastacio remained on his stomach handcuffed, with a knee pressing on his back. The only resistance Ms. Young witnessed was that after officers attempted to throw Anastacio into an SUV, he braced his feet against the door to avoid being thrown into the car. Anastacio never kicked, spat, tried to bite, head-butt, or harm the agents.

Another witness, Humberto Navarrete, viewed the events from ground level.

He witnessed no resistance at any time from the handcuffed and prone Anastacio. He saw two officers holding Anastacio, one with a knee on his back, and one with a knee on his neck. Mr. Navarrete recorded on his cell phone Anastacio's pleas to the agents to stop hurting him. During this time Anastacio asked "What did I do?", pleaded "Help me, please", cried out in pain, complained that he was being treated like an animal, and begged the agents to stop pressing on him ("Take him off me! Mother! Ay! No!") Mr. Navarrete saw agents punch Anastacio in the ribs and kick Anastacio. Anastacio did not kick, bite, head-butt or show any signs of resistance. What Mr. Navarrete witnessed was so brutal and so obviously wrong, that he yelled "He is not resisting guys! Why do you guys keep pressing on him?" [1]

Mr. Gonzalez, a friend of Mr. Navarrete, witnessed Anastacio being held down and abused. Another friend, Osvaldo Chavez, corroborated the testimony of Messrs. Navarrete and Gonzalez.

These independent witnesses saw the arrival of Border Patrol agent Vales, who screamed "Stop resisting, stop resisting" to the supine and unresisting Anastacio. Vales fired off his Taser in probe mode. Anastacio convulsed and screamed in agony. There were four tasings in total, the last being a drive stun, in which the Taser is pressed directly against the victim's flesh.

---

[1] Humberto Navarrete had been employed as a security guard on the San Diego Trolley. He had been trained in basic police procedure, the proper use of force and the law of arrest and search and seizure.

After the last Tasing, officers swarmed Anastacio, putting him in a face-down position, holding him down with their weight, pressing on him and binding his ankles. In Ashley Young's video, defendants Boutwell and Sauer are seen holding Anastacio face down. An agent, believed to be Llewellyn, is crushing Anastacio's head with his knee on top of it. Anastacio suffered a fatal heart attack and consequent brain death as the cumulative result of his brutalization over a period of twenty minutes or more.

During this time, three supervisory personnel, Caliri, De Jesus and Avila witnessed these events, but none made any effort to intervene or stop the brutality. De Jesus ordered witnesses to leave the scene after Vales said on his radio that he saw witnesses who might be recording his actions. De Jesus destroyed video evidence taken by these witnesses.

### III.
### SUMMARY OF ARGUMENT

The defendants in this case now make multiple summary judgment motions. They rely on their self-serving statements, which claim that Anastacio, while face down and handcuffed, was a serious danger to them, constantly kicking, head-butting, trying to bite, cursing and even repeatedly smashing the back of his own head against the pavement. *Not one of their motions* mentions the evidence of third party witnesses and videotapes that contradict their claims. Their legal arguments are neither based on fact nor grounded in law.

11-cv-00522-L-DHB

The one-sided factual presentation of all defendants makes their motions for summary judgment frivolous. Instead of presenting the evidence in the light most favorable to the non-moving party, they have chosen to present the facts in the light most favorable to themselves. They do not even mention the contrary evidence of third party witnesses such as Ashley Young and Humberto Navarrete. They do not mention the uncontradicted evidence of the videotapes made from government cameras at the Border Patrol Station where Anastacio was initially held. They do not mention the video segments made by the witnesses at the Port of Entry. They fail to apprise the Court of the evidence from Mexican officials who witnessed the events at the border. They entirely ignore the contradictions between the testimony of the various defendants themselves, and ignore the conflict between deposition testimony they gave and videotape evidence which proves that testimony to be false. One defendant, Vales, refused to give critical testimony at his deposition based on claiming the Fifth Amendment, and now asks the Court consider his expert's opinion based on what Vales has said. By failing to make a fair initial presentation of the evidence in the light *most favorable* to plaintiffs, defendants have forfeited any claim to this Court's time and effort in analyzing their motions. The grossly misleading factual submission put before the Court, in rank defiance of the basic principles of factual presentation on Rule 56 motions, should result in the summary denial of their motions.

Defendants' presentation of their legal arguments is skewed. Defendants make a bizarre argument that because the retaliation for exercising his right to complain included among other things, the use of brutality by certain defendants, Anastacio's First Amendment retaliation claim may not be pressed, since the analysis of whether excessive force was used is to be done under the Fourth Amendment. The simple response is that when defendants brutalized Anastacio for crying out, asking for help, and begging them to stop, as retaliation for his complaints, they were violating the First Amendment. When they used grossly disproportionate force, they violated the Fourth Amendment. The issue of the First Amendment retaliation is conceptually distinct from Fourth Amendment excessive force. The fact that defendants committed two wrongs (punishing Anastacio for complaining and using grossly excessive force to restrain him) does not give them a free pass on the First Amendment retaliation violation.

Ninth Circuit case law in closely analogous cases makes clear that the agents' actions here constituted excessive force, and gave fair notice to any reasonable agent that their actions contravened the law. The cumulative effect of the actions of these joint tortfeasors caused Anastacio's death, and they are all liable as joint tortfeasors for the death caused by their individual and joint actions which were substantial factors in causing Anastacio's death. The deprivation of the right of familial association is supported by sufficient evidence under the

governing legal standard. Defendant Finn's motion to preclude Anastacio's estate from recovery for pre-death suffering under *Bivens* is not well taken. Finn and Krasielwickz make to dismiss a non-existent "Fourteenth Amendment" claim from the case, which motions should be deemed as moot. The government's motion to seek dismissal of the FTCA negligence action if defendants have qualified immunity has no valid legal support.

Plaintiffs do not object to the dismissal of the second cause of action (for denial of a removal hearing), and agree that the eleventh and thirteenth causes of action (for intentional and negligent infliction of emotional distress) have been properly dismissed.

## IV.
## THE FACTS

### A. Background of Anastacio Hernandez-Rojas and His Relationship to the Plaintiffs

Anastacio Hernandez Rojas is survived by five U.S. citizen children and his life-long partner, Maria Puga, the mother of his children. (Exh. 60, Dep. Tr. Maria Puga, Vol. I, at 17:23 – 18:9; 44:21-25.) Their children are Yeimi (23), Daisy (21), Fabian (14), and the two twins, Daniela and Daniel, who are currently seven years of age. (*Id*. at 17:23 – 18:9.) Attached hereto as exhibit 56 are photos of Anastacio with his children. Maria Puga began her relationship with Anastacio in 1989. (*Id*. at 45:7-19.) He supported his family by working as a pool plasterer.

(*Id*.at 70:23-25.)  The last time Maria, Fabian and Daisy saw Anastacio was on May 30, 2010, at the hospital where he had already been declared brain dead.  (*Id*. 89:6 – 90:9.)  He appeared bruised and beaten, as if he had been hit and dragged on the ground.  (*Id*. 92:2 – 93:22.)  A purple bruise covered the right side of his face and his lips were split.  (*Id*.)

Initially, Maria told Daniel and Daniela that their father had passed away because he was sick (Daniel and Daniela were four years old at the time of Anastacio's death).  (*Id*. at 151:19 – 152:3.)  Several months later, the children saw a news story regarding Anastacio on the television, which prompted Daniela to begin asking questions.  (*Id*. 152:4-15.)  Maria finally told her youngest children that Anastacio had been killed by officers.  (*Id*.)

The three youngest children have experienced extreme difficulty coping with the death of their father.  (*Id*. at 150:7-23; 138:5-17; 248:14-18.)  When he was alive, Anastacio would take his children to the beach and to the park, watch movies together, have meals with them, and color with his children.  (*Id*. 147:10-16.)  In the afternoons, he would take his children outside to play with them and even built swings for them outside.  (*Id*.)

///

///

///

**B. Defendants at the Chula Vista Border Patrol Station Punished Anastacio for His Complaint Against Defendant Ducoing and His Request for Medical Care**

On the evening of May 28, 2010, Anastacio Hernandez Rojas was brought to the Chula Vista Border Patrol Station, also known as building 919.  (Exhibit 2, Dep. Tr. Philip J. Krasielwicz, 17:4-8; 48:2-30)   Anastacio and his brother Pedro exited a bus that arrived at the 919 building.  (Exhibit 1, Dep. Tr. Gabriel Ducoing, 23:13-20; Exhibit 3 (surveillance video of 919) at 00:36; Exh. 39, camera 19 surveillance video of 919, file VTS_01_1.VOB, at 00:40[1].)   Defendants Ducoing and Krasielwicz, and another uniformed Border Patrol agent, Robinson Ramirez, were outside of 919.  (Exh. 1 at 19:19-21; Exh. 6, transcript of audio recording of San Diego Police Department (SDPD) interview of Robinson Ramirez.)

According to the sworn deposition testimony of Defendants Ducoing and Krasielwicz, "eight" individuals in addition to Anastacio and Pedro exited a bus and came into building 919.  (Exh. 1 at 23:13-20; Exh. 2 at 48:2-30; 49:24-50:2.)  Surveillance video from building 919, however, shows only two people, Anastacio and Pedro, exiting a bus and entering an enclosed area outside of building 919.  (Exh.  3 at 00:38; exh. 39 at 00:40-00:50.)  According to Susana Santoyo, the Wackenhut Transport officer who transported both Anastacio and Pedro to the

---

[1] All references to time markers in video exhibits submitted in support of Plaintiffs' opposition are references to the time reference displayed on the bottom bar of the media player.

Chula Vista Border Patrol facility, Anastacio and Pedro were the only two people on the bus.  (Exh. 10, SDPD Investigator's Report, Witness Statement of Susana Santoyo (hereinafter "Exhibit 10").)  Ms. Santoyo recalled that Anastacio was quiet and cooperative on the Wackenhut bus.  (*Id.*)

Once at the Chula Vista Border Patrol facility, Defendant Ducoing ordered Anastacio in Spanish to "ponga el agua en basura" (put the water in the trash).  (Exh. 1, 27:15 – 28:8.)  Ducoing expected Anastacio to obey his command the first time.  (*Id.* at 50:9-11.)   Anastacio poured the water into the trash can.  (*Id.* at 36:19-37:12.)  According to Defendant Ducoing, Anastacio should have understood Ducoing's command as being one to throw the water jug in the trash, not to pour out the water in the trash, which is what Anastacio did.  (Exh. 1, 36:19-37:12.)

Pedro Hernandez observed that the officer who ordered Anastacio to throw the water away became angry with Anastacio.  (Exh. 5, transcript of SDPD interview of Pedro Hernandez, at 16.)  Surveillance video from building 919 shows Anastacio pouring water out of a jug into the trash can within seconds of the time Ducoing points to him and the trash.  (Exh. 3 at 00:44; exh. 39 at 00:45 – 00:52.)  Though Anastacio complied with the order to throw away the water, Defendant Ducoing hit the water bottle to knock it in the trash can.  (Exh. 2 at 59:10-14.)  The officer grabbed Anastacio and roughly pushed him against a wall.  (Exh. 5 at 16;

exh. 3 at 00:46; exh. 39 at 00:52 – 01:00.)[2]  The officer kicked Anastacio's foot. (Exh. 5 at 16.) This caused Anastacio pain because he had screws placed in his ankles from a previous work accident.  (*Id*. at 7.)  Pedro Hernandez told SDPD investigators that Anastacio asked the officer "why are you doing this to us?  Why are you hitting us?  We haven't done anything wrong."  (Exh. 5 at 16.)  The officer responded "you don't want to be beaten?"  (*Id*.)  Anastacio stated "if you think it's the right thing to do, go ahead, but he (*sic*) haven't done anything, we aren't criminals."  (*Id*.)

**1. Ducoing and Finn ignored Anastacio's complaints about Defendant Ducoing's abusive actions**

Defendant Ducoing placed handcuffs on Anastacio and took him into a large processing room in the 919 building.  (Exh. 1 at 40:7-15.)  (Ducoing testified that he was in a "small" interview room with Anastacio for five minutes.)  (*Id*. at 50:13-17.)  Surveillance video of building 919 shows that Ducoing was in a processing room with Anastacio for approximately 27 minutes.  (Exh. 39, surveillance video time clock from 19:10:16 – 19:37:06.)  In the interview room, Anastacio accused Defendant Ducoing of hurting his ankles.  (Exh. 1 at 47:6-21.)  Anastacio asked "why did you hit me?" and told Ducoing "you hurt my ankle."  (*Id*. at 47:2-9.)  The 919 building surveillance video shows Anastacio gesturing towards his ankle

---

[2] Attached hereto as exhibit 20 is an enhanced video of surveillance footage from the Chula Vista Border Patrol facility showing Defendant Ducoing roughly grabbing and pushing Anastacio after Anastacio pours the water into the trash.

and rubbing it as he speaks to Ducoing.  (Exh. 3 at 07:16-07:37; Exh. 39 at 07:38 –

08:35.)  At his deposition, Ducoing admitted that Anastacio's complaint regarding

his ankle was an accusation against Ducoing.  (Exh. 1 at 47:6-21.)

As part of his training, Ducoing was taught that when a prisoner makes a

complaint of misconduct against an officer, that officer is to cease interactions with

the prisoner, alert a supervisor, and permit the prisoner to make the complaint to

the supervisor.  (*Id.* 12:4 – 14; 13:3-12.)  Though he understood Anastacio's

statement to be an accusation, Ducoing did not stop the interview to permit his

supervisor, Defendant Finn, to come talk to Anastacio.  (*Id.* at 47:18-21.)  Ducoing

never informed Supervisor Finn that Anastacio had made a complaint that Ducoing

had hit him.  (*Id.* at 50:18-23.)  Ducoing never informed Supervisor Finn that he

had slapped a water jug out of Anastacio's hand, that Anastacio had accused him

of hitting and kicking him or that Anastacio had complained about pain in his

ankle after Ducoing had kicked Anastacio's ankles.  (*Id.* 60:9-21.)

Anastacio was eventually taken from the large room to another processing

area of building 919.  (Exh. 3 at 10:39; Exh. 39 at 11:10; Exh. 1 at 52:10-12.)

Surveillance video shows Anastacio visibly limping when he leaves the interview

room and enters the processing area.  (Exh. 3 at 10:30-10:50; Exh. 39 at 11:10 –

11:15; Exh. 38, camera 8 surveillance video, file VTS_01_1.VOB at 10:28 –

10:34.)  Anastacio took his shoe off in the processing area.  (Exh. 6, transcript of

audio recording of SDPD interview of Robinson Ramirez, at 303.)  Border Patrol

agent Robinson Ramirez, who was at building 919, told San Diego Homicide

Detective Paul Connelly that Anastacio's foot was poorly bandaged and an old scar

appeared over his ankle.  (*Id*.)  Anastacio expressed that he was in pain because

agents had bumped or kicked his ankles.  (*Id*.)  Defendant Krasielwicz disliked that

Anastacio was complaining in a loud tone and believed Anastacio was not showing

respect.  (Exh. 2 at 78:19-22; 79:5-7.)  Krasielwicz likes it when people show him

respect as an officer. (*Id*. 79:8-13.)

When interviewed by San Diego Police Department detectives, Border

Patrol agent Sandra Cardenas, who was at the Chula Vista facility, stated that

Anastacio had asked Officer Galvan if he could use the phone.  (Exh. 47, transcript

of audio recording of SDPD interview of Sandra Cardenas, at 7:13-21.)  Anastacio

complained to Cardenas about his injured ankle.  (*Id*. at 9:6-22.)  Cardenas

examined Anastacio's ankle.  (*Id*.)  According to Robinson Ramirez, Cardenas

stated that she used to be nurse and that nothing was wrong with Anastacio's ankle.

(Exh. 6 at 303.)

Surveillance video shows Cardenas "examining" Anastacio's ankle by

looking from a distance of 4 to 5 feet without touching Anastacio's ankle.  (Exh.

37, surveillance video from Chula Vista Border Patrol Station, camera 9, file

"VTS_01_2.VOB", at times 6:18 to 6:42.)  The examination appears to consist of

Anastacio showing Cardenas his ankle and gesturing to parts of his ankle while

Cardenas stands and observes for less than twenty-five seconds.  (*Id*.)

After "examining" Anastacio's ankle, Cardenas asked Galvan if an EMT had

already been called.  (Exh. 47 at 9:24 – 10:7.)  Galvan informed her that they were

waiting for a supervisor to determine how to proceed.  (*Id*.)  Anastacio asked

Cardenas if he could use the phone and she told him to wait.  (*Id*. 10:11-13.)

Eventually, Defendant Ishmael Finn, the facility supervisor, approached

Anastacio to speak with him.  (Exh. 1 at 54:23-55:5; Exh. 3 at 20:11; Exh. 37 at

09:45.)  When Anastacio spoke to Finn, he repeatedly pointed to his ankle, which

had a wrapping around it.  (Exh. 2 at 78:2-9.)   Anastacio told Finn that one of his

agents had caused an injury to his ankle; he expressed the desire for medical

attention.  (Exh. 6 at 304.)  At his deposition Defendant Finn admitted that

Anastacio asked to see a doctor.  (Exh. 7, Dep. Tr. Ishmael Finn at 60:10-12.)  Finn

denied medical care to Anastacio.  (*Id*. 53:7-10.)

After speaking to Anastacio, Finn told him that he would be going back to

Mexico.  (Exh. 6 at 304.)  Because Anastacio was being "problematic," Finn

"arranged for him to be transported to Mexico right away."  (*Id*.)  As Anastacio

exhibited difficulty with walking, Krasielwicz and Robinson Ramirez helped him

to the vehicle that would transport Anastacio to the Port of Entry. (*Id*. at 305.)

While being escorted the vehicle, Anastacio complained, stating that his foot hurt

and that he could not walk. (*Id.*)  Surveillance video of building 919 shows Anastacio noticeably limping as he leaves the interview room with Ducoing and enters the processing room.  (Exh. 3 at 10:30-10:50; Exh. 39 at 11:10 – 11:15; Exh. 38 at 10:28 – 10:34.)

**C. Anastacio is transported to "Whiskey 2" at the San Ysidro Port of Entry**

**1.  Defendants Ducoing and Krasielwicz grab Anastacio and wrestle him to the ground**

After handcuffing Anastacio and placing him in a Tahoe SUV, Defendants Krasielwicz and Ducoing transported Anastacio to an area known as "Whiskey 2" (W-2) at the Port of Entry.  (Exh. 1 at 62:10-23; Exh. 2 at 87:7-12.)  They arrived at a fenced in area in Whiskey 2.  (Exh. 1 at 65:13-15.)  Anastacio, Ducoing and Krasielwicz walked about 15-20 feet away from the Tahoe SUV; Ducoing held one of Anastacio's arms while Krasielwicz held Anastacio's other arm.  (*Id.* 66:8-13.)

Either Ducoing or Krasielwicz took one handcuff off Anastacio.  (Exh. 1 67:7-11; Exh. 2 92:13-18.)  Either Ducoing or Krasielwicz ordered Anastacio to place his hands on top of his head.  (Exh. 1 67:12-15; Exh. 2 at 93:1-3.)  Krasielwicz testified that Anastacio, instead of putting his hands on his head, moved his hands downward.  (Exh. 2 at 93:4-6.)  According to Ducoing, as he took the handcuffs off  Anastacio, Anastacio moved one hand towards his waistband while Ducoing held his other hand. ( Exh. 1 67:7-11.)  In contrast, Krasielwicz

stated that Anastacio's hands were both uncuffed when Anastacio moved his hand downwards. (Exh. 2 at 93:25 – 94:3.)

Earlier, at building 919, Krasielwicz had searched Anastacio and found no weapons or contraband on Anastacio's person. (Exh. 2 at 51:11-16.) Despite this, Krasielwicz became uneasy as Anastacio was "moving around too much" when both handcuffs were off. (*Id*. at 94:4-6.) Krasielwicz grabbed Anastacio to gain control of him. (*Id*. at 94: 7-17.) Ducoing also grabbed Anastacio. (Exh. 1 at 68:13-17.) Defendant Ducoing was on one side of Anastacio while Krasielwicz was on the other side; Anastacio struggled with them. (Exh. 2 94:25 – 95:3.) Anastacio did not punch either Defendants Ducoing or Krasielwicz. (Exh. 1 at 71:2-6.) Although Anastacio flailed and made contact with Krasielwicz and Ducoing, he did not punch them. (*Id*. 70:2-12.) There was commotion and the movement of arms and elbows, but no punching. (*Id*. 71:15 – 72:3.)

Before, Krasielwicz had noticed that there were two ICE agents in this area as he took one handcuff off of Anastacio[3]. (Exh. 2 92:13-18.) About 10-20 seconds after he grabbed Anastacio, he heard these ICE agents use batons on Anastacio. (Exh. 2 95:20 – 96:4.) Krasielwicz was struck on the forearm by a baton. (*Id*. 97:4-9.) An ICE agent wielding a collapsible baton also struck Defendant Ducoing's leg. (Exh. 1 at 74:25 – 75:4.) Ducoing told the agents to

---

[3]  The ICE agents were later identified as Defendants Narainesingh and Pilligrino.

stop using their batons and they complied.  (*Id.* 75:12-16.)  Ducoing, Krasielwicz, the other agents and Anastacio quickly fell to the ground.  (*Id.* 75:22-24; Exh. 2 at 96:20-22.)  Anastacio was lying on his stomach.  (Exh. 1 at 75:25 – 76:1.) Ducoing heard Anastacio cry out for help in Spanish.  (*Id.* 76:12-14.)  Ducoing and the other agents pressed down on Anastacio's back.  (*Id.* 76:18 – 77:13.)

Ducoing testified at his deposition that he had studied positional asphyxia. (Exh. 1 at 77:20-22.)  He knew that persons who are on their stomachs and in a strained position with pressure on their backs can die from positional asphyxia. (*Id.* 77:23 – 78:5.)  Ducoing admitted that Anastacio was on his stomach, with his hands cuffed behind his back, and held down by agents, including Ducoing, who were pressing down on him. (*Id.* 78:6-25.)  These agents pressed down on Anastacio's back.  (*Id.* 77:4-9.)

Defendant Ducoing estimated that Anastacio was on the ground for 20 minutes until the officer with the Taser (Vales) arrived.  (Exh. 1 at 81:15-18.) Approximately 20 agents descended into the area with Anastacio and the officer with the Taser. (*Id.* 82:20-22.)  When Ducoing heard the words "clear," he was away and was not on Anastacio. (*Id.* 82:2-6.)  He claimed he did not know who was on Anastacio when the command "clear" was given. (*Id.* 82:7-9.)  Once the Taser was used, Ducoing remained in the vicinity of Anastacio, behind the group of people who were there. (*Id.* 83:11-14.)  Krasielwicz was on the outer circle of

11-cv-00522-L-DHB

agents who surrounded Anastacio. (Exh. 2 at 102:17-19.)  He too heard the words

"clear" and witnessed the use of the Taser on Anastacio.  (*Id*. 102:20 – 103:16.)

Krasielwicz testified that at no point did he hear a supervisor state "Stop.  Get off

the man," or words to that effect. (*Id*. 105:7-10.)  Nor did he hear, at any point, a

supervisor inquire "what's going on here?" (*Id*. 105:11-13.)

> ## 2. Defendants Narainesingh's and Piligrino's justifications for their use of their batons on Anastacio are contradicted by the accounts of Ducoing and Krasielwicz

### a. <u>Narainesingh</u>

Defendant Narainesingh is an Immigration and Customs Enforcement (ICE)

Agent who was working at the San Ysidro Port of Entry on May 28, 2010.  (Exh.

8, Dep. Tr. Harinzo Narainesingh, 11:17-24; 12:17-20.)  He was with his partner,

Defendant Piligrino.  (*Id*. 41:15 – 42:8.)  Defendant Narainesingh saw Defendants

Ducoing and Krasielwicz in the company of Anastacio. (*Id*. 41:10-14.)  Piligrino

asked Krasielwicz or Ducoing if "they were good to go" or words to that effect.

(*Id*. 41:15-19.)  In response, one of the agents gave a thumbs-up sign. (*Id*. 41:20-

22.)  Scuffling and shouting by one of the Border Patrol agents drew

Narainesingh's attention to Defendants Krasielwicz and Ducoing again. (*Id*. 43:1-

8.)  Narainesingh claims that he saw Anastacio "throwing punches." (*Id*. 43:15-

16.) Contrary to the testimony of other agents, Narainesingh claims that Anastacio

swung his arms as if he were in a boxing match, (*Id*. 43:17 – 44:16) and that

Anastacio threw 3 to 4 punches. (*Id.* 44:21-24.)  Narainesingh's deposition

testimony is contradicted by the testimony of Defendant Ducoing who testified that

Anastacio did not punch him or Krasielwicz and that Anastacio never took a

boxer's stance with his arms moving in a punching motion.  (Exh. 1 at 71:2-11.)

Narainesingh snapped his baton open to its full length, walked forward and

issued verbal commands to Anastacio.  (Exh. 8 at 46:22 – 47:3; 51:11-16.)  He

held his baton in one hand while trying to deflect Anastacio's punches.  (*Id.* 49:9-

13.)  He claimed that Anastacio threw 3-4 punches with both hands.  (*Id.* 47:16-

19.)  While Anastacio was throwing punches at Narainesingh, Ducoing sat by the

fence.  (*Id.* 47:20-25.)  Narainesingh testified that Krasielwicz was "still trying to

catch up to the whole area." (*Id.* 48:1-4.)  Narainesingh struck Anastacio's outer

thigh area with his baton. (*Id.* 48:8-15.)  He struck Anastacio 3-4 times. (*Id.* 48:16-

17.)  He struck Krasielwicz in the arm 2-3 times with his baton. (*Id.* 48:18 – 49:4;

49:19-21.)  He hit Krasielwicz when Krasielwicz's arm was around Anastacio's

torso area. (*Id.* 50:5-7.)

Narainesingh grabbed Anastacio and they wound up falling onto the ground

about 10 seconds after he finished hitting Anastacio with the baton.  (*Id.* 51:22 –

52:8.)  Handcuffs were placed on Anastacio who lay face down on the ground.  (*Id.*

52:10-15, 22-25.)  The officers continued to hold Anastacio down while he lay face

down on the ground.  (*Id.* 53:1-3.)  Defendants Piligrino, Ducoing, and Krasielwicz

all held Anastacio down. (*Id.* 53:4-9.)  Narainesingh was on Anastacio's right side, Piligrino was on Anastacio's legs and Krasielwicz held Anastacio down by the waist area. (*Id.* 53:13-22; 54:7-8.)

After placing Anastacio in handcuffs, the agents called for a service vehicle with a caged unit. (*Id.* 55:23 – 56:10.)  When the officers tried to place Anastacio into the cage, Anastacio kicked off the service vehicle, fell back and landed on top of Narainesingh. (*Id.* 57:10-16; 58:9-15.)  Narainesingh claims, in contrast to all other witnesses, that Anastacio was on top on him, essentially sitting on Narainesingh's lap, when the CBP officer with the Taser arrived. (*Id.* 57:17-23; 58:14-24.)  Narainesingh estimated that 20 minutes had passed from the time he became involved with Anastacio to the time the CBP officer arrived with the Taser. (*Id.* 62:25 – 63:6.)

Once the CBP officer with the Taser arrived, Narainesingh moved away. (*Id.* 58:25 – 59:2.)  After the arrival of the officer with the Taser, Narainesingh only recalled that four agents, in addition to some officers sitting on ATVs, were in the area. (*Id.* 59:3-60:1.) (The video shows in excess of fifteen)  He believed the CBP officer used the Taser three times on Anastacio; Narainesingh heard the clicking sound of a Taser twice and witnessed the Taser held to the body of Anastacio, though he did not hear the sound of the Taser the third time.  (*Id.* 56:21-57:6.)

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b. <u>Piligrino</u>**

Defendant Andre Piligrino is an Immigration and Customs Enforcement Agent.  (Exh. 9, Dep. Tr. Andre Piligrino, 10:3-4, 7-15.)  On the night of the incident, Defendant Piligrino saw Anastacio, Ducoing, and Krasielwicz in the area of Whiskey 2.  (*Id*. 82:2-9).  Krasielwicz and Ducoing were in plain clothes that night and Piligrino believed them to be Border Patrol agents. (*Id*. 83:6-17.)

Piligrino witnessed Ducoing remove the handcuffs from Anastacio. (*Id*. 84:20-85:1.)  Krasielwicz gave Piligrino a thumbs up sign. (*Id*. 85:2-6.)  Piligrino began to walk towards his vehicle, a black Tahoe, which was parked nearby. (*Id*. 85:7-11.)  Piligrino claimed that he saw Anastacio swing his arm with his hand in a fist, (*Id*. 86:24-87:1.) and that he estimated that Anastacio swung 5-10 times. (*Id*. 87:2-8.)  At his deposition, Piligrino claimed, for the first time, that Anastacio had a belt in his hand that he was swinging around. [4]  (*Id*. 87:9-15.)  Anastacio struck Ducoing with the belt in Ducoing's head/chest area.  (*Id*. 87:21-24.)  Anastacio swung his belt with his right hand, punched with his left fist, then swung his belt again.  (*Id*. 88:2-5.)  This continued until Anastacio had pinned Ducoing against the fence; Anastacio's back was to Piligrino.  (*Id*. 88:6-20.)  Piligrino estimated

---

[4]  Piligrino filed a written report, which was completed within hours of the incident; within weeks, he was interviewed by SDPD homicide detectives.  In neither statement is there any mention of a belt being swung.  *See* section III(F)(2) below.

that Anastacio had swung his belt 5-10 times at either Krasielwicz or Ducoing. (*Id.* at 88:21-24.)

Piligrino deployed his baton when he saw Anastacio pin Ducoing against the fence. (*Id.* 90:4-8.) Piligrino wielded a baton made of steel. (*Id.* 64:9-10.) He struck Anastacio 3-4 times that night with that steel baton. (*Id.* 70:24 - 71:5.) Piligrino struck the front side of Anastacio's leg because Anastacio, Krasielwicz and Ducoing were moving towards him. (*Id.* 90:9-12; 93:15-20.) Piligrino swung the baton with both hands and he pivoted, shifting his weight from back to front as he brought the baton through its motion. (*Id.* 92:13-23.) Narainesingh was behind Piligrino when Piligrino was swinging his baton. (*Id.* 93:21-23.) Piligrino sheathed his baton and put his hands on Anastacio when Anastacio fell forward. (*Id.* 94:1-17.) When Anastacio fell on the ground, he fell on his "stomach/side." (*Id.* 95:1-2.)

Krasielwicz got on top of Anastacio; Piligrino got on top of Anastacio's legs; and Ducoing got on top of Anastacio's side. (*Id.* 95:11-22.) Anastacio was face down on the ground and his hands were cuffed behind his back. (*Id.* 95:23-25; 99:2-7.) Anastacio screamed "ayudame," which means "help me." (*Id.* 100:25 – 101:2.) Piligrino held Anastacio down for approximately 20 minutes before the officer with the Taser arrived. (*Id.* 102:6-12.) Anastacio was face down while being held down with his hands cuffed behind his back. (*Id.* 103:6-11.)

When the officer with the Taser arrived, Piligrino got up and moved away from Anastacio. (*Id*. 103:18-20.)  He moved approximately 20-30 feet away from Anastacio. (*Id*. 103:21-25.)  He saw about 20 agents in the area. (*Id*. 105:14-16.)  Piligrino did not hear anyone say "Stop.  You don't need to Tase this man," or words to that effect. (*Id*. 105:14-16.)  He did not hear anyone say "We've got 20 people here.  You don't need to Tase him," or words to that effect. (*Id*. 105:17-19.)  Defendant Vales, the officer with the Taser, was the only one giving orders at this point. (*Id*. 105:20-22.)

Defendant Piligrino testified at his deposition that the use of the baton falls in the middle of the continuum of force. (*Id*. 68:21-24.)  Piligrino was trained at the Federal Law Enforcement Training Center regarding force and the use of force. (*Id*. 58:18-20.)  He was taught that "green areas" are areas on the body that can be properly struck with a baton. (*Id*. 73:1-6.)  "Green areas" include the thigh, the calves, and the arms. (*Id*.)  "Yellow areas" are areas of the body that one can still strike, but one should strike the green zones first. (*Id*. 73:10-15.)  "Yellow areas" include joints and the mid-section.  (*Id*. at 73:1-6.)  "Red areas," where one cannot strike with a baton, are the cranium, sternum, spine, and chest. (*Id*. 73:1-6; 16-17.)[5]

---

[5]  Defendant Narainesingh testified at his deposition that he was trained at both the Border Patrol Academy and the ICE academy regarding the use of the baton. (Exh. 8 at 28:2 – 29:6; 35:23 – 36:3.)  The red zone meant forbidden areas of the body where one was not permitted to hit with a baton and included the head, spine, chest, and groin.  (*Id*.)  "Yellow areas" where areas that one was trained not to

Defendant Piligrino testified that it is forbidden to hit someone in the diaphragm to stun them or to take their breath away. (*Id*. 122:3-11.)  He was taught at the Federal Law Enforcement Training Center that it was improper to strike a person in the diaphragm. (*Id*. 123:13-19.)

### 3. Testimony of Independent Witnesses Regarding Defendant Officers' Treatment of Anastacio Before He was Repeatedly Tased.

### a. <u>Ashley Young</u>

Witness Ashley Young and her friend, Mayra Salas, drove down from Los Angeles to spend a weekend in San Diego.  (Exh. 21, Dep. Tr. Ashley Young, at 65:18-25; 66:1-8.)  Ashley and Mayra visited Tijuana and returned to the U.S. around 8:00 p.m.  (*Id*. at 69:14:-23; 71:1.)  They walked across the pedestrian overpass. (*Id*. 71:15-18.)  Just before the start of a chain link fence on the pedestrian overpass, Ashley heard someone yelling "ayudame" (help). (*Id*. 72:1-8.)  She and Mayra crossed the overpass and stopped to witness the events. (*Id*. 72:6-11.)  Exhibit 210 to Ashley Young's deposition is a photograph that shows where Ashley witnessed events. (*Id*. 71:8-25.)  The photograph is attached hereto as Exhibit 22 (hereinafter "exhibit 22").  The arrow with a long line indicates the direction in which Ashley walked on the overpass after crossing the border back

strike because it could cause serious injury. (*Id*. at 30:4-11.)  Yellow areas included joints, elbows and knees. (*Id*.)

into the U.S.  (Exh. 21 at 71:12-22.)  The "x" on exhibit 22 marks the location where Ashley stopped to watch the incident involving Anastacio. (*Id*. 71:23-25.)

Ashley and Mayra stopped on the overpass because they heard someone yelling "ayudame." (*Id*. 72:1-19.)  The manner in which the person was yelling "help" in Spanish aroused concern in both Ashley and Mayra. (*Id*.)  They stopped to witness the incident. (*Id*.)  Ashley recorded four videos of the incident on her camera. (*Id*. 79:1-3).  She was at position "x" on exhibit 20 for the entire time she recorded video. (*Id*.)  She stayed at position "x" for twenty minutes. (*Id*. 73:2-5.)  Ashley started to record video because she saw officers using extreme force on a man on the ground who was not resisting. (*Id*. 80:1-11.)  It seemed "off-putting" to Ashley "that they would be kneeling on top of him when he wasn't struggling." (*Id*. 80:10-11.)

The first video segment Ashley recorded involved two officers. (*Id*. 75:21 – 76:3.)  When she began recording, she saw Anastacio with his pants down to his knees and his hands cuffed behind his back. (*Id*. 80:4-23.)  Anastacio had on boxers or briefs. (*Id*. 84:16-18.)  He was facedown and there were two officers near him. (*Id*. 80:4-23.) She had a clear view of Anastacio. (*Id*. 83:3-4.)  Ashley's actual view of events was much better than what is shown on her first video segment. (*Id*. 81:24 – 82:4.)  She saw two officers in street clothing. (*Id*. 82:9-14.) One officer had a red and white striped shirt and a black jacket. (*Id*.)  Another officer wore

dark clothing and he was on top of Anastacio. (*Id*.)  The officer with the striped shirt paced along the fence while on his cell phone. (*Id*. 83:9-10.)  Anastacio continued to yell "ayudame" and "no hice nada" (I didn't do anything). (*Id*. 84:5-8.)  He was not resisting. (*Id*. 82:22-24.)

Ashley stopped recording because there wasn't enough storage room on her SD card and she wanted to conserve her battery. (*Id*. 84:25 – 85:5.)  Four to five minutes passed before she began recording video again. (*Id*.)  During those four to five minutes, the officer continued to have his arm and knee pressed against Anastacio. (*Id*. 86:11-19.)  The officer had his knee against Anastacio's lower back and his right arm braced against Anastacio's right shoulder. (*Id*. 86:25 – 87:2; 87:11-15.)  The man on top of Anastacio faced Ashley while his back was towards an Explorer or some type of SUV. (*Id*. 83:8-13.)  The other officer continued to pace back and forth. (*Id*. 86:11-19.)  Throughout the entire four to five minute period, Anastacio was completely passive. (*Id*. 87:24 – 88:3.)  He continued to yell "ayudame.  Ayudame.  No hice nada." (*Id*. 88:4-6.)  Other pedestrians made comments and conversed about what was occurring. (*Id*.)

Ashley started recording video again when she saw two additional officers in dark green clothing arrive on ATVs. (*Id*. 88:10-14.)  The second video she recorded involved four officers, the original two officers plus the two officers who arrived on ATVs. (*Id*. 76:11-18.)  The second video shows the arrival of the two

officers on ATVs. (*Id*. 90:18-25.)  The headlights of the ATV are visible on the second video. (*Id*.)  One of the ATV officers approaches the man kneeling on Anastacio while the other ATV officer approached the man walking along the fence who was talking on his cell phone. (*Id*.)  Anastacio remained physically passive and was not moving. (*Id*. 91:10-13.)  He yelled "ayudame.  No hice nada." (*Id*. 91:16-18.)  Anastacio remained on his stomach, in handcuffs, and the officer continued to have his knee on Anastacio's back. (*Id*. 91:19 – 92:1.)

Ashley's view of Anastacio became blocked by one of the newly arrived officers. (*Id*. 92:2-9.)  She stopped recording video to conserve her battery, but she remained on the scene. (*Id*.)  Three to four minutes passed between Ashley's second and third videos. (*Id*. 92:10-15.)  At the end of the three to four minute period, four officers started to move Anastacio to a SUV. (*Id*. 92:16-21.)  Exhibit 22 shows where the SUV was located.  "SUV 2" on exhibit 22 shows the location of the vehicle in which officers attempted to place Anastacio.  (Exh. 21 at 103:20-23.)  The location of the ATVs is marked by two small circles with the word "ATV" next to the circles. (*Id*. 102:10 – 103:3.)  "SUV 2" had been at the scene at all times Ashley was there. (*Id*. 103:15-19.)

The officers picked up Anastacio. (*Id*. 93:23 – 94:1.)  One officer hoisted Anastacio's upper left arm while the other officer grabbed his upper right arm to stand Anastacio up.  (*Id*.)  Anastacio was on his feet and the officers walked him to

the SUV. (*Id.*)  The officers tried to put Anastacio in the passenger area behind the driver's seat.  (*Id.* 93:13-19; 164:8-12.)  Two officers had control of Anastacio's arms while the other two officers stood beside. (*Id.* 96:3-8.)  Anastacio resisted being placed into the SUV. (*Id.* 95:3-5.)  When officers attempted to shove Anastacio into the SUV, he braced his feet up against the frame of the car.  (*Id.* 94:12-17.)  Anastacio was still handcuffed.  (*Id.* 95:17 – 96:2.)

The officers opened the trunk to the SUV and motioned with Anastacio as if to go towards the trunk.  (*Id.* 95:17 – 96:2.)  Ashley began recording video again because she believed they were going to place Anastacio in the trunk of the SUV. (*Id.* 99:8-24.)  The officers did not place him in the trunk, but laid him down on the ground behind the SUV. (*Id.* 95:17 – 96:2.)  Anastacio struggled a bit when he was laid on the ground, but he did not kick, he did not spit, and he did not headbutt anyone. (*Id.* 97:13 – 98:4.)  Ashley stopped recording video again to conserve the battery. (*Id.* 99:25 – 100:3.)

### b.  __Humberto Navarette__

At approximately 8:30 p.m. on the night of the incident, Humberto Navarrete and two friends, Osvaldo Chavez and Sergio Gonzalez, were going to Mexico.  (Exh. 14, Dep. Tr. Humberto Navarrete at 86:18-20.)  Humberto was traveling westbound on the top level of the pedestrian bridge when he heard a male's voice requesting help in Spanish, saying "ayudame por favor." (*Id.*  88:12-

11-cv-00522-L-DHB

22.) While at the top of the pedestrian bridge, he saw two vehicles and a commotion of people with a person screaming in Spanish. (*Id.* 90:24 – 91:8.) He saw a group of about 5 or 6 people. (*Id.* 91:16-17.)

Exhibit 153 to the deposition transcript of Humberto Navarette, which is attached hereto as Exhibit 16, shows where Mr. Navarette stood on the pedestrian bridge that evening. (*Id.* 92:25 – 93:2. *See* Exh. 16, Exhibit 153 to Dep. Tr. Humberto Navarette (hereinafter "Exh. 16").) The area marked as "A" on Exhibit 16 shows the location where Humberto was standing on the bridge when he first heard the voice pleading for help in Spanish. (*Id.*) "C1" and "C2" on Exhibit 16 show where Mr. Navarette saw two cars. (Exh. 14 at 93:17-20.) The commotion he witnessed took place behind the car "C1" and is marked with a "z" on Exhibit 16. (*Id.* 94:23 – 95:11.)

After hearing the screaming, Mr. Navarette and his two friends, Osvaldo and Sergio, made their way down to the ground level. (*Id.* 96:6-9; 97:18-21.) Exhibit 154 to the deposition transcript of Mr. Navarette, which is attached hereto as Exhibit 17, shows where Mr. Navarette stood when he walked to the bottom of the pedestrian walkway. (*Id.* 99:19-22; *see* Exh. 17, exhibit 154 to Dep. Tr. Humberto Navarette (hereinafter "Exhibit 17").) Exhibit 17 shows the inside of the Whiskey 2 area. (Exh. 14 at 101:6-13.) Mr. Navarette stood on the outside of the fence in the area marked with "X" in blue ink on the right hand side of Exhibit 17. (*Id.* at

92:23 - 100:15.)  He was at point "X" on Exhibit 17 for about five minutes. (*Id*. at 101:14 – 102:1.)

When he arrived at point X, Mr. Navarette noticed a Hispanic male on the ground, face down, in handcuffs. (*Id*. 103:2-12.)  The man was not resisting the officers. (*Id*.)  Humberto observed five officers. (*Id*. 106:1-3.)

Mr. Navarette saw a commotion occur behind a vehicle. (*Id*. 104:25 – 105:5.)  The commotion occurred behind the vehicle marked as "C1", and is indicated by the word "commotion" on exhibit 17. (*Id*.)  Mr. Navarette was 10 to 15 feet away from the commotion. (*Id*. 105:9-11.)  Anastacio was on his stomach with his hands cuffed. (*Id*. 107:4-13.)  Mr. Navarette observed no movement from Anastacio, who did not move his arms or legs. (*Id*. 107:14-24.)

About one minute after he arrived at point "X" on exhibit 17, Mr. Navarette pulled out his cell phone to start recording the commotion. (*Id*. 110:8-25.) Anastacio was screaming "help me" in Spanish. (*Id*. 107:25 – 108:1.)  A light pole illuminated the area where Anastacio laid. (*Id*. 218:6-18.)  A light shined down on Anastacio. (*Id*. 218:17-18.)  The light was bright enough to read a book. (*Id*. 227:1-9.)  Mr. Navarette saw an officer with his knee on Anastacio's lower back and another officer with a knee on Anastacio's neck. (*Id*. 108:9-12.)  Although he had his camera pointed at the situation, the video he filmed at this point did not clearly show what was happening. (*Id*. 108:15-25.)  But Mr. Navarette witnessed two

uniformed officers on top of Anastacio, a third uniformed officer next to

Anastacio, and two agents in civilian clothing close to Anastacio. (*Id.* 113:1-3.)

While recording at point "X", Mr. Navarette heard a man telling him that he

could not record video at that location. (*Id.* 113:18 – 114:13.)  Mr. Navarrete

approached an officer was behind him to ask why the other officers were using

excessive force on a person who was not resisting. (*Id.*)   The video files that Mr.

Navarette recorded on May 28, 2010 are attached hereto as Exhibit 15.  A

transcript of the audio from Mr. Navarette's video is attached hereto as Exhibit 18.

The first video Mr. Navarette recorded is file "Vid 00004.AVI."  While recording

the video and witnessing events, Mr. Navarette is heard yelling, "hey, he is not

resisting!  Why, why are you guys using excessive force on him?"  (Exh. 15 at

1:05.)  Mr. Navarette's first video clearly captures Anastacio screaming in pain,

begging for help, and protesting the officers' treatment of him.  (*See also* Exh. 18,

transcript of video file "Vid 00004.AVI." )

After Humberto spoke to the officer regarding the excessive force being

employed against Anastacio, he began recording a second video. (Exh. 14 at 136:3-

23; *see also* exh. 15, video file "VID 00005.AVI.")  Mr. Navarette moved to an

angle where he had a better view and better lighting. (*Id.* 137:13 – 138:3.)  About

three minutes elapsed between the time he talked to the officer to the time when he

started the second video. (*Id.* 138:4-8.)  Mr. Navarette's view was not obstructed

by any vehicle; the lighting was decent and he was about 10 to 15 feet away from the commotion between the officers and Anastacio. (*Id*. 140:18 – 141:9.)

Mr. Navarette saw the officer who had his knee on Anastacio's neck and the officer who had his knee on Anastacio's back, punch Anastacio in the ribs while they were on top of Anastacio. (*Id*. 130:2 – 24; 141:10-23.)  They punched Anastacio using their fists for a period of one to two minutes. (*Id*. 131:5-24.) Anastacio did not fight back; the only action Anastacio took was to plead for help. (*Id*. 132:3-7.)  Anastacio did not kick, headbutt, bite, or show any signs of resistance.  (*Id*. 132:16 – 133:4.)  Mr. Navarette screamed at the officers, but they did not respond to him.  (*Id*. 142:3-9.)  He yelled, "he is not resisting guys!  Why you guys keep, keep pressing on him?"  (Exh. 15, video file "VID 00005.AVI" at 0:21; *see also* Exh. 18 at 2.)  There were five officers present.  (Exh. 14 at 142:10-14.)

Mr. Navarette recorded a third video during which he saw a plain-clothes officer. (*Id*. 143:21-24.)  He saw a person wearing blue jeans standing up with a badge hanging from his neck. (*Id*. 144:22 – 145:2.)  One of the plain-clothes officers started kicking Anastacio. (*Id*. 145:12-14.)  The plain-clothes officer who kicked Anastacio was one of the two plain-clothes officers that Mr. Navarette initially viewed. (*Id*. 145:15-19.)

At one point, officers picked up Anastacio and dragged him elsewhere. (*Id*. 155:13-15.)  Anastacio was face down when at least two officers picked him up by his upper body and dragged him to a different spot. (*Id*. 156:20 – 157:9.)

About eight minutes passed between the third and fourth videos Mr. Navarette recorded. (*Id*. 148:19 – 149:5.)  During this eight-minute period, he witnessed more vehicles arriving.  Agents came in from multiple sides. (*Id*.)  Many agents arrived at the area where Anastacio was. (*Id*.)  Mr. Navarette saw at least two agents kick Anastacio. (*Id*. 153:3-5.)  The kicks were hard, soccer-style kicks. (*Id*. 151:25-152:5.)  Anastacio was still on the ground in handcuffs. (*Id*.)

During the incident, there was no time when Anastacio stopped screaming for help. (*Id*. 172:7-13.)  He was always vocal about needing help. (*Id*.)

### c.  <u>Sergio Gonzalez</u>

On the night of the incident with Anastacio, Sergio Gonzalez was at the top of the pedestrian bridge at the San Ysidro Port of Entry when he heard a male voice yelling "ayudame, auxilio" (help me, help me). (Exh. 19, Dep. Tr. Sergio Gonzalez-Gomez, 61:2-62:3.)  He walked down the ramp and saw a person handcuffed and face down.  (*Id*. 64:18-21; 66:4-9.)  There were three officers; one officer had his knee on the person's back and the other officer had his knee on the person's neck. (*Id*. 66:4-9.)  The officers were hitting Anastacio with their hands.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(*Id*. 127:7-12.)  These officers wore dark uniforms. (*Id*. 128:3-5.)  The third officer was standing. (*Id*.  66:4-9.)

Mr. Gonzalez told Humberto Navarette that they must help because Anastacio was requesting help. (*Id*. 66:13-20.)  Humberto began recording video of events. (*Id*. 66:24 – 67:3.)  Mr. Gonzalez told Humberto that there were four officers. (*Id*.)  He told the officers in Spanish to let Anastacio go, to treat him as a human being. (*Id*. 67:1-5.)  Humberto spoke to the officers in English. (*Id*. 67:6-10.)  An officer standing near Humberto told them to leave. (*Id*. 129:7-9.)

Mr. Gonzalez saw that Anastacio was on his stomach with his hands cuffed behind his back. (*Id*. 67:14-23.)  His legs were not flailing. (*Id*.)  Mr. Gonzalez was about a car's length away from Anastacio when he witnessed the events. (*Id*. 69:21-25.)  Due to light from a street lamp, the lighting was sufficient for Mr. Gonzalez to view the events. (*Id*. 70:1-6; 128:6-8.)  Anastacio was getting hit in the ribs. (*Id*. 71:24 – 72:4.)  The third officer who was standing kicked Anastacio in the ribs. (*Id*. 74:8-20; 128:19 – 129:2.)

Mr. Gonzalez witnessed the officers grab Anastacio by his hands and move him about 100 feet. (*Id*. 79:6-8.)  He saw 15 to 20 officers arrive and surround Anastacio after they moved Anastacio. (*Id*. 79:20-24.)   Mr. Gonzalez saw lights from the Taser and heard Anastacio yell on four different occasions. (*Id*. 81:2-18.)  He could not see Anastacio when the Taser was being used. (*Id*. 81:15-18.)

### d.  Osvaldo Chavez

On the night of the incident with Anastacio, Osvaldo Chavez accompanied his friends Humberto Navarrete and Sergio Gonzalez Gomez to Tijuana.  (Exh. 45, Dep. Tr. Osvaldo Chavez, at 9:8:24 – 9:13.)  As they traveled through the port of entry towards Tijuana, Mr. Chavez's attention was drawn by a man yelling "ayuda."  (*Id*. 15:18-21, 17:2-13.)  He witnessed 8 or 10 uniformed Border Patrol agents surrounding a man who was yelling for help.  (*Id*. 18:23 – 19:16.)  Mr. Chavez was at the same level or plane as the agents and the man yelling for help. (*Id*. 19:14-16.)  He watched the events for a minute and a half.  (*Id*. 24:15-20.) During that minute and a half, he heard the man call out for help approximately eleven times.  (*Id*. 25:3-6.)  The voice was filled with pain and begged for help. (*Id*. 70:18-20; 71:7-8.)

There was no way Mr. Chavez could help the man because of the fence and the presence of so many agents.  (*Id*. 71:9-12.)  At no time did Mr. Chavez hear the man scream any threat to the agents; threaten to hurt or hit any agent; kill any agent; or use a tone that challenged the agents.  (*Id*. 72:15-24.)  He only heard a sound of pain. He found it cowardly behavior for many agents to gang up and punish one man.  (*Id*. 72:25 – 73:16.)

Because he felt powerless to stop the violence being done against the man, Mr. Chavez moved on.  (*Id*. 22:16-24.) Witnessing the events made him feel bad.

(*Id*. 69:8-10.)  He walked towards the gate through which one passes to enter into Tijuana.  (*Id*. 23:14-19.)  His friends did not walk with him.  (*Id*. 26:19-27:5.)  Mr. Chavez waited as he watched Humberto record events with his phone.  (*Id*.; 27:20-25; 28:19-23.)

### D. Anastacio is Forcibly Restrained, Repeatedly Tased and Brutalized by a Swarm of Officers.

#### 1. Perspective of Independent, Nonparty Witnesses

##### a. <u>Ashley Young</u>

After she stopped recording the third video, Ashley continued to observe Anastacio; she had a clear view of him, the lighting was fine, and her view was not blocked at all. (Exh. 21, 101:16-102:1.)  There was a four to five minute period between her third and fourth video when she was observing Anastacio. (*Id*. 100:4-6; 101:16-22.) In this four to five minute period, after officers placed Anastacio on the ground, a fifth officer arrived almost immediately thereafter. (*Id*. 100:7-11.) This was the officer with the Taser. (*Id*.)

There was little communication between the officers who were with Anastacio and the officer who had just arrived. (*Id*. 100:7-16.)  The officer who arrived with the Taser gun screamed, "stop resisting.  Stop resisting." (*Id*.)  Ashley estimated that he said this seven times. (*Id*.)  Anastacio was not moving and he was not resisting any officer. (*Id*. 100:18-19.)  The officer then Tased Anastacio. (*Id*. 100:21.)  When the officer first Tased Anastacio, there were five to six officers

present.  The first Tase of Anastacio occurred on the spot marked with an "A" on exhibit 22. (*Id*. 104:1-7.)  Anastacio was the closest to Ashley he had been all night the first time he was Tased. (*Id*. 102:2-3.)

After the first Tase, Anastacio's body convulsed and he screamed in agony. (*Id*. 104:15-19.)  During Anastacio's convulsions, his legs and shoulders fluttered up and down. (*Id*. 105:20 – 106:1.)  His legs did not rise high enough to make a kicking motion. (*Id*.)  After the first Tase, Anastacio did not do anything. (*Id*. 104:20-23.)  He did not try to roll away. (*Id*.)  Ashley did not record this first Tase of Anastacio. (*Id*. 104:12-14.)

Two male officers picked up Anastacio by his arms and dragged him to a different location, marked as "A-2" on exhibit 22. (*Id*. 105:10-14; 259: 14-25.)  Anastacio did not roll to the "A-2" location on his own. (*Id*. 105:15-17.)  The two officers laid Anastacio face down on the ground. (*Id*. 260:17-23.)  The officers did not move Anastacio very far and it took approximately 10 to 15 seconds to move him.  (*Id*. at 260:7-10.)  Ashley did not video Anastacio being moved to the "A-2" location. (*Id*. 106:17-21.)  When Anastacio was at the "A-2" location, a dozen or more officers arrived from all directions and circled around Anastacio's body. (*Id*. 106:22 – 107:2.)

Ashley recorded the second Tasing of Anastacio on the fourth video segment. (*Id*. 108:12-13.)  The fourth video was the last video she recorded. (*Id*.

77:24 – 78:3.)  Ashley witnessed a total of four Tasings of Anastacio. (*Id*. 107:4-5.)  The fourth video shows the second, third, and fourth Tases of Anastacio. (*Id*. 108:17-22.)  The fourth video also shows Anastacio being circled by a dozen or more officers. (*Id*.)  She witnessed one of the officers pulling off Anastacio's clothing. (*Id*. 109:1-6.)

The officer who Tased Anastacio continued to say "quit resisting, stop resisting." (*Id*.)  The officer issued these commands before he Tased Anastacio a second time. (*Id*. 107:22 – 108:1.)  After the second Tase, Anastacio's body convulsed again. (*Id*. 107:10-21.)  Ashley could distinguish the second Tase from the third Tase because she saw sparks and a blue flash coming off the Taser gun. (*Id*. 109:7-23.)  With the fourth Tase, Ashley witnessed the same blue sparks. (*Id*. 110:21-23.)

Ashley witnessed the officer with the Taser lean into and toward Anastacio. (*Id*. 111:13-17.)  She could not see Anastacio's reaction because her view of him was blocked. (*Id*. 111:20 – 112:1; 112:9-10.)  She viewed a few officers make motions with their legs and arms consistent with kicking Anastacio. (*Id*. 112:2-8.)  Though she could not see physical contact, she saw their legs swing up and move towards Anastacio on the ground. (*Id*. 113:3-8.)  She witnessed actions that indicated that the officer with a Taser used his fist against Anastacio. (*Id*. 113:9-16.)  He bent down and went in towards Anastacio, with his arm extended beyond

his ear, like he was going to swing his arm or toss a baseball. (*Id.*) Then he moved towards Anastacio. (*Id.*)

After recording the fourth video, Ashley and her friend Mayra left. (*Id.* 114:8-13.)  Two officers in CBP uniforms were on the pedestrian walkway and rapidly approaching Ashley. (*Id.*)  She felt uncomfortable with their rapid approach.  (*Id.*)  An officer looked directly at Ashley and Mayra and said "keep on walking" in a powerful and aggressive tone of voice, which shook both Ashley and Mayra. (*Id.* 129:14-24; 131:22 – 132:2.)  She and Mayra left. (*Id.* 114:8-13.)  They approached the bottom of the spiral ramp and saw a couple 50 feet ahead of them. (*Id.* 129:15 – 130:6.)  This couple had been on the walkway for about the same length of time as Ashley and Mayra.  (*Id.*) Two officers stopped the couple. (*Id.*) Ashley witnessed the officer gesture and then take away the couple's cell phone. She overheard the officer say "[w]hat did you record?  We're going to delete it." (*Id.*)  Ashley and Mayra kept walking. (*Id.* 130:7-10.)  She did not tell these two officers that she possessed video of the incident because she believed that the officers did not want anyone to witness what had happened. (*Id.* 131:6-12.)  She testified "surely if they don't want anyone seeing it, they probably wouldn't want anyone recording it either." (*Id.*)

In her sworn deposition testimony, Ashley testified that, save for the time Anastacio placed his feet against the frame of the car, he was not resisting. (*Id.*

269:19-23.)  At no point when the agent with the Taser yelled "stop resisting" was

Anastacio actually resisting. (*Id.* 270:2-12.)  Anastacio did not kick. (*Id.*)  He did

not thrash. *Id.*  He did not move his head to try to bite. (*Id.*) He did not bang his

head against the pavement. (*Id.*)  The agent with the Taser repeatedly yelled "stop

resisting" to a man who was unresisting. (*Id.* at 271:14-22.)  He Tased an

unresisting man repeatedly. (*Id.*)  He yelled "stop resisting" in the presence of

people who were watching him. (*Id.*)

### b.  **Humberto Navarette**

Humberto Navarette could see Anastacio during the Tasing.  (Exh. 14 at

168:7-9.)  He did not see Anastacio kick an agent. (*Id.* 168:7-9.)  He heard the

sound of the Taser and saw sparking from the Taser. (*Id.* 166:1-8.)  Anastacio was

Tased four times. (*Id.* at 166:9-13.)

### c.  **Rafael Barriga-Pulido**

Rafael Barriga-Pulido was a Mexican Federal Immigration Officer assigned

to work at the Port of Entry in an area immediately south of Whiskey 2.  (Exh. 25,

San Diego Police Department Investigator's Report, Witness Statement of Rafael

Barriga-Pulido at 1.)  Mexican immigration officials assigned to the post are

responsible for monitoring the gate connecting the United States and Mexico. (*Id.*)

This is the gate that U.S. officials use to repatriate Mexican nationals back to

Mexico. (*Id.*)

11-cv-00522-L-DHB

On the evening of the incident, Officer Barriga-Pulido was working at this post when a 54 year old woman appeared.  (Exh. 26, transcript of audio recording of San Diego Police Department interview of Rafael Barriga-Pulido (hereinafter "Exhibit 26"), at ¶¶ 60 – 62.)[6]  The woman was upset and asked the officer to intervene because a man, who appeared Hispanic, was being "brutally" beaten on the U.S. side of the border. (*Id.* at  ¶¶ 64 – 70.)  Officer Barriga-Pulido saw 8 to 10 individuals located on the U.S. side, in the corridor that is used to enter into Mexico. (*Id.* ¶¶ 86 – 88.)  These individuals were located near the fence where officers were beating Anastcio; they shouted at the officers to "stop beating him up, that he wasn't an animal, that . . . they should not mistreat him." (*Id.* ¶¶ 90-92.)

At that moment, Officer Barriga-Pulido was not able to witness events.  (¶ 98.)  But he believed it was his responsibility to write a report. (*Id.* ¶¶ 100; 104.)  He asked a young man standing near the fence to write down the license plate number, color and type of truck that was located in the area. (*Id.* ¶¶ 104; 108; 112; 144; 166.)

Eventually, the U.S. officers moved away from where they initially stood so that Officer Barriga-Pulido could view events. (*Id.* ¶¶ 204-206.)  He saw twenty to twenty-five officers. (*Id.* ¶¶ 210-212.)  Officer Barriga-Pulido saw a man on the ground. (*Id.* ¶¶ 233-236.)  The man was lying down and rolling, partly because

---

[6] Defendant United States provided the transcript attached as Exhibit 26 as part of its second supplemental Rule 26 disclosures.

officers were pushing him. (*Id.* ¶¶238 – 242.)  Officer Barriga-Pulido clearly saw officers kick the man on the ground. (*Id.* ¶¶ 298 – 303.)  At least three officers kicked the man on the ground. (*Id.* ¶¶ 304-307.)  These three officers wore navy blue uniforms. (*Id.* ¶¶ 314-315.)

Officer Barriga-Pulido witnessed officers holding down the legs of the man on the ground. (*Id.* ¶ 357.)  The officers ended up taking off the man's pants and throwing them against the wall. (*Id.* ¶¶ 359-361.)  When the officers pulled off the man's pants, he screamed, "no, please" in pain. (*Id.* ¶¶ 375-377.)  The man on the ground asked the officers not to hurt him anymore. (*Id.* ¶ 379.)  He tried to sit up. (*Id.* ¶ 381.)  When the man tried to sit up, the officers came at him with an object; after they put the object on him, the man stayed on the ground, absolutely motionless. (*Id.* ¶ 381.)  The man on the ground "did not react or talk or scream, his body [was] absolutely motionless on the ground." (*Id.* ¶ 383.)   Some individuals who were standing near Officer Barriga-Pulido exclaimed "[t]hey've killed him!"  (*Id.* ¶ 385.)

Officer Barriga-Pulido watched as the U.S. officers waited for a few seconds while the man on the ground remained unmoving. (*Id.* ¶ 387.)  When they saw that he did not react, the officers touched the man with their feet to see if he would respond. (*Id.* ¶ 389.)  The officers did not turn him over. (*Id.*)  When the man did not react, one officer bent down to check his vital signs. (*Id.*)  An officer

eventually began applying pressure to the man's heart area. (*Id*. ¶ 399.)  Another officer took over and continued applying pressure to the man's heart. (*Id*. ¶ 403.) For about eight to nine minutes, the officers attempted to revive the man on the ground. (*Id*. ¶¶ 405-407.)  They realized that their efforts were not working. (*Id*. ¶ 409.)  About four to five minutes later, the ambulance and fire department arrived. (*Id*.)

During the effort to resuscitate Anastacio, a nearby crowd of observers shouted at the officers. (*Id*. ¶ 655.)  A female officer wearing a navy blue uniform responded to the statements made by the crowd. (*Id*. ¶¶ 657, 661, 669.)  She told the crowd to calm down, that this was not her fault. (*Id*. ¶ 669.)  The female officer's last name was Guzman. (*Id*. ¶ 685.)  She was close enough for Officer Barriga-Pulido to speak with her. (*Id*. ¶ 671.)  He asked her, "don't you think there are a lot of officers for just one individual, who, besides, is on the ground?" (*Id*. ¶ 679.)  She responded, "I don't know." (*Id*. ¶ 679.)  Officer Barriga-Pulido then asked the female officer about the condition of the man on the ground. (*Id*. ¶ 715.) She responded, "Oh don't worry, he's fine." (*Id*.)  But the body of the man on the ground remained motionless. (*Id*.)  He was eventually taken away in an ambulance. (*Id*. ¶¶ 729-733.)

### d. **Salomar Ramirez**

Salomar Ramirez is a Mexican Federal Immigration Officer who worked with Rafael Barriga-Pulido on May 28, 2010.  (Exh. 25 at 1.)  A lady suddenly opened the door and told him "[t]hey're beating up a person." ( Exh. 27, transcript of audio recording of San Diego Police Department interview of Salomar Ramirez, at ¶¶ 64, 66.)[7]  Officer Ramirez did not see anything because three cars blocked his view. (*Id*. ¶¶ 70, 72.)  He returned to his office to attend to other matters. (*Id*. ¶ 86.)  When he returned outside approximately ten minutes later, he could see about twenty officers in navy blue uniforms. (*Id*. ¶¶ 92, 96, 100, 104.)  Officer Ramirez saw an individual lying face-up on the ground with four officers on top of him. (*Id*. ¶¶ 114, 116, 120.)  The man's legs are lying on the ground. (*Id*. ¶¶ 122-126.)  Several officers surrounded the man; some held him down and two officers were kneeling on the man. (*Id*. ¶¶ 134, 136, 137-138.)  At this moment, at least twenty officers were present. (*Id*. ¶¶ 141-144.)  The two officers kneeling on the man on the ground were forcefully holding him down. (*Id*. ¶¶ 149 – 152.)  The two officers held the man down by leaning on him with their arms. (*Id*. ¶¶ 153 – 162.)  Officer Ramirez saw that the man on the ground was motionless. (*Id*. ¶¶ 429 – 434.)  The man was still and Officer Ramirez never saw him react. (*Id*. ¶ 433-434.)

## 2.  Defendants' Statements

### a.  <u>Andre Piligrino</u>

---

[7] Defendant United States provided the transcript contained in Exhibit 27 as part of its second supplemental Rule 26 disclosures

Defendant Andre Piligrino testified that he saw Defendant Vales drive stun Anastacio.  (Exh. 9 at 25:11-16; 25:24-26:6; 143:17-20.)  He saw Vales drive stun Anastacio in the chest.  (*Id*. at 32:8-14.)  Defendant Piligrino witnessed Anastacio convulse after Vales placed the Taser on Anastacio's chest.  (*Id*. 32:16-18; 143:21-23.)  Anastacio stopped convulsing after Defendant Vales removed the Taser from Anastacio:

> Q. . . . How soon after you saw the placement of the Taser on the chest did you see the convulsions begin?
> A. Immediately.
> Q. How soon after the Taser was removed did you see the convulsions stop, if at all?
> A. To my recollection, right when he pulled off.

(*Id*. 32:16-25.)  Anastacio exhaled and then went limp.  (*Id*. at 34:2-8.)

**b.  <u>Alan Boutwell</u>**

Defendant Alan Boutwell is a Customs and Border Protection officer.  (Exh. 24, Dep. Tr. Alan Boutwell, 41:6-14.)  On the night of the incident with Anastacio, Boutwell heard a call over his radio that Border Patrol needed assistance in Whiskey 2. (*Id*. 55:22-24; 56:8-10.)  He arrived at Whiskey 2 after Defendant Jerry Vales. (*Id*. 58:19 – 59:3.)  Anastacio had been Tased before his arrival because wires had already been expelled from the Taser. (*Id*. 62:4-14.)  Anastacio was handcuffed behind his back when Boutwell arrived. (*Id*. 63:9-14.)

Boutwell testified at his deposition that he saw Vales "drive stun" Anastacio, or place the Taser against Anastacio's body. (*Id*. 74:8-13.)  Defendant Boutwell

11-cv-00522-L-DHB

understood "drive stun" to mean when the prongs of the Taser are put directly on the person's body. (*Id*. 73:25 – 74:5.)  In the period before the drive stun, Anastacio was handcuffed on the ground. (*Id*. 72:11-25.)  Anastacio was still and his body was not moving. (*Id*.)  Anastacio was not rolling, was not thrashing, and his body was still. (*Id*. 73:4-15.)  Then Vales hit Anastacio with the drive stun. (*Id*.)  Anastacio reacted after Vales used the Taser in drive stun mode. (*Id*. 74:14 – 75:1.)  Boutwell observed Anastacio react to the drive stun by moving. (*Id*.)

About 10 seconds after Anastacio was Tased, Boutwell grabbed Anastacio. (*Id*. 81:24 – 82:9.)  Boutwell was near Anastacio's feet. (*Id*. at 81:24 – 82:9.)  There were an estimated 15 officers within 20 feet of him. (*Id*. 82:10-14.)  Defendant Kurt Sauer grabbed Anastacio's legs. (*Id*. 82:23 – 83:4.)  Boutwell grabbed Anastacio's ankles. (*Id*. 84:19-20.)  After he grabbed Anastacio's ankles, either he or someone else rolled Anastacio on his stomach. (*Id*. 85:20 – 86:1.)  Boutwell and Sauer criss-crossed Anastacio's legs while Anastacio was on his stomach. (*Id*. 85:5-7; 85:24 – 86:7.)  They bent Anastacio's legs and forced them towards Anastacio's body such that his legs criss-crossed to make an "X". (*Id*.)  Boutwell estimated that he held Anastacio's legs for a couple of minutes before someone produced plastic flex cuffs to secure Anastacio's legs. (*Id*. 87:11-18.)

At some point, somebody requested a bag to help Anastacio breathe. (*Id*. 96:16-19.)  Because a medical assistant's bag was not in the area at the time, an

individual had to run through traffic to retrieve a bag. (*Id*. 96:20-24.)  A period of five to ten minutes passed before the bag came into the area where Anastacio lay. (*Id*. 98:23 – 99:5.)  Eventually, an ambulance was called, but it went the wrong way and arrived after being re-routed to Whiskey 2. (*Id*. 99:23 – 100:4.)  The ambulance arrived several minutes after the medical bags arrived. (*Id*. 100:5-8.)

At no point did Boutwell ever say "[l]ook.  Hold on.  There are 15 or 20 of us and one of him, and he's on the ground.  Just back up." (*Id*. 75:13-17.) Boutwell testified that the officer holding the Taser was in charge, though Defendant Vales's rank was the same as Boutwell's rank. (*Id*. 75:18 – 24.)

### c.  **Defendant Supervisor Ramon De Jesus**

Defendant Ramon De Jesus is a supervisor with Customs and Border Protection who is friendly with Defendant Vales and who has socialized with Vales in the past. (Exh. 31, Dep. Tr. Ramon De Jesus, 16:3-7, 22-24; 56:8-13. ) De Jesus witnessed a Taser probe strike Anastacio's back. (*Id*. 70:20-71:1.)  He saw Vales lean in to drive stun Anastacio. (*Id*. 104:23 – 105:21.)  Vales delivered a charge on the drive stun. (*Id*.)

### E. Defendant De Jesus Purposely Destroyed Material Evidence Regarding the Violent Treatment and Death of Anastacio

After delivering the final Taser charge to Anastacio, Defendant Jerry Vales realized members of the public were recording video and taking photos from the pedestrian bridge.  (Exh. 28, transcript of audio recording of SDPD interview with

Jerry Vales (hereinafter "Exhibit 28"), at 102.)  Defendant Vales used his radio to call out and warn other officers that people were recording video and taking photos.  (*Id*.)  He told his fellow officers that "[s]omebody needs to go over there and apprehend them, stop them from getting those photos." (*Id*.)

Defendant Ramon De Jesus stopped a couple and seized their cell phone. (Exh. 29, transcript of audio recording of SDPD interview with Ramon De Jesus, at 217.)  De Jesus met the couple at the foot of the pedestrian ramp as they were walking down the ramp. (*Id*.)  The couple had taken photos with their camera phone. (*Id*.)  De Jesus found the photos on the cell phone and erased them. (*Id*.)

Officer Ernest Kalnas assisted Defendant De Jesus in destroying photos that evening.  (Exh. 30, transcript of audio recording of SDPD interview of Ernest Kalnas, at 90.)  Kalnas heard an officer call out "hey, people, are videotaping, we need to clear that area." (*Id*.)  He accompanied Defendant De Jesus to clear out the pedestrian walkway. (*Id*.)  They confronted a woman who took a photo with her phone. (*Id*. at 91.)  Kalnas looked at the woman's phone and saw one photo. (*Id*. at 92.)  Kalnas and De Jesus cleared the photo on the woman's phone. (*Id*. at 91.) She expressed concern to Kalnas about what was happening. (*Id*.)

During his deposition, Defendant De Jesus was asked multiple questions regarding his actions in destroying evidence of the officers' conduct towards Anastacio.  (Exh. 31, Dep. Tr. Ramon De Jesus, at 58:3-59:4; 59:13 – 20; 60:1-19;

80:2-24; 81:4-15; 81:16-22; 81 – 92; 101:3-11; 110:22 – 113: 4.)  De Jesus

invoked his Fifth Amendment privilege approximately 44 times to decline to

answer each of these questions.  (*Id.*)  Defendant De Jesus invoked the Fifth

Amendment to avoid answering the following questions, among others, posed by

Plaintiffs' counsel:

> BY MR. IREDALE:
> Q. You met the man and the woman at the foot of the pedestrian
> ramp that comes off of the bridge overlooking Whiskey 2?
> MR. BERWANGER: Same.
> THE WITNESS: On the advice of counsel, I, unfortunately, must
> decline to answer the question. As soon as the Grand Jury is
> terminated and it takes no further action, I will be able to
> respond.
> BY MR. IREDALE:
> Q. You believed that they had taken pictures, did you not?
> MR. BERWANGER: Same…
> BY MR. IREDALE:
> Q. You believed that they had taken video?
> MR. BERWANGER: Same…
> BY MR. IREDALE:
> Q. You saw that they had a camera phone?
> A. On –
> MR. BERWANGER: Same…
> BY MR. IREDALE:
> Q. You seized the phone from them at that time?
> A. On the advice of counsel, I, unfortunately, must decline to
> answer the question…
> Q. After seizing the camera phone, you looked at the video that
> was on it?
> A. On the advice of counsel, I, unfortunately, must decline to
> answer the question…
> Q. You saw that they had recorded part of the incident that you
> knew involved the use of force on Anastacio Hernandez?
> A. On the advice of counsel, I, unfortunately, must decline to
> answer the question.

11-cv-00522-L-DHB

(Exh. 31 at 81:16 – 83:24.)

De Jesus admitted that he knew that people in the area had witnessed the incident with Anastacio and those people had implored agents to cease their use of force against Anastacio.  (Exh. 31 at 84:12-16.)  De Jesus heard people scream "[h]e's a human being.  Don't treat him like an animal," or words to that effect. (*Id*. at 84:18-21; 91:3-6.)  He heard people say "[s]top beating him," or words to that effect. (*Id*. at 90:22-24.)  De Jesus heard "[d]on't hurt this man," or words to that effect." (*Id*. 90:25 – 91:2.)  Though he heard the entreaties of a horrified public, he did not consider these to be complaints by people against the agents' treatment of Anastacio. (*Id*. 91:7-10.)

## F.  Medical Evidence Shows that Defendants Caused Anastacio's Death

Dr. Glenn Wagner is the Chief Medical Examiner for San Diego County. (Exhibit 40, Dep. Tr. Glenn N. Wagner, D.O., Vol. I, at 7:8-9.)  Dr. Wagner authored the autopsy report for Anastacio Hernandez-Rojas, which is attached hereto as Exhibit 43.

Dr. Wagner performed an autopsy of Anastacio Hernandez-Rojas on June 1, 2010.  (Exh. 40 at 12:7.)  Dr. Wagner found abrasions and contusions on the forehead and right side of the face, the lips, hands and lower legs, consistent with physical struggle. (*Id*. 13:6-10) He found baton injury to the abdomen and indication of at least two taser events. (*Id*. 13:8-11.)  He found that Mr. Hernandez

Rojas' heart was enlarged.  (*Id.* 13:17.)  The manner of Anastacio's death was homicide. (*Id.* at 12:22-23.)  Homicide is death at the hands of another.  (*Id.* 25:1-2.)

Dr. Marvin Pietruszka, M.D., J.D., is a forensic pathologist and Plaintiffs' medical expert who was deposed by Defendants.  He performed a second autopsy on Anastacio on June 4, 2010. (Exh. 44, autopsy report by Dr. Marvin Pietruszka.) He believed that the cause of death was the trauma that Anastacio sustained. (Exh. 42, Dep. Tr. Marvin Pietruszka, M.D., J.D., at 89:25-90:3.)  He did not believe that methamphetamine played a major role in Mr. Hernandez Rojas' demise. (*Id.* 90:4-6.)  He testified that Mr. Hernandez Rojas was not at risk of dying from methamphetamine.  (*Id.* 89:23-25.)

**1.     Evidence of Trauma to Anastacio's Body**

Dr. Wagner found bruising in the back of the neck consistent with a person putting a knee in Mr. Hernandez Rojas' neck.  (Exh. 41, Dep. Tr. Glenn N. Wagner, D.O., Vol. II, at 230:24-231:4.)  Dr. Wagner found no internal or external marks of injury to the back of the head. (*Id.* 236:3-14.)  He testified that if someone were to bang his head hard against an asphalt surface four or five times, one would expect to see internal or external injury on autopsy.  (*Id.* 236:15-22.)  He witnessed no such injury.  (*Id.* at 236:15 – 237:8.)  There were no physical findings consistent

with the claim that Anastacio Hernandez Rojas banged his head on a hard surface repeatedly.  (*Id.* 237:9-13.)

During the autopsy, Dr. Wagner found a contusion in Anastacio's upper left abdominal area that measured 1 ½ inches long and ¾ inch wide.  (Exh. 43 at 5.) Dr. Wagner found this patterned abrasion/contusion to be evidence of a "collapsible baton strike."  (*Id*. at 6.)  A photo of the baton injury was attached as exhibit 82F to the deposition transcript of Dr. Wagner.  (Exh. 41 at 240:3-19.) That photo is attached hereto as Exhibit 55.  At his deposition, Dr. Wagner testified that the photo depicted "the area of the abdomen which clearly had on the skin the outline of the baton and was the baton strike."  (Exh. 41 at 240:14-19; *see also* exh. 55.)

With respect to the heart attack that Anastacio suffered, Dr. Wagner described a phenomenon known as "*commotto cordis*" ("cardiac contusion").  (*Id*. at 107:21 – 108:21.)   Dr. Wagner testified that the acute subendorcardial heart attack Anastacio suffered was not the result of a blocked artery, but "clearly a result of oxygen deprivation to the whole heart."  (*Id*. at 107: 21 – 108:10.)  The only way Anastacio could suffer such a heart attack was with an arrhythmia that would most likely be triggered by a surge of noreprinephrine or a blow to the chest.  (*Id*. at 108:5-10.)  Dr. Wagner testified that one can suffer a blow to the chest that does not result in a contusion.  (*Id*. at 108:11-15.)  This is the

phenomenon known as "*commotto cordis*."  (*Id*.)  It is frequently seen in auto accidents when a person's chest hits the steering wheel or during a baseball game when a batted ball hits someone in the chest."  (*Id*. at 108:15-21.)

In his autopsy report, Dr. Marvin Pietruszka wrote that medical records showed that:

> On May 29, 2010, a diagnosis of brain death was established. He remained hospitalized and on supportive car until he went into asystole. He was pronounced dead at 4:30 hours on May 31, 2010. His clinical diagnoses were as follows:
>
> 1. Status post cardiac arrest
> 2. Respiratory failure
> 3. Shot with taser gun
> 4. Severe respiratory acidosis from prolonged cardiac arrest
> 5. Non ST elevation and myocaridal infarction inferior leads
> 6. Brain death secondary to hypoxemia and hypotension
> 7. Positive drug screen for amphetamines
> 8. Abrasions on face and bilateral lower extremities.
> 9. Abrasions on face and bilateral lower extremities

Dr. Pietruszka's analysis of slide tissue samples showed, *inter alia*, the following:

> Microscopic Description:
>
> Slide # 1 scalp and 2 Chest wall - There is hemorrhage noted within the underlying adipose tissue and muscle. A number of loose fragments of bone are identified within the tissue.

Slide #3.  Right wrist subcutaneous tissue - There is extensive hemorrhage within the subutaneous fatty, adipose and connective tissue.
. . .
Slide #16.  Testes- The section demonstrates interstitial fibrosis and maturation arrest. Interstitial hemorrhage is noted.

Slide #17.  Posterior neck subcutaneous tissue - There is hemorrhage noted within the adipose tissue.

Slide #18.  Left scapula skeleton muscle and adipose tissue - There is extensive hemorrhage noted within the subcutaneous adipose tissue and extending into the underlying muscle tissue.

(Exh. 44, autopsy report by Marvin Pietruszka, M.D., J.D., pp. 7-10. )

Dr. Pietruszka noted in his autopsy that there were contusions, abrasions and bruises in the following areas of Anastacio's body: the right jaw; the upper jaw; cheek area; both hands; right wrist; right thigh; extensive hematoma extending into the posterior paravertebral musculature near the left scapula; abrasions of both knees and buttocks; contusions and abrasions of the upper and lower lips, the upper gum line, the left anterior chest, the left upper abdomen, the right pelvis, the left inner thigh, the right forearm, and the right anterior tibial region of the leg.  (Exh. 44 at pp. 2-3.)

At his deposition, Dr. Pietruszka testified that in Anastacio's left anterior upper chest there was a hematoma measuring 6 by 8 centimeters, with linear markings, giving a railroad track appearance to the hematoma in an up and down orientation. (Exh. 42 at 76:1-7.)  This was likely from batons. (*Id.*) There was a

59                                   11-cv-00522-L-DHB

very large hematoma measuring 12 cm by 3.5 cm in the left upper abdomen which could have been from an instrument or a punch.  (*Id.* at 76:8-18.)  There was a linear hematoma on the left lower posterior chest wall indicative of infliction of injury by a blunt object. (*Id.*)  This hematoma measured 7.5 by 1.5 cm. (*Id.*)

Dr. Pietruszka believed that the blows causing these contusions would have reduced the ability of Anastacio Hernandez Rojas to breathe.  (*Id.* 90:22-25.)  A person who cannot take deep breaths or has suffered multiple contusions to the chest wall will retain carbon dioxide and inhale less oxygen.  (*Id.* 91:4-6.)  With decreased oxygenation and an increased carbon dioxide, respiratory acidosis develops, as described in the medical reports of this case.  (*Id.* 91:6-9.)

Dr. Pietruszka found hemorrhage on the surface of the liver evidencing ante-mortem trauma to the liver.  (*Id.* 94:22-95:2.)  Dr. Pietruszka believed that the liver trauma had been caused by blunt force. (*Id.* 95:13-18.) There was hemorrhage on Anastacio's diaphragm. (*Id.* 96:3.)  Dr. Pietruszka noted that one of the causes of death was electrocution effect by Taser. (*Id.* 99:1-3.) He testified that electrocution injury from Taser has an overall physiologic effect. (*Id.* 99: 13-16.) It caused pain, an increase in heart rate to an individual susceptible to tachycardia, and the creation of further stress on the cardiovascular system. (*Id.* 99:20-100:1.)

Although the hemorrhage to the liver was small, it was the effect of a major trauma to the rib cage and the intercostal musculature necessary for respiration.

(*Id.* 137:14-17.)  Dr. Pietruszka noted hemorrhage of the tissue surrounding the left fourth and sixth ribs anteriorly; he saw hemorrhage surrounding the third, fourth, and fifth ribs on the left. (*Id.* 138:3-6.) The subcutaneous tissue of the upper back had hemorrhage extending deep to the muscle layer over a large area of the posterior thorax.  (*Id.* 138:14-17.)  Trauma there would cause significant pain, restriction of muscle movement and restriction of respirations.  (*Id.* 138:17-20.) This deep hemorrhage on Anastacio's back reflects a severe degree of trauma. (*Id.* 138:20.)

The hematoma of the upper abdomen was important because the abdominal musculature is critical in respiration. (*Id.* 139:10-12.)  The abdominal wall hemorrhage, chest wall hemorrhage, and posterior thoracic wall hemorrhage all played a part in causing respiratory distress.  (*Id.* 139:13-15.) The position in which Mr. Hernandez Rojas had been held restricted his respiration. (*Id.* 139:21-23.)

There was swelling, discoloration and evidence of edema and hematoma on both the right and left ankles.  (*Id.* 211:24-212:1.)  The extensive hemorrhaging on the back, neck and upper back of Mr. Hernandez Rojas was consistent with the application of blunt force such as a kick, punch, blow from an instrument or blunt trauma from a knee.  (*Id.* 215:4-12.)  The trauma would have been caused by more than merely pressure from a knee.  (*Id.* 216:18-21.) The autopsy photo of the

abdominal hemorrhage showed a degree of force similar to the force used in hitting a racquet ball or swinging a bat.  (*Id*. 221:25-222:3.)

The hemorrhage in the abdomen was three quarters of an inch deep and was consistent with a blow from a baton. (*Id*. 220:9-11.) This blow to the abdomen impaired respiration. (*Id*. 220:24-221:1.) The blow to the abdomen was part of the stress that caused death. (*Id*. 221:2-4.) These repeated blows, hemorrhages and multiple insults were cumulative in their effect.  (*Id*. 221:5-9.)

Dr. Pietruszka attributed the cause of death to multiple stressors. (*Id*. 217:13-17.) These included the blunt force causing the hematomas in the back. (*Id*. 217:18-20.)

## 2.     Evidence Regarding Positional Asphyxia

Dr. Pietruszka stated that positional asphyxia played a role on Anastacio's death. The positional restraint superimposed on all the other injuries Anastacio sustained caused decreased respiration. (*Id*. 206:8-12.)  Positional asphyxia causes such decreased respiration, decreased oxygenation, and increased carbon dioxide retention. (*Id*. 207:3-8.)  It causes abnormal physiologic processes resulting in acidosis.  (*Id*. at 91:4-13; 207:8-10.)  Positional asphyxia places extra strain on the myocardium to oxygenate the blood, resulting in blood going through the heart and into the lungs which is not adequately oxygenated.  (*Id*. 207:10-13.) The reduced

respiration, reduced respiratory rate and the reduced ability to breathe contributed to hypoxia and ultimately respiratory arrest. (*Id.* 207:13-18.)

Dr. Wagner discussed the role of positional asphyxia in his deposition. Referring to the statements of witnesses that Anastacio was prone in such a position that all of the weight is on the trunk, he testified that when one is on a hard surface on the stomach, "you're compressing the organs, and you're compressing the rib cage, in particular the diaphragm." (Exh. 41 at 226:20-22.) Dr. Wagner noted the issue of "having an excessive amount of weight on top of him, even if it was for a short period of time. And if you think of the average police officer running somewhere around 200 pounds, probably not unreasonable. Five people, that's half a ton. It doesn't take too much." (*Id.* 227: 5-13.)

Dr. Wagner testified at his deposition that all of the following figured in the cause of death: the variety of restraints, the number of persons involved, and the fact that Anastacio was prone and Tasered. (*Id.* 227:14-16.) Dr. Wagner believed that the cause of the heart attack and the consequent deprivation of oxygen to the brain was the combination of these contributing factors, all of which were stressors that triggered his heart attack, which then resulted in brain death. (*Id.* 228:21-229:5.)

3.     **Evidence Regarding Use of the Taser**

Dr. Wagner testified that the use of the Taser was a contributory factor in Anastacio's death. (Exh. 41 at 103:9-10; 210:13-22.)  Dr. Wagner testified that repeated taser applications increase acidosis in the body.  (Exh. 41 at 205:7-10.) Tasers cause contraction of the muscles, which creates lactic acidosis. (*Id.* 205:11-13.) Multiple applications of the taser substantially increase acidosis. (*Id.* 205:23-206:1.)

Dr. Wagner testified:

> If you're asking me do I believe that taser contributed to his death? There's no question in my mind, because it was part of the restraint and certainly is going to cause an increase in acidosis and is enough to knock a grown man down. And there is no reason to believe whether it was one firing, two firings or four firings that he would not have responded to that, in addition to whatever else was going on.

(*Id.* 210:13-20.)

Dr. Wagner agreed that repeated, prolonged or continuous exposure to Taser electrical discharge can impair breathing and respiration. (*Id.* 211:13-17.)  Two lesions on Anastacio's abdomen were the length apart that matched the distance between the prongs on the taser in the drive stun mode. (*Id.* 211:19-212:2.)

### 4.    Acidosis

Acidosis is the process of change in blood pH.  (Exh. 41 at 187:11-14.) When blood becomes too acidic it becomes a life threatening condition.  (*Id.*)  Dr. Wagner testified that Mr. Hernandez Rojas was in metabolic acidosis when taken

to the hospital.[8] (*Id.* 187:20-22.)  Anastacio was noted to have severe metabolic acidosis and was becoming hypotensive.  (Exh. 43.)

Dr. Pietruszka explained that a person under physiologic stress, from chest wall hemorrhage with both anterior and posterior contusions and with the diaphragmatic hemorrhage and liver hemorrhage, is not oxygenating normally and not properly eliminating carbon dioxide from his body.  (Exh. 42, 154:1-11.)  If he is then subject to the Taser, lactate levels result in the blood becoming acidotic because the person cannot oxygenate and cannot eliminate carbon dioxide.  (*Id.* 154:11-17.) This makes the person susceptible to blood pressure changes and a heart attack.  (*Id.* 154:17-21.)

Hospital records showed that Mr. Hernandez Rojas had severe metabolic acidosis.  (Exh. 40 at 80:12-15.)  When body systems become more and more acidic, the likelihood of death increases.  (*Id.* 81:11-15.)

### 5.   Cause of Death

---

[8] Dr. Wagner was provided the toxicology report which showed a positive screen (the ELISA) for amphetamines. He was also provided the results of the GC/MS which showed the presence of methamphetamine. These tests showed no trace of phenylephrine. Phenylephrine is the same as Neo-Synephrine. Mr. Hernandez was administered Neo-Synephrine on six separate occasions in the hour and nineteen minutes before his blood was drawn. *(*Exh. 41at 195:11-15.) Even though Phenylephrine provides a positive result on the ELISA test for amphetamines the GC/MS which was conducted showed no detection of phenylephrine. (*Id.* 196:22-25.) Part of the Dr. Wagner's findings were based on the assumption that the toxicology report was accurate and that the hospital in fact drew the blood which was tested in the toxicology report. (*Id.* 197:1-4.)

Dr. Wagner's autopsy stated that his findings were "Anoxic encephalopathy, resuscitated cardiac arrest, acute myocardial infarct due to: physical altercation with law enforcement officers, contributing hypertensive cardiomyopathy, acute Methamphetamine intoxication. Manner of death: homicide."  (Exh. 43 at 1.)

He found, *inter alia*, patterned abrasion/contusion of abdomen consistent with baton injury and soft tissue hemorrhage of posterior neck muscles.  (*Id.*)

Dr. Wagner's autopsy stated:

> Based on the preexisting hypertensive heart disease and acute
> methamphetamine intoxication documented at autopsy, the level
> of physical exertion given his reported state of agitation and
> combativeness while in custody, his being tasered and his
> positional restraint position at time of collapse, it is not clear to
> what degree each contributed to the decedent's cardiac arrest and
> subsequent ischemic brain injury. All are considered proximal or
> contributing factors to his sudden cardiac arrest, acute
> myocardial infarct and subsequent anoxic brain injury.
> Based on these findings and the history and circumstances of the
> death as currently known, the cause of death is best listed as
> anoxic encephalopathy due to resuscitated cardiac arrest due to
> acute myocardial infarct while being restrained and the manner
> of death as homicide.

(Exh. 43 at 3.)

Dr. Wagner quoted from information provided by agent Scott Carlson that included the following:

> ... I saw people jump back on top of the suspect. They were
> saying they need to get control of his legs. The guy was face
> down at this point. They got his lower legs and brought them up
> and crossed them. Someone had zip ties. They put zip ties around
> them and lowered his legs back down. He was not really moving

around after they put his legs down. They rolled him over on his side. The guy was not moving. They rolled him over on his back. He was motionless. Ed and I were standing there. The guy's eyes went two thirds of the way open, and some saliva was coming out of his mouth.

(*Id.* at 127:24-129:9.)

Dr. Pietruszka ruled out methamphetamine as the cause of death in this case. (Exh. 42 at 160:22-23.)  The methamphetamine played some role, however, because it may have created hypersensitivity of the myocardium to tachycardia and anoxia.  (*Id.* 162:17-20.)

Dr. Pietruszka attributed the cause of death to the beating with batons, the kicking and blows that caused blunt trauma to the body, the positional restraint in which Mr. Hernandez Rojas was held, the repeated tasings, the underlying cardiomyopathy, and the presence of methamphetamine. (*Id.* at 69:4-7; 231:11-233:18) It was his opinion that absent these repeated blows and stresses, Mr. Hernandez Rojas would be alive today.  (Id. at 69:8-12.)

## 6. Evidence Suggests the Blood Sample Which Tested Positive for Methamphetmine is Not Actually Anastacio's Blood

Defendants' assertion that Anastacio had methamphetamine in his blood relies on a test known as GC/MS performed by the Medical Examiner's office. (Exh. 58, Dep. Tr. Ian McIntyre at 13:2 – 14:4.)  That test was done on blood claimed to be "antemortem" blood drawn by Sharp Hospital personnel on the night Anastacio was admitted to the hospital.  (*Id.* at 10:7-15.)  Two samples of

1   Anastacio's blood were tested; a sample allegedly taken from Anastacio at 10:12

2   p.m. on May 28, 2010, and a sample allegedly taken at 11:19 p.m. that same

3   evening. (*Id.* at 10:22-11:3.) The GC/MS test showed methamphetamine in the

4   blood sample allegedly drawn from Anastacio at 11:19 p.m. (*Id*. at 13:2 – 14:4.)

5   But a genuine issue of material fact exists regarding whether the blood tested by

6   the Medical Examiner's Office is actually Anastacio's blood. This factual issue is

7   raised by the following: contradictions in hospital records; the lack of any chain of

8   custody documentation showing the delivery of Anastacio's blood to the ME's

9   Office; and the complete absence of any evidence of phenylephrine in the 11:19

10  p.m. blood sample that tested positive for methamphetamine, despite hospital

11  records showing that Anastacio was administered phenylephrine on six separate

12  occasions before his blood sample was taken at 11:19 p.m.

13      Hospital records showed that Anastacio was administered Neosynephrine

14  solution (phenylephrine) at the following times in the evening of May 28, 2010:

15  10:20 p.m., 10:25, 10:29, 10:35, 10:47, and 10:55 p.m. (*Id.* at 52:12-54:14.) The

16  Neosynephrine solution was administered repeatedly before the 11:19 p.m. blood

17  draw. (*Id.*) Neosynephrine is phenylephrine. (Exh. 59, Dep. Tr. Cameron

18  Campbell, M.D., at 52:1-3.)

19      The first blood test administered by the Medical Examiner's Office was a

20  "Drugs of Abuse Screen." (Exh. 58 at 12:8-19.) The sample, taken at 10:12 p.m.,

68                                          11-cv-00522-L-DHB

was tested for cocaine metabolites, amphetamines, opiates, benzodiazepines, fentanyl and cannabinoids.  (*Id.*)  There was a presumptive positive for amphetamines on this test.  (*Id.*)  Amphetamine is a primary metabolite of methamphetamine.  (*Id.* at 45:1-3.)  The presence of amphetamine suggests that methamphetamine was not ingested immediately prior to the blood sample being drawn.  (*Id.* at 22:1-5.)  A presumptive positive does not prove what the specific drug is, nor does it show the precise concentration.  (*Id.* at 12:22-25.)

A gas chromatography/mass spectrometry test (GC/MS) was performed on the blood sample drawn at 11:19 p.m. (*Id.* at 13:3-6.)  The GC/MS is a more accurate and specific confirmatory test.  (*Id.*)  It was run for eight different amphetamine substances, including phenylephrine. (*Id.* at 39:21-23).  The GC/MS did not detect *any* phenylephrine in the blood allegedly drawn by hospital personnel from Anastacio at 11:19 p.m.  (*Id.* at 40:2-4; 41:5-8.)  The blood sample supposedly drawn from Anastacio Hernandez at 11:19 p.m., which tested positive for methamphetamine on the GC/MS, showed no phenylephrine.  (*Id.* at 55:17-25; 56:18 – 57:2.)  The GC/MS showed no phenylephrine, even though hospital records showed multiple administrations of phenylephrine just minutes before the sample was drawn.  (*Id.* at 55:12-16.)

Catherine Hamm, the technician at the Medical Examiner's Office who did the actual testing on the GC/MS, testified at her deposition that she set up the

GC/MS to test for phenylephrine. (Exh. 57, Dep. Tr. Catherine Hamm, at 42:19 – 43:14.)   She testified that the test showed no phenylephrine at all in the blood sample tested that was supposedly taken at the hospital from Mr. Hernandez. (*Id.* at 43:9-14; 58:15-19). This meant that *no* phenylephrine was present, not simply that a minute amount was detected, which was below the reporting cut-off. (*Id.* at 59:21-23.)

The GC/MS test is so sensitive that it can detect quantities of drugs that are below the reporting cut-off. (*Id.* at 59:24 – 60:11.) For example, the amphetamine detected in Anastacio's alleged blood sample was less than 0.04 milligrams per liter. (*Id.* at 59:24-60:4.) It was reflected as less than 0.04 on the report because 0.04 was the reporting cut-off. (*Id.* at 60:2-4.) The GC/MS test detected the amphetamine, even though the amount actually found was below the reporting cut-off. (*Id.* at 60:5-11.) The GC/MS machine can test to the level of nanograms, one billionth part of a gram. (*Id.* at 60:12-23)

Thus, the total absence of phenylephrine calls into question whether the blood found to have methamphetamine was actually the blood of Anastacio Hernandez-Rojas. Although hospital records showed the administration of phenylephrine (Neosynephrine) on six separate occasions before the blood draw at 11:19 p.m., not even a billionth of a gram of phenylephrine could be found in the GC/MS test done by the Medical Examiner's Office.

Testimony elicited at deposition revealed a number of other problems with the antemortem blood samples allegedly drawn from Anastacio.  (Exh. 59 at 66:6 – 68:2.)  Cameron Campbell, M.D., is the doctor in charge of forensic testing at Sharp Chula Vista hospital.  (Exh. 59 at 9:5-8.)  He testified at his deposition that Sharp hospital records reflected an earlier blood sample taken at 10:20 p.m., which was "unacceptable" for testing.  (*Id*. at 62:14-63:21.)  Dr. Campbell testified that there were hundreds of reasons the blood sample could have been found unacceptable for testing, including contamination.  (*Id*. at 62:17-21.)  He further stated that he had no way of determining why the particular blood sample was deemed unacceptable.  (*Id*. 63:22 – 64:1.)

Dr. Campbell testified regarding contradictions between Sharp hospital records and the Medical Examiner's toxicology records regarding the times at which Anastacio's blood samples were collected.  (*Id*. at 66:6 – 67:5.)  He acknowledged a contradiction between the Medical Examiner's records showing Anastacio's blood being collected at 10:12 p.m., and Sharp hospital records reflecting that earliest collection of Anastacio's blood occurred at 10:20 p.m.  (*Id.* at 66:6-11.)  Dr. Campbell did not personally know if the blood tested by the Medical Examiner's Office was actually collected from Anastacio at 10:12 p.m.  (*Id*. at 65:20-23.)  He could not vouch for the reliability of the results of the test on the toxicology report for the 10:12 p.m. sample.  (*Id.* at 66:3-5.)  And though the

71                         11-cv-00522-L-DHB

Medical Examiner's toxicology report stated that Anastacio's antemortem blood sample was collected at 11:19 p.m., Dr. Campbell testified that he had no records that could confirm or refute that blood was drawn from Anastacio at 11:19 p.m. (*Id.* at 66:12 – 67:5.)  Dr. Campbell stated that Sharp hospital had no chain of custody document to reflect precisely what was turned over to the coroner's representative.  (*Id.* at 81:15 – 82:6.)

Dr. Campbell testified with respect to clinical testing of a patient's urine conducted at a hospital.  On the hospital urine test for amphetamines, Tylenol, coffee, codeine, ibuprofen and Neosynephrine will all give positive results for "presumptive" amphetamine. (*Id.* at 70:23-73:5.)  The hospital never did a blood test on Anastacio for amphetamines or methamphetamines.  (*Id.* at 79:4-9.)  The only positive hospital result for amphetamines was from the urine screen, which could have resulted from Tylenol, coffee, or the Neosynephrine, which the hospital administered.  (*Id.* at79:15-20; 70:23 – 73:5)

There exists a genuine question of fact as to whether Anastacio had any methamphetamine in his blood at the time of his death given the following: contradictions in records regarding blood draw; the lack of chain of custody documents; the failure of the Medical Examiner's test to find even a billionth of a gram of phenylephrine (Neosynephrine) in the 11:19 p.m. alleged blood draw, which tested positive for methamphetamine, despite hospital records that show

Anastacio was administered phenylephrine six separate times before the alleged blood draw.  Even assuming the claim that the blood that tested positive for methamphetamine belonged to Anastacio, the testimony of Dr. Pietruszka makes it clear that methamphetamine did not kill Anastacio.  The acts of the Defendants were properly found by both Drs. Wagner and Pietruszka to be homicide: death at the hands of another.

## G. Defendants' Self-Serving Testimony is Contradicted by Video and Audio Evidence and Undermined by Conflicting Witness Testimony

No credence can be given to the testimony of Defendants made in support of their motions for summary judgment because of jarring conflicts in the evidence. Defendants' testimony is contradicted by video and audio evidence and the testimony of independent eyewitnesses.  Equally fatal to Defendants' motions for summary judgment is the abundance of factual contradictions among the Defendants themselves.  Moreover, the credibility of the Defendants is severely undermined by bizarre and incredible claims made during their testimony.

### 1. Ishmael Finn Immediately Deported Anastacio as Punishment for Anastacio's Complaints regarding Ducoing's Misconduct

At his deposition, Defendant Finn made the claim that, in his three years as a supervisor, no detainee or prisoner had ever made a complaint regarding officer misconduct.  (Exh. 7 at 29:1-6; 35:14 – 36:2.)  Finn has been the supervisor of the Chula Vista Border Patrol Station since approximately 2009.  (*Id*.  26:10-12.)  The

11-cv-00522-L-DHB

Chula Vista Border Patrol Station processes prisoners on a daily basis.  (*Id*.  26:7-9.)  Finn's deposition testimony was filled with evasions, absurdities and outright lies.Defendant Finn could not testify to an average volume of prisoners processed in a week; could not estimate the average volume of prisoners in the month prior to the date of his deposition; and declined to estimate as to the annual volume of prisoners processed in a year. (*Id*. 29:10 – 30:4.)  Defendant Finn could not even testify to the number of prisoners who were processed during his shift on the day before his deposition. (*Id*. 30:14-22.)  Finn did not know if any statistics existed regarding the number of prisoners processed through his station for 2012 fiscal year. (*Id*. 33:11-15.)  As a supervisor, Finn admitted that it is his responsibility to supervise his subordinates and know what is happening at his station.  (*Id*. 34:15-24.)

Though Finn could not recall the number of prisoners processed through his station on the date prior to his deposition, he testified that no prisoner had ever made a complaint; no prisoner had ever complained about excessive force; and that no prisoner had ever complained of being denied access to consular officials. (*Id*. 35:14 – 36:2.)

Because he has never received any complaints about an agent, Finn has never had to segregate an agent from a complaining detainee or prisoner.  (*Id*. 36:6-11.)  Had he known of Anastacio's complaint regarding Ducoing, he would

not have permitted Ducoing to take Anastacio to the border.  (*Id*. 72:25 – 73:9.)

Finn testified at his deposition that Anastacio never told him that an agent had

kicked Anastacio.  (*Id*. 58:11-24; 71:22 – 72:1.)

Finn's sworn deposition testimony that Anastacio never complained about

an agent kicking him is directly contradicted by statements made by agent

Robinson Ramirez[9] who was present at the Chula Vista Border Patrol Station.

According to Finn, he never heard Anastacio's complaint and he never rejected

Anastacio's complaint by telling him that no agent had kicked him:

> Q. And you told Anastacio that no agent had injured his ankle or
> words to that effect, correct?
> A. No, I did not.
> Q. You're sure of that too?
> A. One hundred percent.
> Q. One hundred percent you never said anything to the effect of,
> "I deny that an agent injured your ankle"?
> A. No, I did not.
> Q. "No agent injured your ankle;" nothing like that?
> A. I did not.

(*Id*.  60:13-24.)

According to Agent Ramirez, Defendant Finn, in response to Anastacio's

complaint that one of the agents had injured Anastacio's ankle, "told him that one

of the agents did not do that.  And he's going back to Mexico and that's it."  (Exh.

6 at 304.)

---

[9] Defendant Finn testified that he knew Robinson Ramirez.  (Exh. 7 at 59:24-60:1.)
He had no reason to doubt Robinson Ramirez's truthfulness and there was no
animosity between Finn and Ramirez.  (*Id*. 60:6-9.)

### a. Defendant Finn failed to follow established Border Patrol protocol governing the provision of medical care to detainees

During the deposition of Plaintiffs' police practices and procedures expert, Roger Clark, Mr. Clark testified that Defendant Finn failed to follow established Border Patrol protocol regarding the provision of medical care to detainees.   There are policies which were supposed to govern Finn's actions in a case such as Anastacio's.  (Exh. 49, Dep. Tr. Roger Clark, at 203: 14 – 204:18.)  Exhibit 260 to Roger Clark's deposition, attached hereto as exhibit 48, is a memorandum from David Aguilar, Chief of U.S. Border Patrol, dated June 2, 2008, regarding "Hold Rooms and Short Term Custody" policy.  (*See* exh. 48.)  According to the Aguilar memorandum, prisoners detained by Border Patrol who need medical attention are to be evaluated by qualified personnel, such as an EMT, paramedic, physician, or nurse practitioner.  (Exh. 48, ¶¶ 6.7.1 – 6.7.2.)  A supervisor is to be notified as soon as possible of detainees requiring medical attention.  (*Id.* at ¶ 6.7.4.)

Mr. Clark testified that Defendant Finn violated ¶¶ 6.7.1 and 6.7.2 because, though Anastacio complained about an injury and pain, he was not evaluated by qualified medical personnel.  (Exh. 49 at 203: 14 – 204:18.)  At his deposition, Defendant Finn claimed that he was not aware of any regulation setting forth the conditions under which an agent is supposed to provide medical care to a prisoner or detainee. (Exh. 7 at 54:13-16.)  But the 2008 memorandum "Hold Rooms and Short Term Custody" is precisely that – the policy governing provision of medical

76                                   11-cv-00522-L-DHB

care to detainees.  Finn testified that the decision regarding the provision of medical care was left to the discretion of each individual agent; his testimony is contradicted by written Border Patrol policy.  (Exh. 7 at 52:11-12.)

In support of his motion for summary judgment, Defendant Finn offers a *post-hoc* rationalization for his denial of medical care to Anastacio.  He now states in a sworn declaration, for the first time, that he has previously dealt with detainees who "falsely exaggerate a need for medical care in order to delay the processing and/or obtain medical care from a U.S. physician."  (Decl. Ishmael Finn at ¶ 5, doc. No. 147-3.)  This pretext he now offers is at odds with his deposition testimony, which was given under oath on January 10, 2013.  On that date, Finn testified that, other than Anastacio, *he had never denied medical care* to any individual in his career as a supervisor.  (Exh. 7 at 53:1-15.)  Finn's exact testimony was that he "never had to" deny anybody else medical care as a supervisor.  (*Id.*)  In fact, other than Anastacio, Finn stated that he had never denied medical care to *anyone* in his *career as a Border Patrol agent*.  (*Id*. 53:16-18.)  Finn's lies and lack of credibility preclude the granting of summary judgment.

### b. Finn knowingly violated Border Patrol policy regulating reports of officer misconduct against detainees.

Finn testified to policies and procedures regarding complaints made against agents or officers by prisoners and detainees.  Supervisor Finn testified that any detainee may make a complaint to any agent or any supervisor.  (Exh. 7 at 24:11-

13.) When a detainee makes a complaint against a particular officer, the common practice is to prohibit that agent from having further contact with the detainee. (*Id.* 37:7-15.)  A report is then to be made to OIG, the Office of the Inspector General. (*Id.*; 36:18-21.)

Plaintiff's expert Roger Clark discussed Defendant Finn's failure to follow Border Patrol's policy for reporting incidents of officer misconduct.  (Exh. 49 at 207:18 – 208:13.)  Exhibit 261 to Mr. Clark's deposition transcript is a document entitled "Chapter 7: Report of Incidents," which is attached hereto as exhibit 50. "Chapter 7: Report of Incidents" sets forth United States Border Patrol protocol with respect to complaints made by detainees.  (*See* exh. 50.)  According to Border Patrol protocol, an allegation regarding a civil rights violation, such as the mistreatment of an alien or detainee, is considered a "Class 1" allegation that must be reported to both the Office of Internal Audit (OIA) and the Office of the Inspector General (OIG).  (Exh. 50 at 3-4.)  CBP employees are required to immediately report, either orally or in writing, any allegation of misconduct either directly to the OIA or OIG, or to higher level CBP official in their chain of command.  (Exh. 50 at 3.)  Mr. Clark testified that Defendant Finn failed to follow Border Patrol protocol because he did not report Anastacio's complaint of misconduct to OIA or OIG.  (Exh. 49 at 207:18 – 208:13.)

### c.  Finn retaliated against Anastacio to punish him

11-cv-00522-L-DHB

On the evidence, a reasonable jury can find that Finn acted with retaliatory animus towards Anastacio. As of May 2010, Defendant Finn knew that if a prisoner had made a complaint against an agent, that agent should be kept away from the detainee and there should be further contact between the agent and detainee. (Exh. 7 at 37:25-38:5.) Defendant Finn, as a supervisor, was trained not to punish a prisoner or detainee who makes a complaint about brutality, or seeks medical care, or requests to speak with the Mexican consulate. (*Id*. 70:13-25; 71:2-6.) Prisoners or detainees are not subject to discipline for being rude or impolite to agents. (*Id*. 70:10-12.)

Border Patrol agent Sandra Cardenas appeared to be aware of the policy regarding medical treatment of detainees because she asked her co-worker, officer Galvan, if an EMT had been contacted regarding Anastacio's request for medical care. (Exh. 47 at 9:24 – 10:7.) In her sworn declaration that is submitted in support of Defendant Finn's motion for summary judgment, Ms. Cardenas omits any reference to her query regarding the EMT. (*See* Decl. Sandra Cardenas at ¶ 9, doc. no. 147-2.) In her interview with the San Diego Police Department, Cardenas showed her awareness of the proper procedure for medical evaluation:

> A. So I walk around -- I walk outside, and I ask Galvan, you know, if they called the EMT, and they said, "Well, we're going to wait for the supervisor." Because I guess previously there -- you know, I wasn't there, but I don't know if they had issues before that.
> Q. Okay.

> A. But they were trying to get ahold of his supervisor to figure if -- you know, what -- what they were planning on doing with him . . .

(Exh. 47 at 9:24 – 10:7.)

Evidence shows that Finn was aware of Anastacio's request for medical care and his complaint that Ducoing mistreated him by kicking his ankles.  Instead of following Border Patrol protocol, Finn retaliated against Anastacio because Anastacio voiced his grievances.  (*See* Exh. 6 at 304.)  Finn admitted that Anastacio was not combative, but that he was "vocal and argumentative."  (Exh. 7 at 76:11-17.)  Because Anastacio was being "problematic," Finn "arranged for him to be transported to Mexico right away."  (Exh. 6 at 304.)  Finn arranged Defendant Ducoing, the very agent who kicked and hurt Anastacio, to transport Anastacio to Mexico.  (Exh. 7 at 81:18-21.)  In contrast, Pedro Hernandez was not immediately deported.  (Exh. 5 at 6; Exh. 32.)  He remained at the Chula Vista Border Patrol Station and did not know what happened to his brother after he became separated from him.  (Exh. 5 at 6.)[10]

///

///

///

---

[10]  The SDPD interview of Pedro Hernandez took place at the Chula Vista Border Patrol Station, where Pedro was still located while Anastacio was comatose and hospitalized.  (*See* exh. 32, SDPD Investigator's Report, witness statement of Pedro Hernandez, at 1.)

## 2.  Defendants Narainesingh's and Piligrino's Account is Disputed by Their Co-Defendants' Testimony

It is undisputed that Defendants Narainesingh and Piligino beat Anastacio multiple times with their steel batons.  Medical evidence shows that Anastacio suffered blows to his stomach and chest.  (*See* Exh. 42 at 76:1-18.)  But Narainesingh's and Pilligrino's account of the use of the batons against Anastacio conflicts with the testimony of co-defendants Ducoing, Krasielwicz, and Llewellyn.

According to reports written by Defendants Narainesingh and Pilligrino after the incident with Anastacio, Anastacio was physically assaulting Defendants Ducoing and Krasielwicz.  (Exh. 33, Narainesingh memo. dated May 28, 2010; Exh. 34, Pilligrino memo. dated May 28, 2010.) Defendant Narainesingh wrote that Anastacio lunged at Krasielwicz and Ducoing, threw punches at the two agents, and then proceeded to throw punches at all four agents once Narainesingh and Pilligrino became involved.  (Exh. 33 at ¶ 2.)  Defendant Pilligrino wrote that Anastacio punched and kicked Defendants Ducoing and Krasielwicz then continued his assault on all four agents.  (Exh. 34 at ¶ 2.)

During their depositions, Narainesingh and Piligrino embellished their portrayal of an assaultive and out of control Anastacio by fabricating details that were never mentioned in their reports.  Despite the passage of nearly two years and

seven months[11], Narainesingh recalled Anastacio as a Mike Tyson-esque figure who threw punches and swung his arms as if he were in a boxing match.  (Exh. 8 at 43: 17 – 44:16.)  Narainesingh allegedly held his baton in one hand while trying to deflect Anastacio's punches. (*Id*. 49:9-13.)  He claimed that Anastacio threw 3-4 punches with both hands at Narainesingh. (*Id*. 47:16-19.)

Almost two years and seven months after writing his report regarding the incident with Anastacio and giving a statement to SDPD homicide investigators, Defendant Pilligrino added a belt to his rendition for the first time, a detail that only Pilligrino, of all the witnesses, claimed to recall.  Defendant Pilligrino depicted Anastacio as wild man who threw punches while whipping agents with a belt.  (Exh. 9 at 87: 9 – 88: 5.)  According to Piligrino, Anastacio struck Ducoing with the belt in Ducoing's head/chest area. (*Id*. 87:21-24.)  He asserted that Anastacio swung his belt with his right hand, punched with his left fist, then swung his belt again. (*Id*. 88:2-5.)  Piligrino estimated that Anastacio had swung his belt 5-10 times at either Krasielwicz or Ducoing.  (*Id*. at 88:21-24.)

A reasonable jury could find that Piligrino's new details are merely newly minted lies. The testimony of Defendants Piligrino and Narainesingh regarding an assaultive and out-of-control Anastacio is directly contradicted by Defendants Ducoing and Krasielwicz, whom Piligrino and Narainesingh were presumably

---

[11] Defendants Narainesingh and Pilligrino were deposed on December 18, 2012

rescuing.  Instead of being helplessly attacked by Anastacio, both Ducoing and Krasielwicz testified that *they* "grabbed" Anastacio to "gain control" of him after removing handcuffs from Anastacio.  (Exh. 1 at 68:13-17; Exh. 2 at 94:7-17.) Ducoing testified that Anastacio did not punch him or Krasielwicz, though there was commotion and the movement of arms and elbows.  (Exh. 1 at 71:2 – 72:3.) Krasielwicz testified that he heard the ICE agents use their batons approximately 10 to 20 seconds after he "grabbed" Anastacio.  (Exh. 2 at 95:20 – 96:4.)  Neither Krasielwicz nor Ducoing testified that Anastacio punched them, kicked them or whipped them repeatedly with a belt.  And according to Krasielwicz, Defendants Narainesingh and Piligrino used their batons almost immediately after he grabbed Anastacio.

The testimony of Narainesingh and Piligrino are further contradicted by the testimony Defendant Derrick Llewellyn.   On the evening of May 28, Defendant Derrick Llewellyn was working at Whiskey 2.  (Exh. 11, Dep. Tr. Derrick Llewellyn, 35:8-11.)  When Llewellyn arrived upon the scene, Ducoing, Krasielwicz, Piligrino, and Narainesingh were already engaged with Anastacio. (*Id*. 47:8-16.)  The two ICE agents arrived a second or two before Llewellyn did. (*Id*. 48:16-18.)

Llewellyn testified that he did not see Anastacio punch either Border Patrol agent. (*Id*. 43:25-44:21.)  He did not see Anastacio kick either agent. (*Id*.)  He did

not witness Anastacio strike either of the agents with a belt or a baton. (*Id.*)

Llewellyn did not witness Anastacio grab either of the agents with his arms nor did

he see Anastacio bring either of the agents to the ground. (*Id.*)  He did not witness

Anastacio move his hand in a striking manner toward either of the Border Patrol

agents. (*Id.*)

Because the testimony of their co-defendants contradict Defendants

Piligrino's and Narainesingh's justifications for their use of batons on Anastacio,

their motions for summary judgment are improper, without merit, and should be

denied.

### 3.  Defendant Vales Repeatedly Tased Anastacio While He Lay, Unresisting, Handcuffed on the Ground

In Defendants' motions for summary judgment, Defendants attempt to

depict Anastacio as violent, assaultive and constantly resisting officers' commands

in order to justify their use of force against Anastacio, including Defendant Vales's

repeated use of the Taser.  Defendants' depiction of Anastacio is contradicted by

video evidence and the testimony of independent eyewitnesses who reported that

Anastacio was passive, unresisting, and handcuffed on the ground while officers

assaulted him and Tased him.  Evidence shows that Vales's use of the Taser was

particularly egregious and unreasonable given Anastacio's passive behavior,

warranting summary denial of his Rule 56 motion.

11-cv-00522-L-DHB

### a. Witness testimony and video evidence controvert Defendants' claims that Anastacio was kicking, thrashing and resisting during the Tasings

Video evidence recorded by Ashley Young and her testimony show that during the Tasering, Anastacio was lying on the ground in a fetal position, still and not resisting. Despite this incontrovertible video evidence, six of the Defendants claimed that, during the Tasing of Anastacio by Defendant Vales, Anastacio kicked, thrashed and continued to resist officers' commands.  (*See* Exh. 31 at 75-78; exh. 8 at 61:1 – 62:9; exh. 11 at 83:1 - 10; exh. 13 at 61:8-25; exh. 9 at 117:24 – 119:12; exh. 12 at 40: 1-10; 42-44.)

According to Defendant Supervisor De Jesus, Anastacio was constantly resisting, kicking, rolling, and refusing to stay still.  (Exh. 31 at 75:12-24.) Defendant Narainesingh claimed that there was no point when Anastacio lay still on the ground, silent, in a fetal position, with the Vales standing above him screaming, "[s]top resisting, stop resisting".  (Exh. 8 at 61:1 – 62:9.)  Defendant Avila testified that, at no time during the Tasings, was Anastacio still and unresisting.  (Exh. 12 at 42:6 – 44:14.)  He claimed that at no time did Anastacio lay on the ground, in a fetal position, still and unmoving for at least ten seconds. (*Id*. 43:2-15.)

The fourth video file recorded by Ashley Young contradicts Defendants' testimony.  (*See* Exh. 23.)  In the fourth video, Anastacio is seen lying on the

11-cv-00522-L-DHB

ground, in a fetal position.  (Exh. 23 at 00:01.)  Vales is standing over Anastacio,

Tasing him, while audibly screaming "stop resisting!"  (*Id.* starting at 00:01.)

Sparks of light flash from the Taser in Defendant Vales's right hand.  (*Id.* at 00:01

– 00:11.)  An officer with a flashlight stands near Anastacio's head and shines a

light down on Anastacio, illuminating the scene.  (*Id.* at 00:01.)  Vales continues to

scream "stop resisting" as he Tases Anastacio then leans down towards him.  (*Id.*

at 00:03 to 00:14.)  A dozen or more officers and agents surround Anastacio in a

circle as he is being Tased.  (*Id.* at 00:01.)  A voice is heard yelling "keep on

walking!"  (*Id.* at 00:10.)  Immediately thereafter, as if made aware of the presence

of the witnesses, the officer with a flashlight turns off the light.  (*Id.* at 00:11.)

With the light off, Vales leans in close to Anastacio.  (*Id.* at 00:12.)  He then

appears to punch and kick or stomp Anastacio.  (*Id.* at 00:14.)

At her deposition, Ms. Young testified that Anastacio lay on the ground and

he did not kick, roll, or attempt to get up on his feet before Vales unleashed the

Taser on Anastacio the first time:

> Q. Okay. Before the officer activated the taser, did you see
> Anastacio kick his legs?
> A No.
> Q Did you see him roll from side to side?
> A No.
> Q Did you see him attempting to get to his feet?
> A No.
> Q Did you see the officer remove the taser from his belt?
> A Yes.
> Q Okay. Did you see what hand he --

A His right hand.
Q His right hand, okay. Did he -- how long after he told
Anastacio to stop resisting did he remove the taser from his belt?
A Almost immediately.
Q Okay. And how long after he removed the taser from his belt
did he activate the taser?
A Almost immediately.

(Exh. 21 at 223:2-20.)  Ms. Young also heard a static, clicking noise with the first

use of the Taser.  (*Id*. at 223:21-25.)

While Vales repeatedly screamed "stop resisting" to Anastacio, as no point

did Anastacio resist Defendant Vales's commands:

Q So at any point when that agent was yelling "stop resisting,"
was Anastacio kicking?
A No.
Q Was he thrashing about?
A No.
Q Was he moving his head and trying to bite?
A No.
Q Was he banging his head against the cement?
A No.
Q Or the pavement?
A No.

(*Id*. at 270: 2-12.)

**b. Anastacio did not kick, thrash, or resist Defendant Vales's
commands even when the Taser allegedly failed to deliver an
electrical current**

In support of his motion for summary judgment, Defendant Vales attached

the declaration of Mark Kroll, the defense expert on "electronic control devices

('ECDs'), including the TASER X26."  (Decl. Mark W. Kroll, ¶ 1, doc. no. 239-

11-cv-00522-L-DHB

18.)  In his declaration, Mr. Kroll opined that no electric current was delivered to Anastacio during two of the Tases administered by Defendant Vales.  (*Id*. at ¶ 10.)

Mr. Kroll avers that he reviewed the "download record" for Defendant Vales's Taser.  (*Id*. at ¶ 8.)  That record shows that Vales activated the Taser twice at five seconds each.  (*Id*.)  Vales then activated the Taser for 13 seconds and again used the Taser for 12 seconds.  (*Id*.)  According to Mr. Kroll, when Taser probe wires are broken, or a Taser probe is dislodged from an individual, a circuit cannot be completed and no electric current is delivered to the targeted individual.  (*Id*. at ¶ 8.)  When the circuit is interrupted, the Taser's electrical current will arc across the gap between the electrodes on the tip of the Taser; such arcing is "readily visible at night." (*Id*.)  Because arcing is visible at the tip of Vales's Taser on Ashley Young's fourth video clip (*see* exhibit 23), Mr. Kroll opines that during the Taser activation for 13 seconds and the activation for 12 seconds, no current was delivered to Anastacio.  (*Id*. at ¶ 10.)

Mr. Kroll states that Anastacio most likely caused the Taser probe wires to break because he "rolled repeatedly on the ground immediately after the initial activation" by Defendant Vales.  (*Id*. at ¶ 10.)  Kroll did not review the deposition transcripts of Ashley Young, Humberto Navarrete, or any other independent witness to the events.  (*Id*. at ¶ 5.)

1

2

3

4

5

6

7

8

9

10

11

Mr. Kroll's opinion that Anastacio broke the Taser probe wires by rolling after the initial Tase must be disregarded entirely because he purposely failed to consider conflicting testimony by Ashley Young. Ms. Young testified at her deposition that Anastacio did not roll after the first Tase, but was moved by two officers to a different spot. *See supra*., section III(C)(1)(a). Defendants deposed Ms. Young on January 24, 2013. Mr. Kroll executed his declaration on April 3, 2013. Though he had ample time to read Ms. Young's deposition transcript, he chose not to do so.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Assuming the truth of Mr. Kroll's second opinion that no electrical current was delivered to Anastacio on the 13 second and 12 second activations, video recorded by Ms. Young shows that, even with an ineffective Taser, Anastacio cowered in a fetal position, unresisting, while Defendant Vales screamed at him. According to Kroll, the "arcing" of light visible in Ms. Young's final video clip indicates that the Taser's circuit is interrupted and no electrical current is being delivered to Anastacio. While the arcing occurs, the video shows Anastacio lying in a fetal position with his hands cuffed behind his back. (Exh. 23 at 00:01 – 00:11.) Anastacio is not rolling; he is not thrashing; and he is not kicking. *Id*. Defendant Vales stands near Anastacio's feet, with his right leg mere inches away from Anastacio's feet, but he is not being kicked; Anastacio does not even appear to move his feet. (*Id*. 00:01-00:10.)

89                                                11-cv-00522-L-DHB

Kroll concedes that there were two effective Tases of Anastacio.  According to the testimony of witness Ashley Young, Anastacio was passive and unresisting at all times; his conduct did not warrant the use of the Taser.

### c. Vales knew his use of the Taser on a compliant and unresisting Anastacio Hernandez-Rojas was unlawful

Defendant Vales' use of the Taser on a passive Anastacio Hernandez-Rojas violated the principles that he was taught during training.  (Exh. 51, Dep. Tr. Jerry Vales, at 60 – 63.)  During Defendant Vales's deposition, Plaintiffs' counsel questioned him regarding a 25 question, multiple choice test that Defendant Vales took for his basic certification course in the use of the Taser.  (*Id*. at 59:9 – 61:14.)  Question 10 of that test asked:

> If a subject stops resisting an officer, the use of the ECD
> (electronic control device) must:
> A. Stop
> B. Start
> C. Increase
> D. Decrease

(*Id*. at 55:21 – 57:3.)  Vales circled "A" as his response.  (*Id*. at 57:17 – 58:7; 59:16 – 60:14.)  Defendant Vales testified that he was taught that if a subject stops resisting an officer, the use of the electronic control device must stop.  (*Id*. at 60:16 – 61:14.)

11-cv-00522-L-DHB

When Plaintiffs' counsel attempted to question Vales regarding his persistent use of the Taser on an unresisting and passive Anastacio, Vales repeatedly invoked the Fifth Amendment to avoid answering the questions:

> Q. . . . I'm asking the rule that you were taught concerning the use of the Taser. The rule that if the person who is the subject stops resisting, you stop using the Taser; that rule, that principle was one that you understood and had in your mind on the 28th of May of 2010, correct?
> MR. TOLLES: Same objection and – and instruction; and in addition, the question is compound.
> BY MR. IREDALE:
> Q. Your answer?
> A. I decline to answer based on my Fifth Amendment right.

(Exh. 51 at 64:9-20.  *See also Id*. at 65-71.)

Defendant Vales refused to answer any questions regarding his persistent use of the Taser on an unresisting Anastacio while the Taser arced:

> Q. You saw that the Taser was arcing, a-r-c-i-n-g, when you pulled the trigger as he lay motionless on the ground, correct?
> MR. TOLLES: Object. It's vague as to time; it's an incomplete -- strike the last part. And I advise you not to answer based on the Fifth Amendment.
> THE WITNESS: I decline to answer this question based on my Fifth Amendment right.
> BY MR. IREDALE:
> Q. You learned in your Taser studies that when the electricity sparks from the barrel of the Taser, that is a sign that the wires are not in connection with one or more of the barbs, correct?
> MR. TOLLES: I advise you not to answer.
> THE WITNESS: I decline to answer this question based on my Fifth Amendment right.
> BY MR. IREDALE:

Q. You, nevertheless, saw that he remained still and on the
ground as you pulled the trigger on the Taser and saw the arcing?
MR. TOLLES: I advise you to decline to answer.
THE WITNESS: I decline to answer this question based on my
Fifth Amendment right.

. . .

BY MR. IREDALE:
Q. You knew that, at that point, Anastacio was not being
subjected to the electricity that you were trying to shoot through
your Taser?
MR. TOLLES: Same advice.
THE WITNESS: I decline to answer based on my Fifth
Amendment right.
BY MR. IREDALE:
Q. You knew that during that time -- during the whole time you
had the trigger pulled down, he, nevertheless, was not moving,
correct?
MR. TOLLES: Same advice.
THE WITNESS: I decline to answer this question based on my
Fifth Amendment right.
BY MR. IREDALE:
Q. He, nevertheless, was not resisting in any way?
MR. TOLLES: Same advice.
THE WITNESS: I decline to answer this question based on my
Fifth Amendment right.

(Exh. 51 at 66:12 – 68:13.)

Though Defendant Vales repeatedly invoked the Fifth Amendment to avoid

answering any questions regarding his use of the Taser against Anastacio, defense

"expert" Kroll now opines that Vales did not drive-stun Anastacio based on

information Defendant Vales communicated to him.  (Decl. Mark Kroll, doc. no.

239-18, at ¶ 11.)  It is unclear when Defendant Vales "reported that the cartridge on his ECD was removed after the incident".

The abundance of evidence indicating that Defendant Vales unreasonably deployed his Taser on Anastacio while he remained on the ground, passive, unresisting, and in handcuffs, makes any motion for summary judgment by Defendant Vales frivolous and inappropriate.  Defendant Vales abuses the Fifth Amendment privilege by refusing to answer Plaintiffs' counsel's questions at deposition, but then communicating information to his expert to assert that he did not drive stun Anastacio.  For all of these reasons, Defendant Vales's motion for summary judgment should be denied.

### 4. Defendant Supervisors Failed to Intervene to Stop Officers and Agents from Needlessly Brutalizing a Passive, Unresisting Anastacio

Contrary to claims made in their declarations, Defendants De Jesus, Caliri, and Avila (all supervisors) failed to intervene when Anastacio was handcuffed on the ground, surrounded by dozens of officers, and Tased repeatedly.  (Decl. Ramon De Jesus, doc. no. 197-14, at ¶¶ 1, 3-4; Decl. Edward C. Caliri, doc. no. 197-16, ¶¶ 1, 9-10; Decl. Guillermo Avila, doc. no. 197-15, ¶¶ 1, 4-6.)

Defendant De Jesus avers in his declaration that "[a]s is true with all supervisors it was and is my duty to oversee the conduct of officers under my command and ensure that they treat detainees and arrestees humanely and without excessive force.  Further it was and is my duty to intervene if I ever see an officer

utilizing excessive force on a detainee or arrestee."  (Decl. Ramon De Jesus, doc. no. 197-14, at ¶ 2.)  Defendant Caliri testified at his deposition that he perceived his role to be "mindful of everyone's safety," and to ensure that nothing got "too crazy."  (Exh. 13, Dep. Tr. Edward C. Caliri, II, at 53: 9-10; 54:7-19.)

Though they understood their duties and obligations as supervisors, video evidence and the accounts of independent eyewitnesses show that Defendants De Jesus, Caliri, and Avila failed to fulfill those duties when they passively observed events spiral out of control as officers encircled Anastacio and brutalized him while he lay on the ground in handcuffs.  *See supra*.  Caliri testified at his deposition that he never told Vales to stop after the first Tasing, or the second Tasing, and he did not tell agents to stop when he saw Anastacio face down on the ground, surrounded by many agents.  (Exh. 13 at 76:14-22.)   Defendants Caliri and Avila failed to intervene when officers forcibly restrained Anastacio after he was Tased, placed him on his stomach, and then crushed him with their weight. (Decl. Edward C. Caliri, doc. no. 197-16, ¶10; Decl. Guillermo Avila, doc. no. 197-15, ¶ 6.)

Because Defendant supervisors failed to intervene and failed to properly supervise subordinate officers and agents, their motions for summary judgment as to Plaintiffs' fourth cause of action should be denied.

**5. Defendant Avila Relies on Claims That are Not Corroborated by Any Other Witness and that are Patently False in the Face of Audio and Video Evidence.**

During his deposition, Defendant Avila gave a bizarre and bewildering account of events that is sharply at odds with the testimony of his co-defendants and clearly contradicted by video and audio evidence.

On the night of the incident, Defendant Llewellyn called Avila on the radio to ask him to come to Whiskey 2. (Exh. 12, Dep. Tr. Guillermo Avila at 23:10-18.) Avila arrived at Whiskey 2 in a Tahoe. (*Id*. 24:13-18.) When he arrived, he saw a man being held on the ground by two agents in plain clothes. (*Id*. 24:19-22; 25:3-7.) One agent held Anastacio's head while the other held Anastacio's arms. (*Id*. 25:8-19.) The officers attempted to place Anastacio in Avila's Tahoe. (*Id*. 26:19-24.)

Defendant Avila testified that Anastacio screamed "fuck you" to officers at one point. (Exh. 12 at 27:13 – 29:8.) He screamed the phrase loud and hard and he sounded angry, harsh, and defiant. (*Id*.) Avila's depiction of Anastacio as angry and defiant is belied by audio captured by Humberto Navarrete. In Mr. Navarrete's videos, Anastacio's voice is heard screaming in pain, filled with anguish, and pleading with officers. (Exh. 15, files VID 00004.AVI; VID 00005.AVI; VID 00006.AVI.)

Defendant Avila testified that when the CBP agent with the Taser arrived, Anastacio was not on the ground being restrained, but was seated on his buttocks, with his hands cuffed behind him, "ready to strike, ready to kick".  (Exh. 12 at 33:1-22.)  Avila claimed that there were no agents on top of Anastacio and he was not being held on the ground.  (*Id.* 33:12 – 34:6.)

Avila alleged that when the CBP agent (Vales) yelled "stop resisting", Anastacio would inch toward the agent to try to kick him.  (Exh. 12 at 39:23 - 40:10.)  Defendant Avila described Anastacio's movements as a "little dance" whereby Anastacio would inch towards the officer with the Taser.  (*Id.* 35:16-23.)  Avila claimed that, during the second Tase, because Vales had only one dart in his Taser, Vales moved in to drive stun Anastacio.  (*Id.* 39:23 – 40:10.)  At that point, according to Avila, Anastacio was sitting upright, ready to strike.  (*Id.*)  As Vales yelled "stop resisting" and other commands, Anastacio responded with a "[f]uck you.  What are you going to do?  Are you going to kill me?"  (*Id.*)  Avila claimed that as Vales moved forward, Anastacio kicked Vales in the chest.  (*Id.*)

Defendant Avila's testimony is contradicted by the testimony of Defendant Caliri and by the video recorded by witness Ashley Young.  Caliri testified at his deposition that he never witnessed Vales getting kicked by Anastacio.  (Exh. 13 at 61:5-7.)  Defendant Caliri never heard Anastacio scream "fuck you". (*Id.* 51:1-4; 9-12.)  The video of recorded by Ashley Young shows Anastacio on the ground,

his hands cuffed behind him, lying in a fetal position, unresisting, while Defendant Vales stands above him with the Taser screaming "stop resisting."   (Exh. 23.)  At no point is Anastacio engaging in a "little dance" with Vales, nor is he seen sitting upright, "ready to strike."

Defendant Avila's account of events is absurd and patently contradicted by video evidence and the testimony of his co-defendants.  His deposition testimony and declaration are unreliable and improper for use in support of any summary judgment motion.

## 6.  Defendant Llewellyn Knelt On Anastacio's Head and Neck After Vales Tased Anastacio

Defendant Llewellyn was present when Anastacio was Tased.  (Exh. 11, Dep. Tr. Derrick Llwellyn at 85:21 – 86:20.)  But he could not recall if he restrained Anastacio after the Tasing.  (*Id*. 95:16-21.)  He could not "recall" if he jumped on Anastacio after the Tasing.  (*Id*. 95:7-11.)  He could not "recall" if he was among the group of people struggling with Anastacio before Anastacio stopped breathing.  (*Id*. 101:23 – 102:1.)  He could not recall where he was while the struggle with Anastacio went on.  (*Id*. 102:2-5.) Llewellyn "recalled" administering CPR to Anastacio.  (*Id*. 96:4-11.)  But he could not "recall" if he used force against Anastacio in the minute or two before he ripped open Anastacio's shirt to administer CPR.  (*Id*. 102: 17-19; 97:8-12.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

When interviewed by SDPD investigators immediately after the incident, Defendant Llewellyn informed investigators that Anastacio was being combative after being Tased so "**we** subdued the guy again." (emphasis added)  (Exh. 53, transcript of audio recording of SDPD interview of Derrick Llewellyn, at 34:14-18.)  Llewellyn told investigators that the group who subdued included himself, the only Border Patrol agent, and several CBP officers.  (*Id.* at 34:19 – 35:2)  One of the CBP officers managed to grab Anastacio's feet and the officers placed flex cuffs on Anastacio's ankles.  (*Id.* at 35:6 - 23.)  Though Defendant Llewellyn could not recall if he struggled with Anastacio while testifying at his deposition, he was able to remember that he did not place flex cuffs on Anastacio.  (Exh. 11 at 100:11-14.)

The fourth video recorded by Ashley Young shows a melee after Defendant Vales Tased Anastacio with the appearance that officers are kicking and punching Anastacio.  (*See* exh. 23.)  A voice, presumably Anastacio's voice, is heard groaning noises that sound like "oh, oh-oh-oh".  (*Id.* at 00:18 - 00:24.)  An officer rips Anastacio's pants off.  (Exh. 23 at 00:24.)  At 00:38 in the video, an officer turns on a powerful flashlight, which clearly illuminates the scene.  The bare legs of an officer can be seen crushing down on Anastacio's head and neck.  (*Id.* at 00:38.)

Attached hereto as exhibit 4 is an enhanced video of Ashley Young's

recording made by videographer Shayne Davidson. (*See also* Decl. Shayne Davidson at ¶ 3.) A clock appears at the bottom left side of the enhanced video. At 00:38, a red arrow appears that points out Anastacio's head. (Exh. 4 at 00:38.) The bare legs of an agent are seen pressing down on Anastacio's head and neck. (*Id.*)[12]

These legs which were pressing down on the handcuffed Anastacio belonged to Defendant Llewellyn, who was involved in "subduing" Anastacio and whose claimed lack of recollection of precisely what he did at this critical juncture can be found by a reasonable jury to be a false denial and proof of consciousness of guilt for his actions.

### 7. Defendants Deliberately Subjected Anastacio to Positional Asphyxia, Despite Defendants' Training and Knowledge Regarding the Danger

At their depositions, Defendants testified to their training regarding the dangers of positional asphyxia. Defendant Ducoing testified that he received training at the Border Patrol academy for approximately three months. (Exh. 1 at 9:10-14.) He studied positional asphyxia at the Border Patrol academy. (*Id.* at 77:20-22.) He was taught that a person who is on his stomach, in a strained position, with pressure on his back, could die from asphyxia. (*Id.* at 77:23 – 78:5.) Defendant Edward Caliri, a Border Patrol supervisor, testified that he was aware of

---

[12] Attached hereto as exhibit 54 is an enhanced version of Ashley Young's video; the speed of the video is reduced by 50 percent.

restraint asphyxia and that he knew that agents must be careful of that.  (Exh. 13 at 83:22-25.)

Defendant Vales testified that he understood that an individual could have difficulty breathing when the person is face down with weight or pressure on his back.  (Exh. 51 at 89:13 – 90:5.)  On the 25 questions multiple choice test that Vales completed as part of his certification course in the use of the Taser, Vales answered question no. 22 as follows:

> 22.  Subject exposed to an ECD and handcuffed may experience Positional Asphyxiation if allowed to:
>
> A.  Lie in a prone/face down position or one that restricts normal breathing.

(Exh. 51 at 90:7 – 14.)  Vales answered "A" and testified that he believed this to be the correct answer.  (*Id*. at 90:16 – 91:2.)

Defendant Sauer, a fellow Customs and Border Protection employee and close colleague of Vales, similarly testified about his training and knowledge regarding the dangers of positional asphyxia.  (Exh. 52, Dep. Tr. Kurt Sauer, at 8:8-10; 16:15-25; 44:1-15.)  Defendant Sauer is certified to use the Taser as a CBP officer.  (*Id*. 15:23-25.)  Like Defendant Vales, he took the same 25 question, multiple choice test as part of the basic certification course in the use of the Taser. (*Id*. at 46:2 – 10; 47:7 – 48:20.)  Defendant Sauer testified that an individual in restraints who is placed on his stomach can incur problems due to positional

asphyxia.  (*Id*. at 44:1-9.)  As part of his Taser training, he learned that when an individual is Tased, that individual is particularly vulnerable to positional asphyxia.  (*Id*. at 44:10-15.)

After Vales Tased Anastacio, Sauer grabbed Anastacio's legs.  (*Id*. at 41:4-9.)  Anastacio was on his stomach.  (*Id*.)  Sauer had his right knee on Anastacio's arm.  (*Id*. at 41:19-21.)  He and Boutwell criss-crossed Anastacio's legs, making a "X."  (Exh. 24, Dep. Tr. Boutwell, at 85:8 – 86:23.)  Boutwell and Sauer held Anastacio's legs for approximately two minutes until someone placed flex cuffs to secure Anastacio's legs.  (*Id.* at 87:11-15.)  After Anastacio's legs are restrained, Defendant Sauer testified at his deposition that everyone stepped back and he paused to reassess the situation.  (Exh. 52 at 60:5-13.)  While he reassessed the situation, Anastacio remained face down on the ground, lying on his stomach.  (*Id*. at 60:14-18.)  At that time, Defendant Sauer knew that an individual could asphyxiate if he is left face down, particularly after a struggle.  (*Id*. at 61:1-4.)

Defendant Sauer and another officer rolled Anastacio on his back.  (*Id*. at 61:7-20.)  He noticed that Anastacio was unresponsive and turning an off-white color.  (*Id*.)  About 90 seconds to two minutes passed between the time Defendant Sauer noticed that Anastacio was nonresponsive to the commencement of CPR.  (*Id*. 62:8-13.)  In that 90 second to two minute period, he did not see Anastacio breathe.  (*Id*. 62:23 – 63:2.)

11-cv-00522-L-DHB

# V.

## DEFENDANTS HAVE THE BURDEN TO PROVE QUALIFIED IMMUNITY

Qualified immunity is an affirmative defense. Defendants carry the burden of proof. *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). *See also, Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("Because the moving defendant bears the burden of proof on the issue of qualified immunity, he or she must produce sufficient evidence to require the plaintiff to go beyond his or her pleadings."); *Jones v. Martel* 2011 WL 720066, 6 (E.D.Cal.,2011) ("Because qualified immunity is an affirmative defense, the burden of proof initially lies with the official asserting the defense."); *Benigni v. City of Hemet*, 879 F.2d 473, 479-80 (9th Cir. 1989); *Dupris v. McDonald* 2012 WL 210722, 3 (D.Ariz., 2012) ("Qualified immunity is an affirmative defense. The defendant asserting qualified immunity bears the burden of both pleading and proving the defense.")

### A. Defendants have failed to Meet Their Burden Pursuant to FRCP Rule 56

As the moving party, Defendants have failed to meet their burden. Defendants' "facts" are largely their own self-serving assertions, almost entirely unsupported by any references to evidence that directly contradict Defendants' version of the events. Assertions of innocence by Defendants, much of which are directly contradicted by their own co-defendants, are not an adequate substitute for

specific facts or "evidence that negates an essential element of the nonmoving party's case." *Celotex*, 477 U.S. at 331. Defendants in this case have deliberately omitted from their motions the presentation of evidence from many eyewitnesses, video from the government cameras at the detention center, and evidence that certain defendants contradict others on material issues. They knowingly violated the basic principle of Rule 56: evidence is to be taken in the light most favorable to the non-moving party. By seeking qualified immunity on the basis of contested facts, they have forfeited their right to compel this Court's time and analysis of motions framed entirely in violation of the standard governing summary judgment motions.

A movant may not "identify only those portions of the record [supporting its] position on summary judgment, although there exists evidence to the contrary of which defendants are aware." *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988). A motion that ignores known, material and disputed facts is improper, and must fail. "When a party has obtained knowledge through the course of discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in responding to the motion, he defeats [the] purpose [of summary judgment]; and, more importantly, violates the rules of procedure which govern the conduct of trial, specifically Rule 11." *Goka*, 862 F.2d at 650.

11-cv-00522-L-DHB

**B. Plaintiffs Move to Strike the Expert Opinions Submitted in Support of Defendants' Summary Judgment Motions**

Defendants submitted the expert reports of Urey Patrick and Gary Vilke and a declaration by defense expert Mark Kroll in support of their motions for summary judgment.  All three expert opinions fail to consider conflicting testimony by co-defendants and contradictory factual accounts by independent eyewitnesses.  All three experts impermissibly weigh witness testimony and make credibility determinations of witnesses.  Because these experts contravene controlling caselaw and fail to meet the standard of Fed. R. Evid. Rule 702, their opinions are inadmissible and should be stricken.

Determining the weight and credibility of witness testimony "has long been held to be the part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."  *United States v. Scheffer*, 523 U.S. 303, 313 (1998) (internal citations omitted).  *See also Cudjo v. Ayers*, 698 F.3d 752, 763 (9th Cir. 2012) ("Supreme Court precedent makes clear that questions of credibility are for the jury to decide" *citing United States v. Bailey*, 444 U.S. 394, 414 (1980)).

Defendants submitted the expert reports of Urey Patrick in support of their motions for summary judgment.  *See* doc. nos. 247-17; 247-20; 248-17; 248-20. Mr. Patrick's report ignores evidence, disregards contradictions in Defendants' testimony, and misconstrues or ignores the testimony of independent eyewitnesses,

all for the purpose of producing an opinion that sanitizes the actions of Defendants.

Mr. Patrick makes credibility determinations of witness testimony when he ignores contradictory statements made by Defendants and selects the version of events that best suits his predetermined opinion.  He writes in his first report that, after Ducoing removed the handcuffs from Anastacio, Anastacio became combative, swinging both arms, and throwing punches.  (Urey Patrick expert report, doc. no. 247-17, at 4.)  Here, he relies on the version of events given by Narainesingh and Piligrino to portray Anastacio as assaultive and combative.  He purposely ignores the contradictory statements of Ducoing who himself testified at his deposition that Anastacio did not punch him.

Patrick conveniently ignores evidence that does not support his opinion.  For example, on page 12 of his supplemental report, he claims that Anastacio was not a victim of excessive and unlawful force because the "medical examiner did not record any evidence of physical trauma indicative of such force."  (See doc. no. 247-20.)  In making that claim, Mr. Patrick blatantly ignores Dr. Wagner's autopsy report, which describes a large hematoma on Anastacio's upper left abdomen, and which Dr. Wagner states is "consistent with a collapsible baton strike."  (*See* exh. 43 at 5-6.)  Mr. Patrick  ignores the autopsy report of Dr. Pietruszka, which describes a linear hematoma with a "railroad track appearance" measuring 6 cm x 8cm in Anastacio's left upper chest and a linear  hematoma measuring 7.5 cm x 1.5

11-cv-00522-L-DHB

cm in Anastacio's lower left chest.  (Exh. 44 at 3.)  (Dr. Pietruszka testified at his deposition that these injuries indicated the use of batons and other blunt force objects.)

Finally, Mr. Patrick asserts the ridiculous opinion that testimony by civilian witnesses do not show that Anastacio was "calm, passive, and compliant.  They attest to him screaming and moving on the ground."  (Urey Patrick supp. report, doc. no. 247-20, at 11.)  Independent eyewitnesses, such Ashley Young and Humberto Navarette, testified that Anastacio was screaming for help and multiple witnesses watched as Anastacio lay on the ground, unresisting and handcuffed as he was beaten and Tased.

The opinion of Mark Kroll, Defendants' Taser expert, is similarly flawed in that it fails to consider all facts of the case.  Mr. Kroll has not even read the deposition transcripts of Ashley Young and Humberto Navarette.  Decl. Mark Kroll, doc. no. 239-18, at ¶ 5.  He avers that he has reviewed "officer depositions," but he does not state who these "officers" are and does not make clear whether these are Defendant officers or other investigating offices from SDPD.

Likewise, defense medical expert Dr. Gary Vilke selects evidence and testimony that supports his opinion while purposely ignoring unfavorable evidence.  *See* doc. nos.  153-3 and 153-4.  For example, Dr. Vilke's opinion that Anastacio did not suffer from positional asphyxia completely ignores the testimony

of Defendants Boutwell and Sauer who admitted that they forcibly restrained

Anastacio while he was face-down and handcuffed after he was Tased.  *See* doc.

no. 153-3 at 11-12.

The opinions of Mr. Kroll, Dr. Vilke, and Mr. Patrick only consider

testimony and evidence that is favorable to Defendants and consistent with their

opinions.  They implicitly make credibility determinations beyond the scope of any

expert witness role.  Their "expert" opinions should be disregarded.  The opinions

are inadmissible under Fed. R. Evid. Rule 702 and Plaintiffs move to strike their

opinions entirely.

## VI.
## THE MOTIONS TO DISMISS THE FIRST AMENDMENT RETALIATION CLAIM SHOULD BE DENIED

Defendants, in multiple interations, move to dismiss the *Bivens* claim

alleged in the first cause of action. This is a claim of retaliation for exercise of First

Amendment rights. The retaliation alleged included Ducoing's roughing up

Anastacio, Finn's actions in denying Anastacio the right to make a complaint and

summarily ordering him removed for his attempts to complain against Ducoing,

and the actions of defendants at the port of entry because Anastacio was crying out

and objecting to their actions. Part of defendants' retaliatory actions involved the

brutalization of Anastacio at the border as he was crying out for them to stop,

asking for help, and objecting to being treated "like an animal." The defendants

argue, in essence, that the propriety of any force used (not only excessive force claims) by law enforcement be analyzed under the Fourth Amendment objective reasonableness standard. Thus, they reason, since the retaliation claim is based in part on the use of force, and the legal basis for the retaliation claim is the First Amendment, not the Fourth Amendment, the retaliation claim must be dismissed. Defendants misread both the complaint and legal precedent, and fail to properly parse the elements of each cause of action. *Graham v. Connor* 490 U.S. 386 (1988) holds the Fourth Amendment is the legal basis for analyzing a claim of excessive force; it does not say that force imposed to retaliate for exercising the First Amendment is not a separate Constitutional wrong.

Plaintiffs rely not only on the use of force as proof of retaliation, but on multiple other factual bases. Anastacio had a right to request medical care, and to complain of physical mistreatment by agents without retaliatory action of any kind. After Anastacio asked to keep his water, Ducoing retaliated by slapping a jug from Anastacio's hand, kicking his ankles, pushing him to a wall and handcuffing him. There then occurred almost half an hour of discussion, during which Anastacio asked Ducoing why Ducoing had hit him. Thereafter, when Anastacio told Finn that one of his agents had kicked his ankle, complained of that mistreatment and requested medical care, Finn told him he would be returned forthwith to Mexico, denied him medical care, and refused to process, investigate or report Anastacio's

claim of mistreatment. Finn then ordered the same agent about whom Anastacio had complained (Ducoing) to transport him forthwith to the border, despite the obvious likelihood that Ducoing would retaliate physically when they were alone. Anastacio's request to use the telephone before he left the Border Patrol facility was denied. Once at the border, Ducoing and Krasielwicz used a pretext (Anastacio didn't put his hands behind his head quickly enough after being un-handcuffed) to "grab" him, hurl him to the ground, handcuff him and torment him.

Anastacio cried out while on the ground, protesting his mistreatment. Some of his words were preserved on videotape. They were all utterances protected by the First Amendment:

> VID 00004.AVI
> ...[Anastacio] "Que les hago?"  *( What did I do?)*
> [Anastacio]  "Ayudenme."  *(Help me)*
> [Anastacio]  "Ah. No! No! Ayuda.  Ayúdenme!  Ya! Por favor! Señores ayúdenme! Ay, ay, ay." …
> *(Ah. No! No! Help! Help me! Please! People help me! Ay, ay, ay.) …*
> [Anastacio]  "Ayuden me por favor!" *(Help me please! )*
> [Anastacio]  "Me tratan como a un animal"  "Ah, ah, ah. … No.  Ayuda.  No! Ay ay." *("You're treating me like an animal") ( "Ah, ah, ah. No. Help. No! Ay ay.") …*
> [Anastacio]  "No. No. No. Ay! No. No!  Quitenmelo! Mama!  Ay! No!"  *(No. No. No. Oh! No. No! Take him off me! Mother! Ay! No! ")*

(Ex. 18)

Anastacio's protestations and pleas resulted in his being punched, kicked, Tasered and further abused. A reasonable jury can infer that the defendants while

109

he was lying handcuffed on the ground, face down, was retaliation for his refusal to be quiet in the face of the abuse he had suffered. This determination turns on an analysis by the jury of the motivation of the agents and whether they acted in retaliation. It is a question of fact as to their motive in acting as they did. The Fourth Amendment cause of action set forth under *Bivens* is based on an entirely separate assessment of the objective reasonableness of the use of force.  These are separate inquiries.

The elements of each cause of action are different. The cause of action for retaliation for First Amendment rights was recently addressed by the Ninth Circuit. In *Ford v. City of Yakima* 706 F.3d 1188 (9th Cir. 2013) the Court held that a motorist's criticism of police for what the motorist perceived to be an unlawful and racially motivated stop was protected speech. The policeman's booking and jailing the citizen in retaliation was actionable, notwithstanding probable cause to arrest the motorist for a noise violation.

The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461, (1987). While an individual's critical comments may be "provocative and challenging," they are "nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive

11-cv-00522-L-DHB

evil that rises far above public inconvenience, annoyance, or unrest." *Id.* (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)).

Anastacio's speech in objecting to Ducoing about Ducoing's own abuse; in complaining to Finn of Ducoing's misconduct; his requesting medical care; and his objecting to his treatment at the border, fall "squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech... is categorically prohibited by the Constitution." *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990).  This record provides sufficient evidence to demonstrate that the defendants' "acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir.1999)

While the issue of causation ultimately is for the trier of fact, Plaintiffs have provided sufficient evidence for a jury to infer that the defendants' retaliatory motive was a cause of their actions, thus satisfying the causation element of a First Amendment retaliation claim for the purposes of qualified immunity. *Cf. Duran*, 904 F.2d at 1378 (finding summary judgment inappropriate where the officer admitted to stopping the plaintiff because the plaintiff made obscene gestures and yelled profanities but claimed he had no retaliatory motive because he honestly believed criminal activity might be afoot); *Mendocino Envtl. Ctr.*, 192 F.3d at 1303 ("The possibility that other inferences could be drawn [regarding the officers'

motivations] that would provide an alternate explanation for the appellants' actions does not entitle them to summary judgment."). Taken in the light most favorable to Plaintiffs, the facts establish that the defendants violated Anastacio's right to be free from retaliation for complaining and seeking redress.

Police officers in our circuit have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech. *See Duran*, 904 F.2d at 1375-78 (holding that a police officer's traffic stop and subsequent arrest of an individual who directed obscene gestures and words toward that officer was unlawful because it was well-established that police officers may not exercise their authority for personal motives, especially in response to an individual's criticism or insults); see also *Beck v. City of Upland*, 527 F.3d 853, 871 (9th Cir.2008) (holding that *Duran* clearly established that police officers could not use their power to retaliate against an individual for his free speech).

Generally to prove a First Amendment retaliation claim, a plaintiff must show that: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right. *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)).

The Fourth Amendment is used to analyze whether police force was excessive. In determining whether any action is retaliatory, the analysis is driven by First Amendment principles. There are many cases in which plaintiffs have pled both excessive force and retaliation involving force. See e.g. *Morgan v. County of Nassau* 720 F.Supp.2d 229 (E.D.N.Y. 2010) *cf. Greene v. Barber* 310 F.3d 889 (6th Cir. 2002) In *Jones v. Parmley* 465 F.3d 46 (2nd Cir. 2006) then Circuit Judge Sotomayor dealt with a case in which police conduct was alleged to be both excessive force (based on the Fourth Amendment) and retaliation for expressive speech (based on the First Amendment) In that case, both claims relied on the same set of factual allegations.

The defendants' claim that if they use excessive force, they cannot also be liable for use of force (excessive or not) as retaliation is contrary to case law and reason. Plaintiffs' first cause of action for retaliation should not be dismissed.

## VII.
## THE DEFENDANTS HAVE NO VALID QUALIFIED IMMUNITY DEFENSE TO THE CLAIMS OF EXCESSIVE FORCE AND WRONGFUL DEATH

Defendants seek qualified immunity for their use of excessive force. Their claims are not well taken. They have relied on the evidence in the light most favorable to them. But the qualified immunity analysis must rely on the facts in the

light most favorable to the plaintiffs. The law itself was clear that their use of force in these circumstances, under plaintiffs' reading of the facts, was clearly illegal.

A Fourth Amendment claim of excessive force is analyzed under the framework set forth by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, (1989). That analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. *Id.* at 396 Determining whether a police officer's use of force was reasonable or excessive therefore "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. *Id.*; see *Deorle v. Rutherford*, 272 F.3d 1272, 1279-81 (9th Cir.2001). Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, the Ninth Circuit has held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. See, e.g., *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10[ (9th Cir.1997)] (citing several cases). This is because police misconduct cases almost always turn on a jury's credibility determinations. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002).

"To put it in terms of the test we apply: the degree of force used by [the police] is permissible only when a strong government interest *compels* the employment of such force." *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001) (emphasis added). "The essence of the *Graham* objective reasonableness analysis" is that "'the force which was applied must be balanced against the *need* for that force: it is the need for force which is at the heart of the *Graham* factors.'" *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (quoting *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)) (emphasis in original).

In addition to the basic *Graham* factors, (nature of the offense, whether there is active resistance or flight, and whether there is an immediate threat), the Ninth Circuit permits a district court to consider the severity of the injury in evaluating "whether the force used was reasonable in light of all the relevant circumstances." *Hammer v. Gross*, supra, 932 F.2d at 846 (emphasis in original). "A court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. Id. At 847 "[I]f the extent of the injury to [plaintiff] is serious enough, a jury could conclude that [the officer] used force in excess of what was reasonable, even if

[plaintiff] had been resisting at the time." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000.)

Wrongful death cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness.  District Court judges must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story - the person killed - is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. *Ting v. United States*, 927 F.2d 1504, 1510-11 (9th Cir. 1991). In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Ninth Circuit precedent clearly established that the force these defendants used was excessive. In *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), the Ninth Circuit Court of Appeals held that the policemen's action of continuing to press their weight onto a mentally ill detainee's neck and torso as he

lay handcuffed on the ground and begged for air constituted excessive force. This excessive use of force on an unarmed, handcuffed detainee posed a risk of compression asphyxia and was severe. This was especially egregious because the detainee was handcuffed and did not resist officers after he was on the ground.

In *Drummond*, independent eyewitnesses saw one officer knock Drummond to the ground where the officers cuffed his arms behind his back as Mr. Drummond lay on his stomach. Although Drummond offered no resistance, another officer "put his knees into Mr. Drummond's back and placed the weight of his body on him. The first policeman also put his knees and placed the weight of his body on him, except that he had one knee on Mr. Drummond's neck." 343 F.3d at 1054

After Mr. Dummond fell into respiratory distress, the officers continued to put their weight on his back and neck. 343 F.3d at 1054-55. Approximately twenty minutes after Drummond was taken down, Officer Gregory Sawyer arrived at the parking lot. The officers then obtained a "hobble restraint," which they used to bind Drummond's ankles. One minute after the restraint was applied, Drummond went limp, and the officers realized that he had lost consciousness. They checked his pulse, and then removed the handcuffs and hobble restraint and turned him over, onto his back. The officers attempted to perform CPR on Drummond until the paramedics finally arrived. 343 F.3d at 1055.

11-cv-00522-L-DHB

Drummond's medical expert stated that Drummond "suffered a cardiopulmonary arrest caused by lack of oxygen to his heart. The lack of oxygen ... was caused by his inability to breathe caused by mechanical compression of his chest wall such that he could not inhale and exhale in a normal manner. ...that this occurred when [Drummond] was face[-] down on the ground and the police officers set upon his back preventing the anterior wall of his chest from expanding." (*Id.*) As a result of these events Drummond fell into a permanent vegetative state. (*Id.*)

In this case, the defendants used clearly excessive force. Besides beating and kicking Anastacio, the defendants held him handcuffed with their weight pressing on his back for at least twenty minutes. Then defendant Vales used the Taser, both in probe and drive-stun mode multiple times on a supine, handcuffed man. After this, Vales can be seen on video making punching motions towards Anastacio, while another agent pulls Anastacio's pants off his legs. Sauer and Boutwell then flip Anastacio face down and can be seen pressing on him, while another agent, believed to be Llewellyn, kneels on Anastacio's head. The autopsy results which show extensive hemorrhage of the back of the neck and upper back confirm the extent of the force exerted on Anastacio's back.

In *Drummond* the Court wrote:

"We first assess the quantum of force used to arrest [the plaintiff] by considering the type and amount

of force inflicted.'" *Deorle*, 272 F.3d at 1279 (internal
citations omitted). Although the officers in this case did
not shoot or beat Drummond, the force allegedly
employed was severe and, under the circumstances,
capable of causing death or serious injury. Drummond
claims that two officers continued to press their weight
on his neck and torso as he lay handcuffed on the ground
and begged for air. Under similar circumstances, in what
has come to be known as "compression asphyxia," prone
and handcuffed individuals in an agitated state have
suffocated under the weight of restraining officers. See,
e.g., *Jones v. Ralls*, 187 F.3d 848, 850, 852 n. 4 (8th
Cir.1999); *Bozeman v. Orum*, 199 F.Supp.2d 1216, 1226
(M.D.Ala.2002); *Tofano v. Reidel*, 61 F.Supp.2d 289,
292-95 (D.N.J.1999); *Alexander v. Beale St. Blues Co.*,
108 F.Supp.2d 934, 939 (W.D.Tenn.1999); *Johnson v.
City of Cincinnati*, 39 F.Supp.2d 1013, 1018 (S.D.Ohio
1999); see also cases cited infra at 1061.4
343 F.3d at 1057

In this case, taken in the light most favorable to plaintiffs, Anastacio had

done nothing to merit this mistreatment. He was being returned to Mexico, and no

criminal charges were being pressed. Thus, there was no crime which justified the

use of any force, much less the massive amount used. The officers' claim that

Anastacio "struggled" before being taken to the ground and handcuffed is highly

suspect. Anastacio is the witness who could contradict their claims, and he is dead.

But even their own versions show that it was the agents who first "grabbed"

Anastacio, allegedly because instead of moving his hands up, he put them by his

side. After Anastacio was on the ground and handcuffed, the third party witnesses

tell us he did not resist or present any threat to the safety of the officers or others.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nor did he resist arrest or attempt to flee. *See Graham* 490 U.S. at 396. The only thing the objective witnesses tell us is that he cried out in pain, begged the agents to stop, and asked for help. These statements testified to by witnesses and captured on video do not justify the use of brutal force.

In *Drummond*, the Court noted:

> ... after he was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted. Drummond was a mentally disturbed individual not wanted for any crime, who was being taken into custody to prevent injury to himself. Directly causing him grievous injury does not serve that objective in any respect. Once on the ground, prone and handcuffed, Drummond did not resist the arresting officers. Nevertheless, two officers, at least one of whom was substantially larger than he was, pressed their weight against his torso and neck, crushing him against the ground. They did not remove this pressure despite Drummond's pleas for air, which should have alerted the officers to his serious respiratory distress....
>
> The officers — indeed, any reasonable person — should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable. In this case, it is even more striking that the officers had been specifically warned of the extreme danger of this sort of force. Not only was there ample publicity in Southern California regarding similar instances of asphyxiation as a result of the use of similar force in the months before the incident, see $650,000 Settlement OKd in Inmate Death, L.A. TIMES, Feb. 24, 1999, at B4; Supervisors Asked to OK $2.5 Million to Settle Suits, L.A. TIMES, Feb. 2, 1999, at B1; but, more important, the Anaheim police department had issued a training bulletin in April of 1998 specifically warning

officers that "when one or more [officers] are kneeling on a subject's back or neck to restrain him, compression asphyxia can result [`t]hat may be a precipitating factor in causing death.'" Anaheim Training Bulletin # 98-14 (Apr.1998). Although such training materials are not dispositive, we may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable. As the Fifth Circuit stated, "it may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 449 (5th Cir.1998). See also *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir.1994)
343 F.3d at 1059

## VIII.
## DEFENDANT VALES HAS NO LEGITIMATE CLAIM THAT HIS CONDUCT WAS NOT CLEARLY ILLEGAL

The controlling law on the use of the Taser in effect at the time of this case is set out in *Bryan v. MacPherson*, 590 F.2d 767 (9th Cir. 2009).  "Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles.  The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless."  *Bryan v. McPherson*, 590 F.3d 767, 772-73 (9th Cir. 2009) superseded sub nom. *Bryan v. MacPherson*, 608 F.3d 614 (9th Cir. 2010) opinion withdrawn and superseded on denial of reh'g, 630 F.3d 805 (9th Cir. 2010) (internal quotation marks and citation omitted).  "Consequently, the objective facts reveal a tense, but

121                                   11-cv-00522-L-DHB

static, situation with Officer McPherson ready to respond to any developments while awaiting back-up. Bryan was neither a flight risk, a dangerous felon, nor an immediate threat. Therefore, there was simply "no immediate need to subdue [Bryan]" before Officer McPherson's fellow officers arrived or less-invasive means were attempted.  Officer McPherson's desire to quickly and decisively end an unusual and tense situation is understandable. His chosen method for doing so violated Bryan's constitutional right to be free from excessive force." *Id.* at 780-81.  (Internal citations omitted)

> *Bryan v. MacPherson I* was superseded in 2010, after the death of Anastacio, based solely on the issue of qualified immunity.  *Bryan III* specifically found that the Ninth Circuit by its decision "did not alter our holding that Officer MacPherson used excessive force on Bryan" by Tasering an unarmed man, only that based on "recent statements [in other circuit opinions] regarding the use of tasers, and the dearth of prior authority," a "reasonable officer in Officer MacPherson's position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances Officer MacPherson confronted in July 2005." *Bryan v. MacPherson*, 630 F.3d 805, 809 (9th Cir. 2010). As of May 28, 2010, the law in the Ninth Circuit was clearly established by *Bryan v. McPherson I* that using the Taser on a suspect who presented no threat to the officers violated the Constitution.

A year **after** the incident in question, there were two related opinions issued by the Ninth Circuit Court of Appeal sitting *en banc* in *Mattos v. Agarano*, and *Brooks v. Seattle,* 661 F.3d 433 (9th Cir. 2011). The Court found the use of a taser, in two specific factual circumstances, unconstitutional. While the Court found the particular use of force in *Mattos* and *Brooks* unconstitutional, it held the defendant officers were not liable in the civil suits filed against them because the law governing Taser use wasn't clearly established at the time of their arrests in 2006 and 2004 respectively. *Mattos* and *Brooks* are of no consequence in the analysis of qualified immunity in the present case.

The use of the X–26 Advanced Taser in dart mode against Anastacio constituted an "intermediate, significant level of force that must be justified by a strong government interest [that] compels the employment of such force." *Bryan v. MacPherson*, 608 F.3d 614 (9th Cir.2010). As explained by the Ninth Circuit, the X26 Taser delivers a 1200 volt, low ampere electrical charge that instantly overrides the victim's central nervous system and paralyzes the muscles throughout the body. The pain is intense and felt throughout the body, and can result in immobilization, disorientation, loss of balance and weakness, even after the electrical current has ended. There was no governmental interest in inflicting this type and level of pain on a man who was hundcuffed and surrounded by officers. Vales' actions were unnecessary and clearly constituted excessive force.

# IX.
## THE APPROPRIATE STANDARD APPLICABLE TO THE FAMILIAL ASSOCIATION CAUSE OF ACTION IS "DELIBERATE INDIFFERENCE"

Defendants argue that the Court must apply the "purpose to harm" standard under the Fifth Amendment for the right of association cause of action.  The "purpose to harm" standard often reserved for high speed chases. At the time of Anastacio's death, there was no need for any Defendant to make a "snap judgment" because of an "escalation situation."   There is no dispute. Anastacio was in handcuffs on the ground, at the port of entry, and surrounded by between five and twenty federal agents during the relevant events.

"[T]he critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 373 (9th Cir.1998) (reviewing circuits' treatment of *County of Sacramento v. Lewis,* 533 U.S. 833 (1998) decision).  As the *Lewis* Court explained, the deliberate indifference standard "is sensibly employed only when actual deliberation is practical." *Id.* at 851.  According to *Lewis*, when officials have time to make unhurried judgments, the deliberate indifference standard is proper.  *Id.* at 853.

The deliberate indifference standard is appropriate in this case because Defendants had ample time to deliberate in the twenty minutes in which they used

124

11-cv-00522-L-DHB

force on Anastacio.  Defendants in this case in no way had to act "in haste, under

pressure" as the officers in *Lewis*.  *Id.* at 853. The "intent to harm" standard applies

in situations where the police "have obligations that tend to tug against each other"

and must make decisions "in haste, under pressure, and frequently without the

luxury of a second chance." *Lewis,* 523 U.S. at 853, 118 (internal quotation marks

omitted). Ninth Circuit decisions and those of other circuits support Plaintiffs'

position. *See, e.g., Rivas v. City of Passaic,* 365 F.3d 181, 195-96 (3d Cir.2004)

(holding that under *Lewis,* the "intent to harm" standard applies to split-second

decisions, but not "where an official had to act with some urgency").  When the

facts of a case "falls within the "middle-range" between custodial settings and

high-speed chases, "the more appropriate standard of review is 'deliberate

indifference.'"   *Ewolski v. City of Brunswick*, 287 F.3d 492, 510-11 (6th Cir.

2002).

   There was no "fast action" or high speed chase in this case.  "Fast action"

and "competing public safety obligations" under *Porter v. Osborn*, 546 F.3d 1131,

1139 (9th Cir. 2008) do not apply here.  This was a "slow action" event as

Anastacio lay on the ground in handcuffs.  There is sufficient physical evidence

and witness statements to show that no one was in danger when Defendants used

force on Anastacio, resulting in his death.  District Courts have found that unless

actual deliberation was impossible, the deliberate indifference standard applies. In

*Alvarado v. City of Santa Ana*, SACV 12-0328 JGB ANX, 2013 WL 2237891 (C.D. Cal. May 21, 2013), the Court found that even though the officers were only inside the home for eleven seconds, they were at the scene for over 25 minutes. Thus, a jury could reasonably find that the officers had time to deliberate before shooting the decedent. In *Alvarado*, the Court found that "situation was not evolving rapidly, in fact it was not evolving at all," because there was no altercation, screaming, or crying inside the home and the decedent was not involved in any evasive action because he was standing still with his arms at his sides at the time he was shot.

In this District, Judge Gonzalez found that applicable standard should be that of deliberate indifference in a shooting death case following a high speed car chase. *Kosakoff v. City of San Diego*, 08-CV-1819UEGNLS, 2010 WL 1759455 (S.D. Cal. Apr. 29, 2010) *aff'd in part sub nom. Estate of Kosakoff ex rel. Kosakoff v. City of San Diego*, 460 F. App'x 652 (9th Cir. 2011). Judge Gonzalez distinguished *Kosakoff* from *Lewis* and *Porter* because the situation was *de-escalating* up to the moment of the shooting. Although the *Kosakoff* decedent led the police on a high-speed and dangerous car chase, at some point that chase was called off, and for the next 15 minutes, the decedent proceeded to his mother's residence by driving below the posted speed limit, using his turn signals, and coming to a complete stop at a red light. Judge Gonzalez found that the officers

could have proceeded to stabilize the situation without any unnecessary use of force and that the de-escalating nature of the situation gave the officers sufficient opportunity to deliberate on their course of conduct.

Even if the more stringent "purpose to harm" standard is applicable, a jury in this case could easily draw a reasonable inference from the totality of the circumstances that it is met. For Plaintiffs to succeed on that theory, they must show that the officers' purpose in using force on Anastacio was "to cause harm unrelated to the legitimate object of arrest." See *Lewis*, 523 U.S. at 836.  A plaintiff must show "the intent to inflict force beyond that which is required by a legitimate law enforcement objective." *Id.* at 1140 (citations and internal quotations omitted). In *Porter*, the Ninth Circuit indicated that a "purpose to harm" may be established by evidence of: (1) an intention to "'induce . . . lawlessness, or to terrorize, cause harm, or kill,'" or (2) force being used against a suspect "to teach him a lesson" or to "get even." 546 F.3d at 1140-41 (citations omitted). In the present case, a jury could reasonably conclude that the officers wanted to "get even" with Anastacio from the fact that: (1) they kicked Anastacio; (2) they hit Anastacio while he was handcuffed; (3) they deliberately pressed upon him, making it difficult to breathe; (4) one of them Tasered Anastacio repeatedly and sadistically; (5) they surrounded Anastacio to prevent the bystanders from seeing the violence; (6) they destroyed video evidence of the use of force taken by the public and; (7) the agents later

deliberately misstated the facts in order to justify what they knew to be an unreasonable case of deadly force.  Under any standard, a reasonable jury can find these defendants liable for the harm to the familial association of Plaintiffs with decedent.

## X.

## BECAUSE DEFENDANTS' INTENTIONAL CONDUCT WAS A SUBSTANTIAL FACTOR IN CAUSING ANASTACIO'S DEATH, THEY ARE LIABLE FOR HIS DEATH

### A. Proximate Cause Analysis in This Case is Governed by Common Law Tort Principles

Federal courts have found that proximate cause under §1983 and Bivens incorporates common-law tort causation principles.  *Cyrus v. Town of Mukwonago*, 624 F. 3d 856, 864 (7th Cir. 2010) (common-law tort causation rules apply to 1983 claims; general rule is that expert testimony is not necessary to prove causation); *Sanchez v. Pereira-Castillo*, 590 F. 3d 31, 50 (1st Cir. 2009) (common law tort causation principles apply under 1983; causal connection may consist of state actor setting in motion series of acts by others which state actor knows or reasonably should know would cause others to inflict constitutional injury); *Egevary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (tort law causation must govern our analysis of the Bivens claim).  This position is consistent with the Supreme Court's direction and 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions."  *Monroe v. Pape*, 365

U.S. 167, 187 (1961).

**B. Substantial Factor Causation Applies in This Case**

To show causation in a wrongful death action based on intentional torts, Plaintiffs need only show that Defendants' conduct was a substantial factor in causing Anastacio's death. *Tate v. Canonica* , 180 Cal.App.2d 898, 907 (Ct. App. 1960) ("The critical question as to causation in intentional torts is whether the actor's conduct is a substantial factor in bringing about the type of harm which he intended from his original act); *Rutherford v. Owens-Illinois, Inc*., 16 Cal. 4th 953, 969 (1997) ("California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations"). A plaintiff is not required to "eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not." *Osborn v. Irwin Mem'l Blood Bank*, 5 Cal. App. 4th 234, 253 (Ct. App. 1992).

Although there is no judicially approved definition of what constitutes a substantial factor, the California Supreme Court has noted that a force which plays more than an "infinitesimal" or "theoretical" part in bringing about an injury constitutes a substantial factor. *Rutherford*, 16 Cal. 4th at 969. The California Court of Appeal noted with approval the comment of the BAJI Committee, which

stated that a substantial factor for causation purposes is "'something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.'"  *Espinosa v. Little Co. of Mary Hosp.*, 31 Cal. App. 4th 1304, 1314 (Ct. App. 1995), *citing* Com. to BAJI No. 3.76 (8th ed. 1994 bound vol.) at p. 99. Moreover, the California Supreme Court has warned that "[u]ndue emphasis should not be placed on the term 'substantial.'"  *Rutherford*, 16 Cal. 4th at 969.

Thus, so long as Defendants' conduct "actively and continuously" operated to bring about harm to Anastacio, their conduct is a substantial factor in Anastacio's death.  *Osborn*, 5 Cal. App. 4th at 253, citing Rest.2d Torts, §§ §§ 439, 433, com. e.  The *Osborn* court held that "[c]onduct can be considered a substantial factor in bringing about harm if it 'has created a force or series of forces which are in continuous and active operation up to the time of the harm' or stated another way, 'the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another.'" *Id*. (internal citations omitted).  The concept of an independent intervening cause "has no place in the law of intentional torts, so long as there is a factual chain of causation."  *United States Fid. & Guar. Co. v. Am. Employer's Ins. Co*., 159 Cal. App. 3d 277, 285  (Ct. App. 1984) (internal citations omitted).

### C. Applicable Jury Instructions Set Forth the Applicable Causation Requirement

Ninth Circuit Pattern Jury Instruction §9.8 makes clear that Plaintiffs can

demonstrate causation in this case because Defendants' acts or failure to act were the moving force behind Anastacio's death.

> In order to establish that the act(s) or failure to act of the defendant deprived the plaintiff of his particular rights under the United States Constitution as explained in later instructions, the plaintiff must prove by a preponderance of the evidence that the act(s) or failure to act were so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

 (Ninth Circuit Pattern Jury Instruction §9.8 on Causation)

California Civil Jury Instruction (CACI) §3025 requires that the parties apply the "substantial factor test" for the §52.1 cause of action. The Four part Jury Instruction under §52.1 requires that the Plaintiff prove 1) that Defendant interfered with Plaintiff's right  by threatening or committing violent acts; 2) that Plaintiff reasonably believed that if he exercised his right, Defendant  would commit violence against him; 3) that Plaintiff was harmed; and 4) that Defendant's conduct was a substantial factor in causing Plaintiff's harm.  CACI §3025  Bane Act (Civ. Code,   52.1) - Essential Factual Elements.

**D. A Recent Ninth Circuit Opinion Precludes a Grant of Summary Judgment in Favor of Defendants on the Issue of Causation**

In July 2013 the Ninth Circuit reversed a district court grant of judgment as a matter of law on the issue of causation in a §1983 case involving a decedent and multiple officers.  *Krechman v. County of Riverside*, --F.3d -- (9th Cir. 2013), 2013 WL 3824913.  In *Krechman*, two Defendant officers, Garcia and Chacon,

attempted to place handcuffs on the decedent, Appel, who exhibited signs of mental illness. *Id.* at *1. Officers struggled to place the handcuffs on Appel's other arm; eventually they wrestled him to the ground where Garcia sprawled his body over Appel's upper body and Chacon grabbed Appel's legs. *Id.* at *1-*2. Two additional officers, Dusek and Alfaro (both defendants in the case) arrived on the scene and helped restrain Appel, who was forced face-down on the ground. *Id.* at *2. Alfaro and Dusek each held one of Appel's arms; Garcia held Appel's head; and Chacon held down Appel's legs. *Id.* During this time Alfaro's knee was also on Appel's back, exerting an estimated 105 pounds of pressure, while Dusek used his right knee to hold down the right side of Appel's upper body. *Id.* Officers were able to finish handcuffing both of Appel's hands. *Id.* At one point, Chacon also placed a knee on Appel's left lower back. *Id.* Eventually, officers placed Appel face-up and noticed that he was unresponsive. *Id.* By the time paramedics arrived, Appel did not have a pulse and was not breathing; he was pronounced dead at the hospital. *Id.*

At trial, Defendants presented a theory that Appel died of natural causes (kidney failure that caused cardiac arrhythmia), which were unrelated to Appel's altercation with police. *Id.* at *3. Dr. Gary Vilke, the defense expert (who is also Defendants' expert in the instant case), testified in support of defendants' theory. *Id.* Plaintiffs contended that Appel died due to excessive force and supported their

theory with testimony from the coroner, Dr. Mark Scott McCormick, and Plaintiff's expert, Dr. Ronald O'Halloran. *Id.* Dr. McCormick, the coroner, testified that there was evidence of blunt-impact injuries to Appel's torso, head, arms, and legs; and that Appel's heart was enlarged, which placed him at higher risk for cardiac arrhythmia. *Id.* The coroner classified Appel's death as a homicide because the "'confrontation itself [was] a stressor that contributed to the arrhythmia' that caused Appel's death." *Id.*

Dr. O'Halloran, plaintiffs' expert, testified that there were two ways the encounter with police could have led to Appel's death. *Id.* First, Appel's could have died from restraint asphyxia because his chest was compressed for too long with too much weight. *Id.* Second, Appel could have died from the police encounter because the stress of the encounter and the fear and pain associated with his restraint could have caused an increase in adrenaline, which then triggered the cardiac arrhythmia. *Id.*

At the end of trial, the jury hung, and the district court granted Defendants' motion for judgment as a matter of law, which the Ninth Circuit reversed. *Id.* at *4. The Ninth Circuit found that the district court improperly weighed evidence favorable to Plaintiff, improperly made credibility determinations of Drs. McCormick and O'Halloran, and failed to draw all reasonable inferences in favor of Plaintiff, the nonmoving party. *Id.* at *4-*5. Although the district court was

133                                              11-cv-00522-L-DHB

bound to take the testimony of the Plaintiff's expert witnesses as true for purposes of determining whether to grant judgment as a matter of law, the court instead took Defendants' expert testimony as true. *Id.* at *5. Thus, "the district court erred in concluding as a matter of law that Defendants' conduct was not a substantial factor in Appel's death." *Id.*

Like the coroner in Krechman, Dr. Wagner, the medical examiner in this case, determined Anastacio's death to be a homicide. Anastacio's physical exertion and agitation while in custody, the use of the Taser, and positional restraint all contributed to Anastacio's heart attack and subsequent brain death. (*See* exh. 43.) Plaintiffs' expert, Dr. Pietruszka, attributed Anastacio's death to Defendants' conduct, including the beating with batons, the kicking and blows, which caused blunt trauma to Anastacio's body, the repeated Tasings, and positional restraint. (*See* exh. 42 at 231 – 232.)

Pursuant to *Krechman*, Defendants' motions for summary judgment as to the issue of causation must fail because evidence exists indicating that Defendants caused Anastacio's death. *Krechman*, 2013 WL 3824913 at *4-*5. "The standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). *Accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251 (1986); *see also Celotex Corp. v. Catrett*, 477

1  U.S. 317, 323 (1986).  Because *Krechman* holds that a district court is precluded

2  from granting judgment as a matter of law when medical testimony exists showing

3  that defendant officers' use of excessive force could have caused an individual's

4  death, Defendants motions for summary judgment must also fail here.  *Krechman*,

5

6  2013 WL 3824913 at *4-*5.

7

8          Plaintiffs' factual recitation has shown that Defendants' actions were a

9  substantial factor in causing Anastacio's death because their conduct "actively and

10  continuously" operated to bring about his death.  *Osborn*, 5 Cal. App. 4th at 253.

11  Viewing evidence in the light most favorable to Plaintiffs, a reasonable juror could

12

13  find that Ducoing and Krasielwicz kicked Anastacio when he lay handcuffed on

14  the ground; that either Ducoing or Krasielwicz sat on Anastacio's back when he

15  was handcuffed on the ground; that Narainesingh and Piligrino unleashed their

16

17  batons on Anastacio though he was not punching or assaulting any agent; that

18  Vales repeatedly Tased an unresisting Anastacio while he was handcuffed on the

19  ground; that Boutwell, Sauer, and Llewellyn contributed to positional asphyxia

20

21  when they placed Anastacio on his stomach after he had been Tased and forcibly

22  held him down, either by "criss-crossing" his legs or crushing his neck; that

23  Defendant officers kicked and punched Anastacio after Vales Tased him; that

24

25  Supervisors Avila, Caliri, and De Jesus all watched and failed to intercede while

26  officers killed Anastacio; and that throughout this entire ordeal, Anastacio was

27

28

stressed, fearful, and anxious, crying out repeatedly for help in anguish.  The

defendants who acted in a joint venture are jointly liable for Anastacio's death,

which resulted from their actions.

**E. On The Negligence Cause of Action Defendants Are Also Liable**

"Under well-established common law principles, a negligent tortfeasor is

generally liable for all damage of which his negligence is a proximate cause; stated

another way, in order to recover damages sustained as a result of an indivisible

injury, a plaintiff is not required to prove that a tortfeasor's conduct was the **sole**

proximate cause of the injury, but only that such negligence was **a** proximate

cause.  *American Motorcycle Associate v. Superior Court*, 20 Cal.3d 578, 586

(1978) (emphasis in original).  "A tortfeasor may not escape... responsibility

simply because another act - either an innocent occurrence such as an act of God or

other negligent conduct - may also have been a cause of the injury."  *Id.*

The Restatement (Second) of Torts §431, states, "[t]he actor's negligent

conduct is a legal cause of harm to another if... his conduct is a substantial factor in

bringing about the harm."  In *Rutherford*, the California Supreme Court

emphasized that the substantial factor test was "formulated to aid plaintiffs as a

broader rule of causality than the 'but for' test."  16 Cal. 4th at 969.  "The

substantial factor standard is a relatively broad one, requiring only that the

contribution of the individual cause be more than negligible or theoretical."  *Id.*at

978.

Where two or more causes combine to produce a single result, incapable of any logical division, each may be a substantial factor in bringing about the loss, and, if so, each may be charged with all of it.  *Hughey v. Candoli,* 159 Cal.App.2d 231,  241 (Ct. App. 1958).

CACI 431 states the rule with respect to multiple causes:

> A person's negligence may combine with another factor to cause harm. If you find that defendant's negligence was a substantial factor in causing plaintiffs' harm, then defendant is responsible for the harm. Defendant cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing plaintiffs' harm.

"Clearly, where a defendant's negligence is a concurring cause of an injury, the law regards it as a legal cause of the injury, regardless of the extent to which it contributed to the injury."  *Espinosa v. Little Company of Mary* 31 Cal.App.4th 1304, 1317-1318 (1995).

For the foregoing reasons, the Court should deny Defendants' motions for summary judgment as to the wrongful death causes of action.  Defendants are liable for both their intentional and negligent acts.

## XI.
## PLAINTIFFS MAY RECOVER FOR ANASTACIO'S PAIN AND SUFFERING BEFORE DEATH

Defendant Finn argues that Plaintiffs' claims for Anastacio's pain and suffering before death are not recoverable.  The Supreme Court has stated that the purpose behind the Federal Civil Rights Act is to: (1) prevent official illegality; and (2) compensate persons for injuries caused by the deprivation of constitutional rights. *See Carey v. Piphus,* 435 U.S. 247, 254 (1978).  In  rejecting a state law restriction on damages in a *Bivens* action, *Carlson v. Green*, 446 U.S. 14, 18 (1980) held that a limitation on damages in survival claims would subvert the policy of allowing complete vindication of constitutional rights by making it more advantageous for a tortfeasor to kill rather than to injure.

"A federal official contemplating unconstitutional conduct similarly must be prepared to face the prospect of a *Bivens* action. A uniform rule that claims such as respondent's survive the decedent's death is essential if we are not to "frustrate in [an] important way the achievement" of the goals of *Bivens* actions." *Id* at 25 citing *Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 702 (1966).   The Supreme Court held that whenever a state survival statute would abate a *Bivens* suit against a defendant whose conduct caused the plaintiff's death, federal common law allows the action to survive. *Id.* at 24. *Carlson* held that to further the goal of deterring the unconstitutional conduct of federal officials, the Court may apply a federal rule allowing survival of all *Bivens* actions. See *Id.* at 24–25.

Actions under 42 USC §1983 and those under *Bivens* are identical save for the replacement of a state actor under § 1983 by a federal actor under *Bivens*.  *Van Strum v. Lawn*, 940 F.2d 406, 409 (9th Cir. 1991).  The law developed under section 1983 litigation may be correctly applied to a *Bivens*  action, "to fill the doctrinal interstices." *Brawer v. Horowitz,* 535 F.2d 830, 834 (3rd Cir. 1976). Section 1983 does not explicitly address survivor claims. If a civil rights statute is "deficient in the provisions necessary to furnish suitable remedies," courts should look to applicable state law. 42 U.S.C. § 1988(a).   However, state law may not be applied when it is "inconsistent with the Constitution and laws of the United States." *Id.; see Robertson v. Wegmann,* 436 U.S. 584, 594–95, 98 (1978).

The seminal case addressing whether California survival remedies limit the damages recoverable in a § 1983 action is *Guyton v. Phillips,* 532 F.Supp. 1154 (N.D.Cal.1981), *abrogated on other grounds, Peraza v. Delameter,* 722 F.2d 1455 (9th Cir.1984). In *Guyton,* the plaintiff filed a § 1983 action for excessive force following the shooting death of her unarmed minor son. With respect to the issue of damages, *Guyton* ruled that "California's survival statute, insofar as it excludes recovery for pain and suffering, is inconsistent with § 1983." *Id.* at 1166. "To deny recovery for pain and suffering would strike at the very heart of a § 1983 action.... Had the victim survived, he could have recovered, among other things, loss of earnings and pain and suffering. The inescapable conclusion is that there may be

139                             11-cv-00522-L-DHB

substantial deterrent effect to conduct that results in the injury of an individual but virtually no deterrent to conduct that kills its victim."  *Id.*

As is with majority of District Courts[13], the Southern District of California does not to apply § 377.34's limitation on damages for pain, suffering, or disfigurement, finding it inconsistent with the purposes of § 1983. *See, e.g., Hirschfeld v. San Diego Unified Port Dist.,* 2009 WL 3248101, at *4 (S.D.Cal. Oct.8, 2009).  Defendants rely on *Cardinal v. Buchnoff*, 2010 WL 1337489 (S.D.

---

[13] A majority of California district courts faced with the issue of whether § 377.34 precludes the recovery of pain and suffering damages in a § 1983 survival action have followed *Guyton. See Williams v. City of Oakland,* 915 F.Supp. 1074, 1079 (N.D.Cal.1996) ;*Guerrero v. County of San Benito,* No. C 08–0307 PVT, 2009 WL 4251435, at *5 (N.D.Cal. Nov. 23, 2009); *T.D.W. v. Riverside Cnty.,* No. EDCV 08–232 CAS, 2009 WL 2252072, at *5–6 (S.D.Cal. July 27, 2009); *Garcia v. Whitehead,* 961 F.Supp. 230, 232–33 (C.D.Cal.1997)("The Court does not find persuasive the notion that punitive damages provide an adequate deterrent effect. Even where a constitutional violation is found, punitive damages are never available against the agency itself in a section 1983 action, and are not always warranted against the individual defendant."). Other circuits and district courts addressing analogous state court survival statutes have likewise determined that the exclusion of damages for pain and suffering is inconsistent with the spirit and intent of § 1983. *See, e.g., Bass by Lewis v. Wallenstein,* 769 F.2d 1173, 1190 (7th Cir.1985); *Jaco v. Bloechle,* 739 F.2d 239, 245 (6th Cir.1984); *McClurg v. Maricopa Cnty.,* 2011 WL 4434029, at *4 (D.Ariz. Sept. 23, 2011); *Gilbaugh v. Balzer,* No. 2001 WL 34041889, at *5–7 (D.Or. June 7, 2001); *Banks v. Yokemick,* 177 F.Supp.2d 239, 251–52 (S.D.N.Y.2001); *Davis v. City of Ellensburg,* 651 F.Supp. 1248, 1256 (E.D.Wash.1987); *Heath v. City of Hialeah*, 560 F. Supp. 840, 843 (S.D. Fla. 1983) ("Where death is the cause of the suit, however, the deleterious effect on the policy of deterrence is plainer to see. Indeed, it would be far more profitable to kill the plaintiff than to scratch him. Prosser, Law of Torts, p. 902 (4th Ed.1971)); *Berry v. City of Muskogee*, 900 F.2d 1489, 1499–1507 (10th Cir.1990); *Bell v. Milwaukee,* 746 F.2d 1205 (7th Cir.1984), *overruled on other grounds by Russ v. Watts,* 414 F.3d 783 (7th Cir.2005); *Jaco v. Bloechle,* 739 F.2d 239, 241–45 (6th Cir.1984).

Cal. Apr. 5, 2010).  As Judge Anello found, *Cardinal* was distinguishable from *Hirschfield* in an important respect.  In *Cardinal*, the complaint alleged that Defendants used excessive force during an arrest that caused physical pain, not the plaintiff's death. [06-CV-72 MMA-BLM, Docket No. 69].   Plaintiff in *Cardinal* died in April of 2009, more than four years after the use of force from an unrelated cause. [06-CV-72 MMA-BLM, Docket Nos. 89, 133].  Judge Anello found that *Cardinal* was distinguishable from *Hirschfield* because denial of recovery for pain and suffering in *Hirschfield* would have left the estate in that case with no recompense.  "Without proof of any compensatory damages, the estate likewise would not have been able to recover punitive damages. Thus, application of California's survival statute would have left the estate with *no* remedy, and the purpose and intent of Section 1983 would have been eviscerated. It was this result that the *Hirschfield* court noted as its basis for permitting the decedent's estate to seek pain and suffering damages."  *Id* at *2.

It would undermine the policies of § 1983 to apply state laws that preclude the recovery of loss-of-life or pain and suffering damages *when the death of the victim resulted from the alleged unconstitutional violations.*  Where the decedent died almost immediately following the alleged constitutional conduct, absent damages for pain and suffering or loss of life, the recoverable compensatory damages for the injury inflicted on the decedent would be minimal to non-existent.

Such a result would be contrary to § 1983's goals of compensation and deterrence, as it would be in this case to *Bivens*' purpose to vindicate federal Constitutional law.

Had Anastacio survived, he would be entitled to compensation for the pain and suffering he endured as a result of Defendants' use of excessive force. Precluding such damages would plainly undermine the twin goals of compensation and deterrence. Eliminating pain and suffering damages in an action where the victim dies would undermine the principal of uniformity, particularly since a potential damage award could vary significantly depending on the forum in which the action was filed.

## XII.
## THE UNITED STATES' REQUEST TO DISMISS THE NEGLIGENCE CAUSE OF ACTION IS CONTRARY TO THE LAW

The United States joins in defendants' motions and seeks dismissal of Plaintiffs' negligence action should any defendant be found to have qualified immunity. This request is contrary to the law.

"The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional liability." *Billington v. Smith,* 292 F.3d 1177, 1190 (9th Cir.2002). *See also Daniels v. Williams*, 474 U.S. 327, 332–33 (1986) (distinguishing constitutional deprivations from negligently inflicted injuries); *Farmer v. Brennan*

(1994) 511 U.S. 825 (Mere negligence is insufficient to meet the standard under deliberate indifference which describes a state of mind more blameworthy). On August 19, 2013, the California Supreme Court issued an opinion with respect to California negligence law in a §1983 wrongful death action in *Hayes v. Cnty. of San Diego,* 57 Cal. 4th 622, 305 P.3d 252 (2013).  "As noted, state negligence law, which considers the totality of the circumstances surrounding any use of deadly force, is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used."  Id at *12.   The *Hayes* Court explicitly confirmed that "the state and federal standards are not the same" and rejected the notion that "[t]he same consideration of the totality of the circumstances is required in determining reasonableness under California negligence law." *Id.*

Defendant United States assert that the standard that applies to the excessive force claims applies to the negligence action and that if qualified immunity is warranted, then the negligence cause of action should necessarily be dismissed.  It failed to cite to a single legal authority for this novel proposition.  The Ninth Circuit and California Supreme Court have made abundantly clear that there are differences between federal constitutional liability and state tort liability. The government's request to conflate the two in its joinder motion is contrary to the law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## XIII.
## THE COURT SHOULD DENY DEFENDANTS' MOTIONS TO DISMISS A NON-EXISTENT "FOURTEENTH AMENDMENT" CLAIM REGARDING MEDICAL CARE

Finn and Krasielwickz move to dismiss a "Fourteenth Amendment" claim for failure to provide medical care for a serious medical need. They misapprehend the complaint, which nowhere alleges as a separate cause of action the deprivation of medical care and treatment under the Fourteenth Amendment (which applies to the state, not the federal government). The complaint alleges that defendants retaliated against Anastacio for voicing complaints of mistreatment, for requesting medical assistance, and for accusing an agent of having abused him. The retaliation by Finn included denial of medical care that Anastacio requested (whether or not the Constitution, independent of Border Patrol practice and regulations, gave him an independent right to it) Finn's retaliation went beyond this, however. He ordered Anastacio immediately expelled from the country, put him in the custody of the man about whom he had complained, and refused to make a record of his complaint or to investigate it, or to refer it to OIG as required. The relevance of the denial of medical care is that Finn denied Anastacio a medical evaluation and care **in retaliation** for Anastacio's voicing his complaint about his injured ankle and the agent's kicking which caused it. It is the denial of medical evaluation and care *as retaliation* (whether or not the denial of medical care *simpliciter* was

144                                              11-cv-00522-L-DHB

independently violative of a separate Constitutional provision) that is the basis, in part, of the First Amendment retaliation claim alleged in the complaint's first cause of action. No separate cause of action in the complaint is alleged based on the unconstitutional denial of medical care, and these motions to dismiss a nonexistent cause of action based on the Fourteenth Amendment should be denied as moot.

## XIV.
## CONCLUSION

The evidence against these defendants is sufficient to call for a trial on the plaintiffs' claims. Taken in the light most favorable to the plaintiffs, the evidence shows the following: Ducoing (V325) slapped a container of water from Anastacio's hands, grabbed him, threw him up against a wall, kicked his ankles and handcuffed him, all in retaliation for Anastacio's request to keep his water and his perceived bad "attitude". Ducoing then spoke with Anastacio for almost half an hour during which Anastacio complained that Ducoing had hit and kicked him. Krasielwickz, knowing of Ducoing's wrongful actions, nonetheless refused to report his wrongdoing.

Anastacio complained to Finn that Ducoing had kicked his ankle; that he was in pain; and that he needed medical care. Finn, the supervisor of the station, retaliated by refusing to call an EMT, refusing to process Anastacio's complaint, and ordering his immediate return to Mexico in the custody of the person (Ducoing) who had mistreated him and of whose misconduct he had complained.

Krasielwickz and Ducoing then take Anastacio to the border. There, they remove him from the car, and unhandcuff him. On the pretext that Anastacio did not raise his hands above his head quickly enough, Ducoing and Kraseilwicz grab Anastacio, and begin to use force on him.

Narainesingh and Piligrino begin to whack at Anastacio with steel batons, striking him in both the chest and diaphragm, and swinging so wildly that they also hit Ducoing and Krasielwicz. The four of these agents, joined by Llewellyn, force Anastacio face down to the ground, handcuff him, and then when he complains that they are mistreating him, press with their body weight on his back, neck and shoulders, causing pain and restricted breathing.

Because Anastacio refuses to shut up, and protests his mistreatment, Ducoing and Krasielwickz both beat and kick him, as well as apply unnecessary force to the back of this handcuffed, supine man who is begging for help. Supervisors Caliri, Avila and De Jesus witness Anastacio's treatment. They see that he is handcuffed, on his stomach, face down, and being subjected to unreasonable force and restraint. Instead of intervening, they allow the excessive force to continue. This mistreatment continues for at least twenty minutes, during which time members of the public witness the agents' conduct and ask them to stop. The agent with the Taser, Vales, is summoned.

When Vales arrives on the scene he sees a handcuffed man on the ground, unresisting. He screams out "stop resisting, stop resisting", while Anastacio is not resisting in any way. The comments are for the onlookers' benefit so as to give Vales a pretext to use his Taser. Vales then Tases Anastacio four times. During that time Anastacio is not attempting to hurt the agents, but is in excruciating pain. Ducoing sees Anastacio lying on the ground in the fetal position as he Tases him the third time, with electricity arching from the front of the Taser gun (indicating that one of the wires is not conducting electricity). Even though Anastacio is unmoving, Vales still screams "stop resisting". He then goes in to use the Taser in drive stun mode, directly against Anastacio's torso. After he does so, he begins to hit and kick Anastacio, while another agent pulls off Anastacio's pants and walks away. Vales Tasing and the swarming of Anastacio takes place while Anastacio is on the ground, surrounded by at least 15 other agents.

Ducoing radios that there are witnesses who may be recording the events. De Jesus and other agents in response go to make the witnesses leave, and to seize and delete any cell phone recordings of the events. Boutwell and Sauer turn Anastacio on his stomach, face down. They press down on his body with force, restraining his legs and restricting his breathing. Sauer knows, as does Vales, that after Tasing, a person is highly vulnerable to positional asphyxia.

147                                    11-cv-00522-L-DHB

Sauer and Boutwell keep Anastacio face down, pressing with their body weight. Llwellyn drives his knee and body weight into Anastcio's head, neck and back, restricting his breathing. After Sauer and Boutwell put plastic zip-ties around Anastacio's feet, they leave him face down, where he remains not breathing, the victim of a heart attack brought on by their use of force and deprivation of oxygen.

After Anastacio's death, the defendants tell repeated untruths to investigators. Ducoing and Krasielwickz describe Anastacio as a drug crazed superman who attacked then with attempted head butts, kicks and bites. Nareinesingh and Piligrino falsely describe a pugilistic Anastacio, kicking and punching at four defenseless agents. Llewellyn lies by deliberately omitting details about his knee crushing into Anastacio's head and neck just before his death. Vales claims that Anastacio kicked him multiple times but preserves no evidence of photographs, seeks no medical assistance and falsely alleges that Anastacio was rolling and kicking wildly before the final drive stun against Anastacio's body. Vales' statements to the police are shown to be false by Ashley Young's video which shows a still, unresisting Anastacio on the ground in a fetal position before Vales drive stuns and punches him. De Jesus, Avila and Caliri give false accounts of non-existent aggression to justify their refusal to intervene to stop the brutalization. Finn lies more than anyone else, claiming falsely that Anastacio never made an accusation of agent mistreatment, claiming that he had never

received a complaint ever, claiming that before Anastacio, he never denied any prisoner medical care.

The actions of defendants caused Anastacio's death. The baton blows to the chest and diaphragm, the injuries sustained from the knees and fists of Krasielwickz and Ducoing, the substantial hematoma inflicted by Llewellyn's knees and body on Anastacio's neck and upper back; the positional asphyxia caused by the actions over 20 minutes of Ducoing, Krasielwicz, Narainesingh, Piligrino, and Llewellyn, the restraint at the end as Boutwell, Sauer and Llewellyn kept Anastacio forced into a face down position handcuffed, pressing down on his legs back and neck, depriving him of air and the ability to breathe after Ducoing's repeated sadistic Tasing had tortured and exhausted Anastacio Hernandez, (who suffered from high blood pressure and an enlarged heart). Medically, all these acts were the substantial cause of Anastacio's death, the joint and multiple actions of the defendants combining to kill him.

A reasonable jury, on this evidence, could find these facts to be true. For purposes of the defendants' motions, the Court is required to accept them as the basis for the legal analysis of qualified immunity. Based on these facts, none of the defendants can assert a plausible claim to qualified immunity. The use of force as described upon a handcuffed, prone man, face down on the ground, is legally and

11-cv-00522-L-DHB

morally indefensible. No reasonable agent with a brain would do such things; no human being with a heart could.


Dated: September 10, 2013                    Respectfully submitted,


                                             /s/ Eugene Iredale
                                             EUGENE G. IREDALE
                                             JULIA YOO
                                             GRACE JUN
                                             Attorneys for PLAINTIFFS