# EXHIBIT 31

1              UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3     _____
                                      )
4     THE ESTATE OF ANASTACIO HERNANDEZ-ROJAS,) CASE NO. 11-CV-0522-L NLS
      by its personal representative, DAISY )
5     HERNANDEZ, DANIEL HERNANDEZ, a minor,  )
      DANIELA HERNANDEZ, a minor, and FABIAN )
6     HERNANDEZ, a minor, by and through their)
      guardian ad litem MARIA PUGA MORAN, and      )
7     DAISY HERNANDEZ, an individual,        )
                                             )
8                     Plaintiffs,            )
                                             )
9          v.                                )
                                             )
10    CUSTOMS AND BORDER PROTECTION AGENT     )
      7663; BORDER PATROL AGENT V325; BORDER )
11    PATROL AGENT V315; IMMIGRATION          )
      ENFORCEMENT AGENT 2054; IMMIGRATION     )
12    ENFORCEMENT AGENT 7G2186; BORDER PATROL      )
      AGENT L (D.O.B. 11/4/1969); CUSTOMS AND      )
13    BORDER PROTECTION AGENT B (D.O.B.       )
      7/8/1969); CUSTOMS AND BORDER PROTECTION)
14    OFFICER S (D.O.B 10/27/1971); BORDER    )
      PATROL SUPERVISOR V61; BORDER PATROL    )
15    SUPERVISOR 1199; BORDER PATROL          )
      SUPERVISOR 168; CUSTOMS AND BORDER      )
16    PROTECTION SUPERVISOR CAQ03175, UNITED      )
      STATES, and DOES 1-25, INCLUSIVE,       )
17                                            )
                     Defendants.              )
18    _____)

19

20        VIDEOTAPED DEPOSITION OF RAMON A. DeJESUS

21             SAN DIEGO, CALIFORNIA

22            FRIDAY, FEBRUARY 1, 2013

23

24       REPORTED BY STACEY P. PARKER, CSR NO. 8430

25

```
          1    Entry?

          2         A.   No.

          3         Q.   All right.  Let me go back now to retracing

          4    your career within the Customs and Border Patrol.  You

          5    told me that sometime in 2008, you were promoted to a

          6    supervisor?

          7         A.   Yes, sir.

          8         Q.   Can you tell me the approximate month that

          9    occurred?

         10         A.   That was July, I believe.

09:25:30 11         Q.   And could you tell me what is the GS ranking

         12    change that you underwent?

         13         A.   At that time, I went from a GS-11 to a GS-12.

         14         Q.   And as a supervisor, what were your duties

         15    when you first became a supervisor?

         16         A.   Supervising officers; talking to the

         17    traveling public if there's complaints; making

         18    schedules; that sort of stuff.

09:25:58 19         Q.   Let's go over those in turn.  You said,

         20    "Supervising officers."

         21         A.   Uh-huh.

         22         Q.   When you first became a supervisor, were you

         23    working primarily at the Port of Entry at San Ysidro?

         24         A.   Yes.

         25         Q.   And you would supervise officers.  How many
```

```
             1   men to go into battle?

             2        A.    I don't know.  I don't know what the

             3   beginning of that term is.

             4        Q.    Fair enough.

             5              But in any event, you said you believe that

09:31:28     6   you had such musters at least once a year with upper

             7   management.

             8        A.    Correct.

             9        Q.    Can you tell me the last such muster that you

            10   remember attending before May of 2010?

            11        A.    No, I can't.  I'm sorry.

            12        Q.    Can you remember any specific muster that

            13   you've attended since you became a supervisor --

            14        A.    Yes.

            15        Q.    -- in 2008?

            16        A.    Yes.

            17        Q.    Tell me which one you recall.

            18        A.    I don't -- I can't think of a specific one,

            19   but I know I have after I became a supervisor.

            20        Q.    And can you tell me typically what members of

09:32:00    21   upper management attend such musters?

            22        A.    Usually it's a branch chief, which is a step

            23   above -- a second line supervisor.  That's usually

            24   who's giving the musters.

            25        Q.    And the subject matter of the musters include
```

EX31_003

1    the need to intervene if you're witnessing excessive

2    force --

3        A.    Yes.

4        Q.    -- being used?

5        A.    Yes, sir.

6        Q.    And were there ever any discussions in your

09:32:27  7    presence of examples in which supervisors successfully

8    intervened to prevent the use of excessive force?

9        A.    Not that I can recall.

10        Q.    Were there ever any examples discussed during

11    any of the musters you attended of the use of excessive

12    force occurring in the presence of a supervisor who did

13    not properly intervene?

14        A.    No, sir.  I can't recall.

15        Q.    So the idea of intervening and the obligation

16    to intervene if you witness excessive force was taught,

09:32:57  17    but without reference to any specific examples?

18        A.    Not that I can remember, no.

19        Q.    Am I correct in that statement?

20        A.    Yes.

21        Q.    And at Dallas, did you have a curriculum that

22    you used for that two-week program?

23        A.    I believe so, yes.

24        Q.    Did it have a section on Constitutional

25    obligations of supervisors to intervene if they witness

EX31_004

09:33:28   1   excessive force, if you recall?

            2       A.   I don't recall.

            3       Q.   In any event, is it fair to say that as of

            4   May of 2010, you understood that as a supervisor, you

            5   were obligated to observe the conduct of those who were

            6   under your command?

            7       A.   Right.

            8       Q.   And that you were obligated to ensure that

            9   they were acting in accordance with the rules that they

           10   were taught and that you were taught?

           11       A.   Yes.

09:33:58  12       Q.   And that they were required to treat

           13   prisoners in a humane fashion?

           14       A.   Yes.

           15       Q.   And that they were required to avoid

           16   brutality?

           17       A.   Right.

           18       Q.   To avoid excessive force?

           19       A.   Yes.

           20       Q.   And to avoid force that would enhance or

           21   cause the increased likelihood of death or serious

           22   bodily injury?

           23       A.   Yes.

           24       Q.   And you understood that if you witness such

           25   conduct, you were under an obligation to intervene to

EX31_005

```
              1          A.    Aside from the inbound traffic that we
10:21:00      2   inspect, we also have the responsibility of inspecting
              3   vehicles and persons leaving the country as well.  So
              4   yes, they do have that responsibility.
              5          Q.    Was there a video camera located in the
              6   Whiskey 2 area on May the 28th of 2010?
              7          A.    I don't know.
10:21:27      8          Q.    Now, let's talk about Jerry Vales.  Is he a
              9   person with whom you have friendly relations?
             10          A.    Sure.
             11          Q.    Have you ever socialized off the job with
             12   him?
             13          A.    I have.
             14          Q.    And would you describe to me when and where.
             15          A.    I can't recall when, but I know it was
             16   usually a going-away party for another officer, you
             17   know, stuff -- stuff like that.
             18          Q.    At the home of a fellow employee --
             19          A.    No.
             20          Q.    -- or party?
             21          A.    A party, yeah.
             22          Q.    At a bar or a restaurant?
10:21:57     23          A.    It might have been a bar.
             24          Q.    How often have you seen him in social
             25   functions?
```

              1    the use of force in the incident?

              2         A.   Yes.

              3         Q.   You were aware that there were pedestrians

              4    who were witnessing the incident?

              5         A.   Correct.

              6         Q.   And you were aware that there were

    10:23:28    7    pedestrians who were videotaping the incident?

              8              And let me do this:  We're going to be

              9    entering into the area now that we discussed earlier.

             10              MR. BERWANGER:  Uh-huh.

             11    BY MR. IREDALE:

             12         Q.   So I'm going to put the question.  Make sure

             13    you pause before you give your answer.

             14              MR. BERWANGER:  Thank you.

             15              MR. IREDALE:  May we reread the last

             16    question, please.

             17              (Whereupon, the record is read by the

             18              Reporter as follows:

             19              "Q.   And you were aware that there were

             20              pedestrians who were videotaping the

             21              incident?")

    10:24:00   22              MR. BERWANGER:  In the abundance of caution,

             23    I'm going to recommend to you that you not respond to

             24    the question and explain why you're not responding to

             25    the question.

```
         1              THE WITNESS:  On the advice of counsel, I,
         2    unfortunately, must decline to answer the question.  As
         3    soon as the Grand Jury is terminated and it takes no
         4    further action, I will be able to respond.
         5    BY MR. IREDALE:
         6         Q.   And you say, "On the advice of counsel."  Are
         7    you invoking your rights under the Fifth Amendment to
         8    the Constitution of the United States?
         9         A.   Yes, sir.
        10         Q.   Your right to be free from compelled
10:24:29 11    self-incrimination?
        12         A.   Yes, sir.
        13         Q.   Now, the next question I want to put is:  How
        14    many people who were bystanders do you believe were
        15    videotaping the incident?
        16              MR. BERWANGER:  Okay.  Same.
        17              THE WITNESS:  On advice of counsel, I,
        18    unfortunately, must decline to answer the question.  As
        19    soon as the Grand Jury is terminated and it takes no
        20    further action, I will be able to respond.
        21    BY MR. IREDALE:
10:24:58 22         Q.   Did you hear Jerry Vales speak over a radio
        23    after he had finished Tasing Mr. Hernandez-Rojas?
        24              MR. BERWANGER:  You can respond.
        25              THE WITNESS:  Not that I recall.
```

EX31_008

```
           1   BY MR. IREDALE:

           2        Q.   Did you not hear him say over the radio that

           3   he saw people videotaping, and he wanted other officers

10:25:29   4   to get those people?

           5             MR. BERWANGER:   Okay.  Please decline to

           6   respond.

           7             THE WITNESS:   On the advice of counsel, I,

           8   unfortunately, must decline to answer the question.  As

           9   soon as the Grand Jury is terminated and it takes no

          10   further action, I will be able to respond.

          11   BY MR. IREDALE:

          12        Q.   And so you're invoking your rights under the

          13   Fifth Amendment?

          14        A.   Yes, sir.

          15        Q.   You're refusing to answer because the answer

          16   to the question might tend to incriminate you, correct?

10:25:57  17             MR. BERWANGER:   Asked and answered, Counsel.

          18             You can answer.

          19             THE WITNESS:   Yes, sir.

          20   BY MR. IREDALE:

          21        Q.   Now, you say that you will answer the

          22   question when the Grand Jury is concluded?

          23        A.   Yes, sir.

          24        Q.   And do you know when that will be?

          25        A.   No, I do not.
```

EX31_009

             1      Q.    Did you review any other documents?

             2      A.    I did not.  I didn't read --

             3      Q.    All right.

             4      A.    -- this entire report.

             5            MR. IREDALE:  Now, with your permission,

             6      Mr. Berwanger, can we mark this as Exhibit 218?

10:37:06     7            MR. BERWANGER:  Certainly.

             8            (Whereupon, Defendants' Exhibit No. 218 is

             9            marked for identification.)

            10      BY MR. IREDALE:

            11      Q.    And I'm going to ask you if what you have,

            12      marked as 218, is a copy of the report that you wrote?

            13      A.    Yes, sir.

            14      Q.    And is it your signature and badge number on

            15      the lower left-hand side of that report?

            16      A.    Yes, sir, it is.

            17      Q.    And did you sign it and mean that what you

            18      wrote in the report was yours and that it was correct?

            19      A.    Yes.

            20      Q.    All right.  Now, let me refer you, if I

10:37:27    21      could, to your report and ask whether you wrote in the

            22      report, approximately the middle, quote, "I saw the

            23      Taser probe strike Hernandez on the lower back"?

            24      A.    Yes, sir.

            25      Q.    Is that true?

                1        A.    Yes.

                2        Q.    All right.  Have you had a chance to review

                3   your report now?

                4              MR. BERWANGER:  The entire report or just

                5   what you're reading?

                6              THE WITNESS:  I only read the one sentence

                7   that --

                8   BY MR. IREDALE:

                9        Q.    Would you like to read the entire report?

    10:37:57    10        A.    Sure.

    10:38:39    11              (Whereupon, a pause in the proceedings.)

                12              THE WITNESS:  Okay.

                13   BY MR. IREDALE:

                14        Q.    Okay?  Have you had a chance to read it?

                15        A.    Yes, sir.

                16        Q.    A full chance?

                17        A.    Yes.

                18        Q.    It wouldn't be unfair of me to ask you

                19   questions about the events of the night?

                20        A.    No.

                21        Q.    All right.

                22              MR. BERWANGER:  Let me clarify, Counsel.

                23   It's not unfair to ask questions about the evening of

                24   the incident.  It's a little unfair to ask questions

    10:38:58    25   about the report.  But he's read it.  So in fairness,

EX31_011

10:41:29    1        A.    I don't recall who the officer was but, yes,

            2    I remember officers jumping on his legs.

            3        Q.    By, among other people, Sauer?

            4        A.    I don't recall specifically the officers.

            5        Q.    Well, Boutwell and Sauer were people on your

            6    team that night?

            7        A.    Yes, sir.

            8        Q.    Under your supervision?

            9        A.    Yes, sir.

           10        Q.    Under your authority?

           11        A.    Yes, sir.

           12        Q.    Now, my question for you is:  Up until the

           13    time when that drive stun was either applied or

           14    attempted to be applied, your testimony, as I

           15    understand it, is Mr. Hernandez was constantly

10:42:00   16    resisting?

           17        A.    Right.  Yes.

           18        Q.    Constantly kicking?

           19        A.    Yes.

           20        Q.    Constantly rolling?

           21        A.    Yes.

           22        Q.    Constantly refusing to stay still?

           23        A.    Yes.

           24        Q.    Constantly refusing to stop resisting?

           25        A.    He was also hurting himself as well.

EX31_012

```
            1      Q.    He was hurting himself?

            2      A.    Right, by hitting his head on the ground,

            3  stuff of that nature.

            4      Q.    So you saw him striking his head on the

            5  ground?

            6      A.    By him jumping and flopping around, yes.

10:42:28    7      Q.    Did you see him hit the back of his head on

            8  the ground?

            9      A.    I know he did a -- a few times.  I can't

           10  recall where exactly it happened but, yes, he did.

           11      Q.    And did that appear to be deliberate to you?

           12      A.    I don't know if it was deliberate or not.

           13      Q.    Where did you see him strike his head?

           14      A.    He was on the ground when -- when he was on

           15  the ground.

           16      Q.    Forgive me.  What portion of his head did you

           17  see striking the ground?

           18      A.    Well, he was face down.  So it was more on

           19  the front.

           20      Q.    It was the front.  And was he banging the

           21  head hard against the ground?

10:43:00   22      A.    Yes, he was.

           23      Q.    Yes.  Hard enough to break the skin?

           24      A.    I'm not sure.

           25      Q.    The surface there is asphalt?
```

EX31_013

```
            1        A.    Yes, sir.

            2        Q.    Rough?

            3        A.    Yes.

            4        Q.    And in any event, with this rolling, this

            5   kicking, this striking the head against the asphalt, he

            6   was -- from the time you went there until the time

10:43:27    7   shortly after that drive stun was moving toward his

            8   body, he was in constant motion of one kind or another?

            9        A.    Yes, sir.

           10        Q.    Never stayed still?

           11        A.    No.

           12        Q.    Never remained stock still as Vales was above

           13   him, correct?

           14        A.    Correct.

           15        Q.    Do you remember a point at which Vales was

           16   Tasing him and you saw arc light flashing from the

           17   Taser?

           18        A.    Not that I can recall.

10:43:58   19        Q.    Actually, light, sparks shown from the Taser?

           20        A.    I don't remember that.

           21        Q.    Do you remember at that point as Vales pulled

           22   the trigger -- appeared to pull the trigger on the

           23   Taser, Vales shouted again, "Stop resisting.  Stop

           24   resisting.  Stop resisting"?

           25        A.    Yes, sir.
```

EX31_014

|       |    |     |                                                    |
|-------|----|-----|----------------------------------------------------|
|       | 1  | Q.  | Do you remember at the time that he was            |

2  yelling, "Stop resisting," the man on the ground was

3  absolutely stock still?

10:44:29  4  A.  Not that I can recall.

5  Q.  Do you remember that while he was yelling and

6  saying, "Stop resisting," the man on the ground for a

7  period of 15 to 20 seconds was curled up in a fetal

8  position unmoving?

9  A.  No, not that I recall.

10  Q.  Okay.  And you're sure of that?

11  A.  Yes.

12  Q.  And you were there and you saw it?

13  A.  Yes.

14  Q.  And you're a trained observer?

15  A.  Yes.

16  Q.  And if you had seen -- if you had seen one of

10:44:57  17  the people you were supervising continuing to use force

18  and say "Stop resisting" upon a prisoner who was, in

19  fact, not resisting, you would have intervened?

20  A.  I would have.

21  Q.  You would not have permitted force to be used

22  upon a prisoner who was remaining stock still and not

23  kicking?

24  A.  Yes, sir.

25  Q.  Who was remaining stock still and not

EX31_015

1       A.    No.

2            Q.    One of the people -- well, there was a

10:45:59  3   family -- there was a man and a woman that you stopped

4       that night shortly after the Tasing ended, correct?

5                  MR. BERWANGER:   Okay.  I think we're going to

6       go for the Fifth.

7                  THE WITNESS:   On the advice of counsel, I,

8       unfortunately, must decline to answer the question.  As

9       soon as the Grand Jury is terminated and it takes no

10      further action, I will be able to respond.

11      BY MR. IREDALE:

12           Q.    You're taking the Fifth, right?

13           A.    Yes, sir.

14           Q.    Now, as soon as the Tasing ended, you didn't

10:46:25  15   see to the medical condition of Anastacio Hernandez?

16      In fact, at that point, you turned and went to

17      intercept the pedestrian traffic that was leaving,

18      correct?

19           A.    On the --

20                 MR. BERWANGER:   Same.

21                 THE WITNESS:   On the advice of counsel, I,

22      unfortunately, must decline to answer the question.  As

23      soon as the Grand Jury is terminated and it takes no

24      further action, I will be able to respond.

25      ///

.

```
              1   BY MR. IREDALE:

              2        Q.    Take the Fifth?

              3        A.    Yes, sir.

              4        Q.    And among the people that you saw leaving the

   10:46:56   5   area was a man and a woman, correct?

              6        A.    On the --

              7              MR. BERWANGER:    The Fifth.

              8              THE WITNESS:    -- advice --

              9              On the advice of counsel, I, unfortunately,

             10   must decline to answer the question.  As soon as the

             11   Grand Jury is terminated and it takes no further

             12   action, I will be able to respond.

             13   BY MR. IREDALE:

             14        Q.    But for now, you're taking the Fifth?

             15        A.    Yes, sir.

             16        Q.    And you stopped the man and the woman who

             17   were leaving, did you not?

             18              MR. BERWANGER:    Same.

             19              THE WITNESS:    On the advice of counsel, I,

             20   unfortunately, must decline to answer the question.  As

             21   soon as the Grand Jury is terminated and it takes no

   10:47:25   22   further action, I will be able to respond.

             23   BY MR. IREDALE:

             24        Q.    You met the man and the woman at the foot of

             25   the pedestrian ramp that comes off of the bridge
```

EX31_017

```
          1    overlooking Whiskey 2?

          2              MR. BERWANGER:  Same.

          3              THE WITNESS:  On the advice of counsel, I,

          4    unfortunately, must decline to answer the question.  As

          5    soon as the Grand Jury is terminated and it takes no

          6    further action, I will be able to respond.

          7    BY MR. IREDALE:

10:48:00  8         Q.   You believed that they had taken pictures,

          9    did you not?

         10              MR. BERWANGER:  Same.

         11              THE WITNESS:  On the advice of counsel, I,

         12    unfortunately, must decline to answer the question.  As

         13    soon as the Grand Jury is terminated and it takes no

         14    further action, I will be able to respond.

         15    BY MR. IREDALE:

         16         Q.   You believed that they had taken video?

         17              MR. BERWANGER:  Same.

         18              THE WITNESS:  On the advance of counsel -- on

         19    the advice of counsel, I, unfortunately, must decline

         20    to answer the question.  As soon as the Grand Jury is

         21    terminated and it takes no further action, I will be

         22    able to respond.

         23    BY MR. IREDALE:

         24         Q.   You saw that they had a camera phone?

         25         A.   On --
```

EX31_018

1           MR. BERWANGER:  Same.

2           THE WITNESS:  -- the advice of counsel, I,

10:48:29    3    unfortunately, must decline to answer the question.  As

4    soon as the Grand jury is terminated and it takes no

5    further action, I will be able to respond.

6    BY MR. IREDALE:

7           Q.   You seized the phone from them at that time?

8           A.   On the advice of counsel, I, unfortunately,

9    must decline to answer the question.  As soon as the

10   Grand Jury is terminated and it takes no further

11   action, I will be able to respond.

12          Q.   After seizing the camera phone, you looked at

10:48:58    13   the video that was on it?

14          A.   On the advice of counsel, I, unfortunately,

15   must decline to answer the question.  As soon as the

16   Grand Jury is terminated and it takes no further

17   action, I will be able to respond.

18          Q.   You saw that they had recorded part of the

19   incident that you knew involved the use of force on

20   Anastacio Hernandez?

21          A.   On the advice of counsel, I, unfortunately,

22   must decline to answer the question.  As soon as the

23   Grand Jury is terminated and it takes no further

10:49:28    24   action, I will be able to respond.

25          Q.   You knew that you had no legal basis to seize

EX31_019

```
 1   the camera from them, did you not?

 2        A.   On the advice of counsel, I, unfortunately,

 3   must decline to the answer the question.  As soon as

 4   the Grand Jury is terminated and it takes no further

 5   action, I will be able to respond.

 6        Q.   They had committed no crime, to your

 7   knowledge, at the time you seized their camera phone?

 8        A.   On the advice of counsel, I, unfortunately,

 9   must decline to answer the question.  As soon as the

10   Grand Jury is terminated and it takes no further

10:49:58  11   action, I will be able to respond.

12        Q.   You knew that there were people in the area

13   who had witnessed the event and who had been asking the

14   agents to stop their use of force?

15             MR. BERWANGER:  You can answer that.

16             THE WITNESS:  Yes.

17   BY MR. IREDALE:

18        Q.   You heard people screaming, "He's a human

10:50:30  19   being.  Don't treat him like that," or words to that

20   effect?

21        A.   Yes, I did.

22        Q.   And you knew that this man and this woman and

23   possibly others had taken video of the incident,

24   correct?

25             MR. BERWANGER:  Same.
```

EX31_020

```
          1              THE WITNESS:  On the advice of counsel, I,

          2    unfortunately, must decline to answer the question.  As

          3    soon as the Grand Jury is terminated and it takes no

          4    further action, I will be able to respond.

          5    BY MR. IREDALE:

          6         Q.   You knew, of course, that if there was video,

10:51:00  7    a review of that video would be able to show whether

          8    there had been excessive force or justifiable force?

          9              MR. BERWANGER:  Same.

         10              THE WITNESS:  On the advice of counsel, I,

         11    unfortunately, must decline to answer the question.  As

         12    soon as the Grand Jury is terminated and it takes no

         13    further action, I will be able to respond.

         14    BY MR. IREDALE:

         15         Q.   By the way, you know that video phones can

         16    take images that are subject to being lightened and

10:51:27 17    enhanced so that even though they may appear dark at

         18    first, they can be made more visible?

         19              MR. BERWANGER:  Same.

         20              THE WITNESS:  On the advice of counsel, I,

         21    unfortunately, must decline to answer the question.  As

         22    soon as the Grand Jury is terminated and it takes no

         23    further action, I will be able to respond.

         24    BY MR. IREDALE:

         25         Q.   Now, when you seized that camera, you had an
```

EX31_021

1    option of turning it over to the passenger service

2    representative there at the Port of Entry, did you not?

3              MR. BERWANGER:  Same.

4              THE WITNESS:  On the advice of counsel, I,

10:52:00  5    unfortunately, must decline to answer the question.  As

6    soon as the Grand Jury is terminated and it takes no

7    further action, I will be able to respond.

8    BY MR. IREDALE:

9         Q.   You could have told the people, "This may be

10   evidence in an incident.  We need to ask you to let us

11   keep your phone."  You could have said that to them,

12   correct?

13             MR. BERWANGER:  Same.

14             THE WITNESS:  On the advice of counsel, I,

15   unfortunately, must decline to answer the question.  As

16   soon as the Grand Jury is terminated and it takes no

17   further action, I will be able to respond.

18   BY MR. IREDALE:

10:52:27  19        Q.   You could have asked if they would go into

20   the building and permit someone from the government to

21   download from their phone the video image that was on

22   the video -- the phone --

23             MR. BERWANGER:  Same.

24   BY MR. IREDALE:

25        Q.   -- correct?

EX31_022

```
         1        A.    On the advice of counsel, I, unfortunately,
         2   must decline to answer the question.  As soon as the
         3   Grand Jury is terminated and it takes no further
         4   action, I will be able to respond.
         5        Q.    Instead of doing those things, you, yourself,
         6   erased the video on the camera phone?
         7             MR. BERWANGER:  Same.
         8             THE WITNESS:  On advice of counsel, I,
10:52:59  9   unfortunately, must decline to answer the question.  As
        10   soon as the Grand Jury is terminated and it takes no
        11   further action, I will be able to respond.
        12   BY MR. IREDALE:
        13        Q.    Not only did you erase that videotape, but
        14   you called the G.S.A. officers in the area?
        15             MR. BERWANGER:  Same.
        16             THE WITNESS:  On the advice of counsel, I,
        17   unfortunately, must decline to answer the question.  As
        18   soon as the Grand Jury is terminated and it takes no
        19   further action, I will be able to respond.
        20   BY MR. IREDALE:
        21        Q.    You told the G.S.A. officers that someone
10:53:29 22   else may have taken video and you wanted to know if
        23   they had stopped anyone to seize camera phones?
        24             MR. BERWANGER:  Same.
        25             THE WITNESS:  On the advice of counsel, I,
```

EX31_023

            1    unfortunately, must decline to answer the question.  As

            2    soon as the Grand Jury is terminated and it takes no

            3    further action, I will be able to respond.

            4    BY MR. IREDALE:

            5         Q.   One of the reasons why you destroyed the

            6    video was because you did not want evidence that might

10:53:57    7    have supported the claim that there was misconduct by

            8    the agents there, including the agents you supervised?

            9              MR. BERWANGER:   Same.

           10              THE WITNESS:   On the advice of counsel, I,

           11    unfortunately, must decline to answer the question.  As

           12    soon as the Grand Jury is terminated and it takes no

           13    further action, I will be able to respond.

           14    BY MR. IREDALE:

           15         Q.   Can you cite to me any regulation that

           16    authorizes agents at the Port of Entry to seize the

10:54:24   17    cameras of persons who are going into Mexico?

           18              MR. BERWANGER:   Same.

           19              THE WITNESS:   On the advice of counsel, I,

           20    unfortunately, must decline to answer the question.  As

           21    soon as the Grand Jury is terminated and it takes no

           22    further action, I will be able to respond.

           23    BY MR. IREDALE:

           24         Q.   The name of the passenger service

           25    representative at the time was Karen Butler, was it

EX31_024

```
 1   not?

 2              MR. BERWANGER:  You can answer.

 3              THE WITNESS:  Yes, sir.

 4   BY MR. IREDALE:

 5        Q.   And Ms. Butler could have been given the

 6   camera phone to hold, correct?

 7              MR. BERWANGER:  Same.

 8              THE WITNESS:  On the advice of counsel, I,

 9   unfortunately, must decline to answer the question.  As

10   soon as the Grand Jury is terminated and it takes no

11   further action, I will be able to respond.

12   BY MR. IREDALE:

13        Q.   You erased the camera phone, correct?

14              MR. BERWANGER:  Same.

15              THE WITNESS:  On advice of counsel, I,

16   unfortunately, must decline to answer the question.  As

17   soon as the Grand Jury is terminated and it takes no

18   further action, I will be able to respond.

19   BY MR. IREDALE:

20        Q.   Did you take contact information from the

21   couple from whom you seized the camera phone?

22              MR. BERWANGER:  Same.

23              THE WITNESS:  On the advice of counsel, I,

24   unfortunately, must decline to answer the question.  As

25   soon as the Grand Jury is terminated and it takes no
```

EX31_025

```
         1    further action, I will be able to respond.

         2    BY MR. IREDALE:

         3         Q.    Did you, yourself, preserve any record of

         4    their identity and contact information?

         5              MR. BERWANGER:  Same.

         6              THE WITNESS:  On the advice of counsel, I,

         7    unfortunately, must decline to answer the question.  As

         8    soon as the Grand Jury is terminated and it takes no

         9    further action, I will be able to respond.

        10    BY MR. IREDALE:

10:55:58  11         Q.    Now, did you consider the statements of the

        12    people who were watching this incident who said words

        13    to the effect of, "Stop beating him.  Treat him like a

        14    human," to be an attempt to make a complaint about the

        15    conduct of the agents in the matter?

        16              MR. BERWANGER:  You can answer.

        17              THE WITNESS:  No.  I did not think it was

        18    a -- I -- I'm sorry.  Can you repeat the question.

        19    I'm --

        20    BY MR. IREDALE:

        21         Q.    Sure.

        22              You heard people saying, "Stop beating him,"

10:56:29  23    or words to that effect?

        24         A.    Yes, sir.

        25         Q.    You heard people saying, "Don't hurt this
```

EX31_026

1   man," or words to that effect?

2       A.   Yes.

3       Q.   You heard somebody saying, "He's a human

4   being.  Don't treat him like an animal," or words to

5   that effect?

6       A.   Yes.

7       Q.   Did you consider those to be complaints about

8   the conduct of the agents in their treatment of

9   Anastacio Hernandez-Rojas?

10      A.   No, I did not.

11      Q.   Do you know whether any other videos of the

12  incident were erased?

13           MR. BERWANGER:  Same.

10:57:00  14           THE WITNESS:  On the advice of counsel, I,

15  unfortunately, must decline to answer the question.  As

16  soon as the Grand Jury is terminated and it takes no

17  further action, I will be able to respond.

18  BY MR. IREDALE:

19      Q.   Now, you told me that you watched the PBS

20  program on the incident involving the death of

21  Anastacio?

22      A.   Yes, sir.

23      Q.   And in that program, there's a sequence where

24  they show video that was taken from a camera of a

25  person who filmed part of the incident?

EX31_027

10:57:29  1        A.    Yes, sir.

          2        Q.    And it was a young woman.  Did you understand

          3   that from watching the program?

          4        A.    Yes.

          5        Q.    And she was able to avoid having her camera

          6   confiscated, and the video erased; you --

          7              MR. BERWANGER:  Same.

          8   BY MR. IREDALE:

          9        Q.    -- understood that?

         10        A.    On advice of counsel, I, unfortunately, must

         11   decline to answer the question.  As soon as the Grand

         12   Jury is terminated and it takes no further action, I

         13   will be able to respond.

         14   BY MR. IREDALE:

         15        Q.    And so is your understanding that at least

         16   the PBS program brought this incident to light based on

10:58:00 17   a video recording made by somebody similar to the video

         18   recording that you erased?

         19              MR. BERWANGER:  Same.

         20              THE WITNESS:  On the advice of counsel, I,

         21   unfortunately, must decline to answer the question.  As

         22   soon as the Grand Jury is terminated and it takes no

         23   further action, I will be able to respond.

         24   BY MR. IREDALE:

         25        Q.    Now, I believe that at the time you were

EX31_028

1          MR. BERWANGER:  No.

2     BY MR. IREDALE:

3          Q.   Did you erase the tape?

4          A.   On the advice of counsel, I, unfortunately,

5     must decline to answer the question.  As soon as the

6     Grand Jury is terminated and it takes no further

7     action, I will be able to respond.

8     BY MR. IREDALE:

11:13:58    9     Q.   All right.  That means you're taking the

10    Fifth Amendment?

11         A.   Yes, sir.

12         Q.   All right.  Now, with respect to the Tasing

13    itself, you counted three different times that you

14    heard a clicking sound from the Taser?

15         A.   Correct.

16         Q.   And you know now after your Taser training

17    that you participated in, that that clicking sound

18    occurs when the trigger is pulled?

19         A.   Yes, sir.

11:14:29   20     Q.   And does that clicking sound occur when the

21    electricity is going through the wires, if you know?

22         A.   Not that I know of.

23         Q.   The clicking refers to the trigger being

24    pulled?

25         A.   I'm not sure.

EX31_029

1   the question were again?

2              MR. IREDALE:  The question that I'm going for

3   is after that reference to the three different times

4   that I heard the clicking, and the question is, "Okay.

5   And you said at one point, he went to drive stun the

11:17:57   6   gentleman.  Did you actually see him deliver a charge

7   on that?"

8              (Whereupon, a pause in the proceedings.)

9              MR. BERWANGER:  Tell you what.  Maybe you are

10  better able to find that.

11:18:25   11             MR. IREDALE:  Very good.

12             MR. IREDALE:  Here we go.  It's on your

13  transcript, Page 18, beginning at Line 4.

14  BY MR. IREDALE:

15       Q.   Now, you had a chance to review the

16  transcript, you told me, before your deposition today?

17       A.   Yes, sir.

18       Q.   And except for that portion as to which you

19  invoked your Fifth Amendment rights, you believe the

20  transcript, as I understand it, to be an accurate

21  transcript of what you actually said at the time?

22       A.   Yes, sir.

11:19:00   23       Q.   Now, let me ask you this question:  At the

24  time Dolan said to you, "Okay.  And you said at one

25  point, he went to drive stun the gentleman.  Did you

EX31_030

```
          1    actually see him deliver a charge on that?"

          2              Do you recall that question?

          3         A.   Yes.

          4         Q.   And your answer was --

          5         A.   Yes.

          6         Q.   -- "Yes"?

          7         A.   Yes, sir.

          8         Q.   So you did actually see a charge delivered on

11:19:28  9    the drive stun.  That's what you told Detective Dolan,

         10    correct?

         11              MR. BERWANGER:  If you recall.

         12              THE WITNESS:  That -- from what I recall,

         13    yes.

         14    BY MR. IREDALE:

         15         Q.   You were trying to give your best answer at

         16    the time?

         17         A.   Yes.

         18         Q.   The events were fresh in your mind?

         19         A.   Yes, sir.

         20         Q.   Trying to tell the truth at that time?

         21         A.   Yes, sir.

         22         Q.   Now, let me, in this regard, ask you, when

         23    you first arrived, there were either four or five

11:19:59 24    people on Mr. Hernandez; is that correct?

         25         A.   That's -- from what I remember, it was two or
```

EX31_031

```
            1              MR. IREDALE:  Yes.  And I'm going to inquire
            2    concerning a portion of the statement that the agent
            3    gave.
            4              MR. BERWANGER:  On Page 10?
            5              MR. IREDALE:  Yes.
            6    BY MR. IREDALE:
            7         Q.   And while the chronology is not clear, it may
            8    be that this conversation was with the people with the
            9    video on their cell phone.  So I think in fairness to
           10    you, I should refer you to the basis of the inquiry,
11:25:29   11    and then you can respond --
           12              MR. BERWANGER:  Thank you.
11:25:33   13              MR. IREDALE:  -- as you think appropriate.
           14              (Whereupon, an off-the-record discussion is
           15              held between Mr. Berwanger and the witness.)
           16              MR. BERWANGER:  Okay.  I'm going to advise
           17    the witness to take the Fifth.
           18              MR. IREDALE:  All right.
           19              MR. BERWANGER:  So I think you have to
           20    respond --
           21              THE WITNESS:  Okay.
11:26:30   22              MR. IREDALE:  Let me just put the questions,
           23    and then I understand that.
           24    BY MR. IREDALE:
           25         Q.   At some point, you were speaking to a couple
```

EX31_032

```
         1    of travelers at the foot of the bridge, were you not?
         2         A.    On the advice of counsel, I, unfortunately,
         3    must decline to answer the question.  As soon as the
         4    Grand Jury is terminated and it takes no further
11:26:58 5    action, I will be able to respond.
         6    BY MR. IREDALE:
         7         Q.    They were arguing saying, the guy's a human,
         8    and asking that you not mistreat him, correct?
         9              MR. BERWANGER:  Same.
        10              THE WITNESS:  On the advice of counsel, I,
        11    unfortunately, must decline to answer the question.  As
        12    soon as the Grand Jury is terminated and it takes no
        13    further action, I will be able to respond.
        14    BY MR. IREDALE:
        15         Q.    You said to them, "Hey, that guy was
        16    resisting and fighting us"?
        17              MR. BERWANGER:  Same.
        18              THE WITNESS:  On the advice of counsel, I,
11:27:29 19   unfortunately, must decline to answer the question.  As
        20    soon as the Grand Jury is terminated and it takes no
        21    further action, I will be able to respond.
        22    BY MR. IREDALE:
        23         Q.    The people that were asking you not to
        24    mistreat him saying he was human were the same people
        25    who had the video on their cell phone, correct?
```

EX31_033

          1        A.    On the advice of counsel, I, unfortunately,

          2    must decline to answer the question.  As soon as the

          3    Grand Jury is terminated and it takes no further

11:27:58  4    action, I will be able to respond.

          5        Q.    They were the people to whom you said, "Hey,

          6    that guy was resisting and fighting us"?

          7        A.    On the advice of counsel, I, unfortunately,

          8    must decline to answer the question.  As soon as the

          9    Grand Jury is terminated and it takes no further

         10    action, I will be able to respond.

         11        Q.    They had in their hand possible video

         12    evidence that would be able to show whether they were

         13    right and he was being mistreated or you were right and

11:28:30 14    the guy was resisting and fighting us, correct?

         15        A.    On the advice of counsel, I, unfortunately,

         16    must decline to answer the question.  As soon as the

         17    Grand Jury is terminated and it takes no further

         18    action, I will be able to respond.

         19        Q.    And you decided to destroy that evidence?

         20        A.    On the advice of counsel, I, unfortunately,

         21    must decline to answer the question.  As soon as the

         22    Grand Jury is terminated and it takes no further

         23    action, I will be able to respond.

11:28:57 24        Q.    You left the scene after the Tasing ended to

         25    intercept those travelers, correct?

EX31_034

             1        A.    On the advice of counsel, I, unfortunately,

             2   must decline to answer the question. As soon as the

             3   Grand Jury is terminated and it takes no further

             4   action, I will be able to respond.

             5        Q.    When you returned sometime later, you saw

             6   that Mr. Hernandez was unable to breathe?

             7              MR. BERWANGER:  You can respond.

             8              THE WITNESS:  Yes.

             9   BY MR. IREDALE:

11:29:29    10        Q.    You saw that CPR was being performed?

            11        A.    Yes, sir.

            12        Q.    You said, "Oh, what's going on?" or words to

            13   that effect?

            14        A.    Sure, yes.

            15        Q.    And you were told he wasn't breathing

            16   anymore?

            17        A.    Correct.

            18        Q.    And it was at this point they were taking

            19   handcuffs off of his person?

            20        A.    Yes.

            21        Q.    And you saw them after you returned, turn

            22   Mr. Hernandez on his side?

11:30:00    23        A.    Yes, sir.

            24        Q.    You heard someone call for oxygen?

            25        A.    Yes.

EX31_035