1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT
9                   SOUTHERN DISTRICT OF CALIFORNIA
10

11   THE ESTATE OF ANASTACIO              )   Civil No. 11cv522 L (DHB)
     HERNANDEZ-ROJAS, by its personal     )
12   representative DAISY HERNANDEZ, *et* )   **ORDER DENYING MOTIONS FOR**
     *al.*,                               )   **SUMMARY JUDGMENT [doc. nos.**
13                                         )   **145, 146, 147, 151, 152, 153, 184, 185,**
                       Plaintiffs,        )   **197, 201]**
14                                         )
     v.                                    )
15                                         )
     UNITED STATES OF AMERICA,            )
16                                         )
                       Defendant.         )
17   _____ )

18         Currently pending are the individual defendants' motions for summary judgment. The

19   motions are fully briefed and are considered without oral argument.

20   **I.     Background**

21         On March 23, 2012, Plaintiffs, the Estate of Anastacio Hernandez-Roja, which is for the

22   benefit of the children of decedent ("Anastacio"), filed the operative third amended complaint

23   ("TAC"). [ELECTRONIC CASE FILING ADMINISTRATIVE POLICIES AND

24   PROCEDURES M #53.] Plaintiffs assert fourteen causes of action: five of the causes of action

25   are alleged constitutional violations under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388

26   (1971), and the remaining nine are brought under the Federal Tort Claims Act and the Alien Tort

27   Claims Act. Plaintiffs seek general and special damages, punitive damages, and injunctive or

28   declaratory relief.

The initial complaint and the first amended complaint were brought against the United States of America and Does 1-50. The second amended complaint [doc. #16] named individual defendants with a numbering system. In their joint motion for protective order, [doc. #41], the parties agreed to use a "star numbering system for each of the individually named defendants at least through the discovery phase of litigation." *Id.* at 2. The TAC continued the use of the numbering system. After a telephonic status conference with the magistrate judge, the requirement that the parties use a star numbering system for each individually named defendant was lifted, except as to defendant Gabriel Ducoing. (Order filed July 29, 2013. [doc. # 242]) The magistrate judge ordered supplemental briefing with respect to the continued application of the star numbering system to defendant Ducoing. After full review of the matters presented, the magistrate judge found that the numbering system would no longer apply to Ducoing. In an effort to clarify the identities of the individual defendants, the Court will use the individual defendants' names rather than the star numbering system.[1]

Plaintiffs allege that their father, Anastacio, a 42-year old Mexican national, died as a result of physical abuse by Defendants. (TAC ¶ 28.)[2] On May 28, 2010, United States Border

---

[1]The following table identifies the individual defendants by title and star number, name, and motion for summary judgment docket number:

| Customs and Border Protection Agent 7663 | Jerry Vales | #201 |
|---|---|---|
| Border Patrol Agent V325 | Gabriel Ducoing | #146 |
| Border Patrol Agent V315 | Philip Krasielwicz | #145 |
| Immigration Enforcement Agent Piligrino | Andre Piligrino | #185 |
| Immigration Enforcement Agent 7G2186 | Harinzo Narainesingh | #184 |
| Border Patrol Agent L | Derrick Llewellyn | #152 |
| Customs and Border Protection  Agent B | Alan Boutwell | #151 |
| Customs and Border Protection Officer S | Kurt Sauer | #153 |
| Border Patrol Supervisor Finn | Ishmael Finn | #147 |
| Border Patrol Supervisor 1199 | Guillermo E. Avila | #197 |
| Border Patrol Supervisor 168 | Edward C. Caliri | #197 |
| Custom & Border Protection Supervisor CAQ03175 | Ramon DeJesus | #197 |

[2]The Court provides the factual background from allegations in the TAC because many of the facts as presented by the various defendants are significantly at odds with plaintiffs' version of events as well as co-defendants' accounts.

1  Patrol agents arrested Anastacio and his brother on United States land near the Mexican border.

2  (*Id.* ¶¶ 43-44, 46.) Those agents then transported the men to the Border Patrol Detention Facility

3  and turned them over to two of the defendants, Border Patrol Agent Philip Krasielwicz

4  ("Krasielwicz") and Border Patrol Agent Gabriel Ducoing ("Ducoing"). (*Id.* ¶¶ 57, 59.)

5           After Ducoing ordered Anastacio to empty his water jug, the agent allegedly slapped the

6  jug from Anastacio's hand. (TAC ¶¶ 62, 64.) Following Anastacio's complaint to the agent

7  about the slap, Ducoing allegedly grabbed Anastacio, pushed him against a wall, and "repeatedly

8  kicked the inside of Anastacio's ankles." (*Id.* ¶¶ 65-67.) Anastacio requested medical treatment

9  and an opportunity to appear before an Immigration judge. (*Id.* ¶¶ 72-73.) Ducoing did not

10  comply with Anastacio's requests. (*Id.* ¶ 74.)

11           After being taken to the processing area, Anastacio complained to two Border Patrol

12  agents about Ducoing's treatment and requested medical attention and the opportunity to appear

13  before an Immigration Judge. (TAC ¶¶ 75-76.) Anastacio then reiterated his complaints and

14  requests to Border Patrol Supervisor Ishmael Finn ("Finn"). (*Id.* ¶ 78.) In response, Finn ordered

15  Krasielwicz and Ducoing to immediately remove Anastacio from the United States. (*Id.* ¶ 82.)

16  The agents drove Anastacio to a border area known as "Whiskey 2," took him out of the car, and

17  allegedly pushed him against the car and "tried to throw him to the ground." (*Id.* ¶¶ 86, 88.)

18  Immigration Enforcement Agent Harinzo Naraisnesingh ("Narainesingh") and Immigration

19  Enforcement Agent Piligrino ("Piligrino") arrived and struck Anastacio "repeatedly" with

20  batons. (*Id.* ¶ 89.) Border Patrol Agent Derrick Llewellyn ("Llewellyn") arrived and allegedly

21  punched Anastacio "repeatedly." (*Id.* ¶ 90.) The five agents threw Anastacio to the ground and

22  handcuffed him. (*Id.* ¶ 91.) While Anastacio was lying on his stomach and in handcuffs, the

23  agents allegedly "punched, kicked and stepped on Anastacio's head and body." (*Id.* ¶ 92.)

24           While this was taking place, a group of civilians formed. (TAC ¶ 93.) The civilians took

25  photographs and videos of the events and screamed for the agents to stop. (*Id.* ¶¶ 94-95.)

26  Anastacio cried out for help and begged for the agents to stop. (*Id.* ¶ 98.) Plaintiffs allege that

27  U.S. Customs and Border Protection Supervisor Ramon DeJesus ("DeJesus") confiscated

28  bystanders' phones and erased the photographs and videos. (*Id.* ¶ 96.)

Agents Alan Boutwell ("Boutwell") and Kurt Sauer ("Sauer"), along with the five original agents on the scene, allegedly struck a Anastacio. (TAC ¶ 102.) After Border Patrol Supervisors Guillermo E. Avila ("Avila") and Edward C. Caliri ("Caliri") arrived, they allegedly "permitted and encouraged the agents to continue abusing Anastacio." (*Id.* ¶¶ 103-105.) Customs and Border Patrol Officer Jerry Vales ("Vales") shot Anastacio with his Taser gun four or five times. (*Id.* ¶ 107, 114.) Llewellyn, Boutwell, and Sauer then allegedly beat Anastacio and "ziptied his legs to his already handcuffed hands, putting him in a 'hog tied' position on his stomach." (*Id.* ¶ 115.)

Plaintiffs allege that as a result of these events, Anastacio suffered a heart attack and ultimately died. (TAC ¶¶ 116, 118.) Dr. Glenn Wagner, San Diego County Chief Medical Examiner, performed an autopsy and ruled that the death was a homicide. (Plfs' Exh. 43.) Dr. Marvin Pietruszka performed another autopsy and found several injuries to Anastacio's body, including broken ribs and large hematomas. (Plfs' Exh. 44.) Dr. Pietruszka also ruled the death a homicide and found "the cause of death to be lack of oxygen to the brain brought on by a heart attack." (*Id.* ¶ 119.)

## II.   Summary Judgment Standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* FED. R. CIV. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will

1  bear the burden of proof at trial. *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts

2  will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

3  *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

4       "The district court may limit its review to the documents submitted for the purpose of

5  summary judgment and those parts of the record specifically referenced therein." *Carmen v. San*

6  *Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not

7  obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91

8  F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251

9  (7th Cir. 1995)). If the moving party fails to discharge this initial burden, summary judgment

10 must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H.*

11 *Kress & Co.*, 398 U.S. 144, 159-60 (1970).

12      If the moving party meets this initial burden, the nonmoving party cannot defeat summary

13 judgment merely by demonstrating "that there is some metaphysical doubt as to the material

14 facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986);

15 *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence

16 of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing

17 *Anderson*, 477 U.S. at 242, 252). Rather, the nonmoving party must "go beyond the pleadings"

18 and by "the depositions, answers to interrogatories, and admissions on file," designate "specific

19 facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R.

20 Civ. P. 56(e)).

21      When making this determination, the court must view all inferences drawn from the

22 underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at

23 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate

24 inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on

25 a motion for summary judgment." *Anderson*, 477 U.S. at 255.

26 **III.   Evidentiary Objections**

27      Before turning to the merits of defendants' motions, the Court notes that both parties have

28 submitted objections to various evidentiary materials.

11cv522

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.      Defendants' Joint Objections to Plaintiffs' Exhibits

Defendants' joint objections characterize plaintiffs' evidence as being unsupported assertions, misstatements of testimony, speculative, argumentative, not authenticated, or misleading. (*See* Objections filed October 1, 2013.)

"At summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)) (internal quotations omitted). The focus is on the admissibility of the evidence's contents, not its form. *Fonseca v. Sysco Food Servs.of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

Unauthenticated documents cannot be considered in a motion for summary judgment, *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) (citing *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002)) (quotation marks omitted), and therefore, lack of proper authentication can be an appropriate objection where the document's authenticity is genuinely in dispute. But an inquiry into authenticity concerns the genuineness of an item of evidence, not its admissibility, *Orr*, 285 F.3d at 776, and documents may be authenticated by review of their contents if they appear to be sufficiently genuine. *Las Vegas Sands, LLC*, 632 F.3d at 533 (citing *Orr*, 285 F.3d at 778 n. 24) (quotation marks omitted).

"Objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. *Burch v. Regents of Univ. of California*, 433 F. Supp.2d 1110, 1119 (E.D. Cal. 2006); see *Anderson*, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted.").

In ruling on summary judgment, the Court considers the evidence submitted in support of and opposition to the motion, it does not rely on the parties' characterization of the evidence. *See Dalton v. Straumann Co. USA Inc.*, 2001 WL 590038, at *4 (N.D. Cal. May 18, 2001) ("Statements of undisputed facts, as in this case, are generally unhelpful. It is on the underlying

declarations, depositions and exhibits that the court will rely.").

As the case law noted above makes clear, defendants' objections concerning unsupported assertions or  misstatements of testimony, or evidence being speculative or argumentative, or not properly  authenticated, or statements that appear to be misleading are without merit at the summary judgment stage. In reviewing the present motions for summary judgment and plaintiffs' response, the Court has given attention to the evidence presented and the applicable Rules of Evidence. Having therefore considered the objections and case law, the Court overrules defendants' joint objections.

### B.   Plaintiffs' Motion to Strike Expert Opinions

Within their consolidated opposition to the motions, plaintiffs move to strike the expert reports of Urey Patrick and Gary Vilke, and a declaration by defense expert Mark Kroll. (Opp. at 104.) This is  procedurally improper under the Civil Local Rules. Because a "motion to strike" buried within an opposition is not a properly filed motion, which requires an independent briefing schedule, defendants are not given an adequate opportunity to respond to the motion and the Court is deprived a full briefing on the matter. Accordingly, the Court will not consider plaintiffs' request to strike the expert reports and expert declaration.

### IV.   Qualified Immunity

The doctrine of qualified immunity shields government officials from civil liability so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware under the circumstances. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity balances the need to hold public officials accountable for irresponsible exercises of power and the need to shield officials from harassment, distraction, and liability for reasonable performance of their duties. *See id.* Qualified immunity analysis is a two-step process: courts must determine whether a plaintiff alleges a constitutional violation, and whether the right at issue was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Which of the two steps should be addressed first rests in the sound discretion of the court. *Pearson*, 555 U.S. at 236.

11cv522

## A.    First Amendment Retaliation Claim

Defendants argue that plaintiffs' first amendment retaliation claim should be dismissed because any use of force claims must be analyzed under the Fourth Amendment objective reasonableness standard. In so contending, defendants rely on *Graham v. Connor*, 490 U.S. 386 (1988). *Graham* provided that "[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment . . . ." *Id.* at 395. In other words, the Fourth Amendment, not the First Amendment, is the only proper basis for an excessive force or false arrest claim. Although correct, plaintiffs' retaliation claim alleges a First Amendment violation and does not assert a retaliation claim based on the Fourth Amendment. Therefore, defendants' motion seeking dismissal of the retaliation claim under the First Amendment is denied.

### 1.    Constitutional Violation

The First Amendment forbids government officials from retaliating against individuals for speaking out. *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see also, U.S. v. Poocha*, 259 F.3d 1077 (9th Cir. 2001)(The First Amendment protects verbal criticism, challenges, and profanity directed at police officers.).

To recover under a *Bivens* action for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Id.*; *see also Skoog v. County of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (To prevail on a First Amendment retaliation claim, a plaintiff must show that 1) the defendant's action "would chill or silence a person of ordinary firmness from future First Amendment activities" and 2) the defendant's "desire to cause the chilling effect was a but for cause of the defendant's action."); *see also Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013). The Ninth Circuit has held that "retaliatory police action such as an arrest or search and seizure would chill a person of ordinary firmness from engaging in future First

1    Amendment activity." *Ford*, 706 F.3d at 1193.

2                          **a.      Chilled Speech**

3         In the present case, plaintiffs allege that while at the Processing Center, Anastacio

4 requested medical care and complained about physical mistreatment by agents. Anastacio asked

5 Ducoing why he had kicked him. (Ducoing Decl., Exh. D.) Krasielwicz overheard the

6 conversation that occurred between Anastacio and Ducoing. (Krasielwicz Depo., Exh. C.) Jose

7 Galvan, a non-party, was fingerprinting Anastacio when Anastacio "complained about his ankle,

8 saying he had pins in his ankle. (Galvan Decl., Exh. F) Krasielwicz called Supervisor Finn.

9 When Anastacio told Finn that one of his agents had kicked his ankle and complained of his

10 mistreatment and requested medical care, Finn told Anastacio he would be returned to Mexico

11 immediately, bypassing standard procedures. This statement is supported by both Ducoing and

12 Krasielwicz  (*Id.*; Krasielwicz Decl.) In his deposition, Finn states that a supervisor, such as

13 himself, is obligated to report any complaints to the Office of the Inspector General; however,

14 Finn also declares that he had never received a complaint during his tenure that began in 2009.

15 Finn noted that "it's a common practice if a prisoner is making complaint against an agent, then

16 obviously, that agent is not going to have any more contact with that prisoner. (Plft's Exh. 7.)

17 Finn ordered both Ducoing and Krasielwicz to escort Anastacio to Whiskey 2.

18         In his deposition, Finn also stated that when a prisoner asks for medical care – the right to

19 see a doctor or medical technician – it is the discretion of the agent or supervisor to determine

20 whether medical care is offered. Further, Finn acknowledged that he did not allow Anastacio to

21 have any medical treatment although he remembered "first hearing of the leg injury from

22 Anastacio himself." (*Id.*) But Finn denied that Anastacio told him that his ankle had been kicked

23 by one of the agents that day. The declaration of Robinson Ramirez, however, states that he

24 heard Anastacio tell Finn that one of the agents had hurt his ankle. (Finn, Exh. 5.) Galvan also

25 told Finn that Anastacio was kicked by Ducoing or Krasielwicz. Finn acknowledges that

26 Anastacio was not combative but he "was being argumentative." He additionally denies

27 Anastacio ever asked to use the phone. It is therefore undisputed that Anastacio did not receive

28 medical care; nor did Finn process, investigate, or report Anastacio's claim of mistreatment.

1    Anastacio also asked repeatedly to use a phone but that too was denied. Agent Cardenas noted

2    that Krasielwicz repeatedly told Anastacio to be quiet and stop talking. (Cardenas Decl.)

3          Ultimately, once they arrived at the border crossing – "Whiskey 2" – Ducoing and

4    Krasielwicz contend in their declarations or depositions that Anastacio's behavior changed as the

5    handcuffs were removed, *e.g.*, he was not throwing punches but was pushing the agents and

6    would not go down. (Ducoing & Krasielwicz Decls.) It is unclear whether Anastacio was

7    protesting his mistreatment and crying out in pain when he was next subjected to baton strikes

8    by Piligrino and Narainesingh, who along with Ducoing and Krasielwicz, also grappled with

9    Anastacio to take him to the ground. According to Krasielwicz, Piligrino and Narainesingh, they

10   all fell to the ground, with Anastacio falling on Krasielwicz's legs. (Krasielwicz Decl.)

11   Krasielwicz states that only one of the ICE agents was hitting Anastacio with a baton. Anastacio

12   was screaming "ayuda me" which means "help me" in English. (Krasielwicz Decl., Narainesingh

13   Depo.) Krasielwicz and Ducoing both requested that the baton strikes cease. (Ducoing &

14   Krasielwicz Decls.)

15         Another Border Patrol Agent, Llewellyn, arrived and the five agents took Anastacio to the

16   ground on his stomach and succeeded in getting Anastacio in handcuffs behind his back. (*Id.*)

17   During this time Anastacio "continued to scream for help in Spanish." (Ducoing & Krasielwicz

18   Decls.) Ducoing then states that he called Finn to tell him what had transpired and was told to

19   bring Anastacio back so charges could be pressed and a caged unit would be sent. (*Id.*) When

20   Ducoing returned to Anastacio, who remained face down and handcuffed behind the back, the

21   agents still were physically holding him down. (Ducoing Decl.)

22         The caged unit arrived and according to Ducoing, "we picked" up Anastacio who "started

23   kicking and fighting us again." (*Id.*) Ducoing states that Anastacio arched his back and hit his

24   head against the window when they attempted to get him in the caged unit. At that point,

25   Ducoing stated "we" knew we could not put him in the vehicle so they laid Anastacio on the

26   ground, on his stomach, while still handcuffed. Ducoing and Krasielwicz assert that they stepped

27   away from Anastacio at that point while the other officers continued to hold Anastacio face

28   down on the ground. (Krasielwicz & Ducoing Decl.)

In deposition testimony, Sergio Gonzalez-Gomez, who was on the bridge watching the incident, stated he told his friend Humberto Navarrete, "You know what? We've got to help out here. They're asking for help. " Q Who was asking for help? A Well, the decedent." (Gonzalez-Gomez Depo. at 66.) Osvaldo Chavez also testified that Anastasio was screaming for help, "ayuda" in Spanish. All of the civilian witnesses to the events testify similarly. Avila noted that Anastasio was yelling "you are hurting me" and "you are killing me." (Avila Decl.)  But only Avila states that Anastasio was using foul language. (*Id.*)

Vales arrived with his Taser and told everyone to stay away from Anastasio. (*Id.*) Only Narainesingh heard Vales give Anastasio a warning that he was going to be tasered. Krasielwicz states that Vales told Anastasio  to "stop resisting." (*Id.*) Ducoing and Krasielwicz both acknowledge they could no longer could see Anastasio on the ground when Vales first deployed the Taser but according to Ducoing, after the first Taser shot, Anastasio stood up and started yelling again. (*Id.*) What Anastasio was screaming was left unsaid by Ducoing and Krasielwicz. The audio of Allison Young videotape provides evidence that Anastasio continued to do no more than ask for help. At that point, Vales tasered Anastasio again and Anastasio went down to the ground, rolling 20-25 feet breaking the taser wires. (*Id.*). According to Ducoing, Anastasio was continuing to scream but was on his back and because Anastasio was not "complying with orders," Vales attempted to drive stun[3] Tasers can be deployed in either dart mode or drive-stun mode Anastasio. (*Id.*) Ducoing stated that Anastasio was rolled over again. Ducoing does not mention when Anastasio's legs were ziptied by Boutwell and Sauer, but states Anastasio lost consciousness.

Supervisor DeJesus arrived during the use of the Taser. He noted that multiple agents were holding Anastasio down even though he was face down and handcuffed. (DeJesus Depo. at I-003.) Additionally, DeJesus agreed with the question: "[u]p until the time when that drive stun was either applied or attempted to be applied, your testimony, as I understand it, is Anastasio was constantly resisting." (*Id.*) It is undisputed the Supervisor defendants, Avila, Caliri and

---

[3]Tasers can be deployed in either dart or probe mode, or in drive stun mode. Drive stun mode is deployed with the Taser directly against the target's body.

DeJesus, did not act to intervene in the situation, and it is further uncontested that they heard Anastacio's cries for help, as did Boutwell and Sauer and the other defendants.

Anastacio's questioning of the various agents for what he perceived to be physical mistreatment and an unlawful attack and crying out for help falls "squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech ... is categorically prohibited by the Constitution." *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990). Taking plaintiffs' allegations as true, along with the deposition and declaration testimony,  and the videotape recorded by Allison Young, Anastacio was repeatedly calling out "help me" rather than offering resistance and because of his continued pleas for assistance, defendants physically abused Anastacio. Thus, a reasonable jury could conclude that all the officers' acts "would chill or silence a person of ordinary firmness from future First Amendment activities." A rational jury could find that defendants chilled the future exercise of First Amendment rights when Anastacio was seized and repeatedly injured.

### b.    Causation

In order to show a constitutional violation under the First Amendment, there must be a substantial causal relationship between the constitutionally protected activity and the adverse action. Plaintiffs correctly point out that the issue of causation is generally for the trier of fact but they further contend that they have provided sufficient evidence for the jury to infer that the defendants' retaliatory motive was the cause of their actions.

The causation element of a First Amendment retaliation claim requires plaintiffs to show that protected conduct was the substantial or motivating factor underlying the defendant's adverse action.  *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir.2009) "To show the presence of this element on a motion for summary judgment, [plaintiff] need only "put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [defendants'] intent . . . . *Id.* (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)."Recognizing that the ultimate fact of retaliation for the exercise of a constitutionally protected right rarely can be supported with direct evidence of intent, . . .  courts have found sufficient complaints that allege a chronology of events from which retaliation may be inferred."

*Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987) (quoting *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985)). "[T]iming can properly be considered as circumstantial evidence of retaliatory intent." *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

Here, plaintiffs have presented sufficient evidence that raises and supports a First Amendment retaliation claim. The various video and deposition evidence demonstrates that Anastacio repeatedly, indeed almost constantly, asked for help and cried out in pain while unable to move or act aggressively. The retaliation for his utterances and cries is demonstrated beginning with Anastacio's initial complaints about Ducoing hurting his ankle, the denial of medical care, to Finn's decision to immediately deport Anastacio after being told of his injury in contravention of policy, the continuing use of physical force, being tasered multiple times while face down on the ground, handcuffed, surrounded by multiple officers. This provides a reasonable inference that plaintiffs' protected act was a substantial factor underlying defendants' adverse acts and a jury could so find. Plaintiffs have provided facts that "would chill or silence a person of ordinary firmness from future First Amendment activities" and defendants' desire to cause the chilling effect was a substantial cause of the defendant's action.

### 2.     Clearly Established Right

As the Court has determined, plaintiffs have alleged a constitutional violation – retaliation in violation of the First Amendment – against all the defendants; therefore, the next question is whether the right at issue was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

It is clearly established that police officers may not use their authority to retaliate against protected speech, even if probable cause to arrest exists. *Ford* at 1195–96. In *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990), the Court held that it was  clearly established that police officers may not use their authority to punish an individual for exercising his First Amendment rights. And *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006) clearly established that a police action motivated by retaliatory animus was unlawful, even if probable cause existed for that action." Thus, Ninth Circuit precedent has long provided notice to law enforcement officers that it is unlawful to use their authority to retaliate against

1  individuals for their protected speech.

2  ### 3.  Conclusion

3  Taking as true plaintiffs' allegations along with plaintiffs' and defendants' evidence,

4  plaintiffs have alleged a violation of Anastacio's clearly established First Amendment right "to

5  be free from police action motivated by retaliatory animus." *Ford*, 706 F.3d at 1196. Further,

6  that right was clearly established at the time of the incident. Accordingly, none of the defendants

7  are entitled to summary judgment on qualified immunity.

8  ### B.  Excessive Force and Wrongful Death

9  Plaintiffs bring their excessive force cause of action under the Fourth Amendment against

10  defendants Krasielwicz, Ducoing, Piligrino, Narainesingh, Llewellyn, Sauer, and Boutwell.

11  (TAC at 18.)

12  ### 1.  Constitutional Violation

13  All claims that law enforcement officers used excessive force, either deadly or

14  non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be

15  analyzed under the Fourth Amendment and its standard of objective reasonableness. *See*

16  *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005); *Quintanilla v. City of*

17  *Downey*, 84 F.3d 353 (9th Cir. 1996); *see also Drummond v. City of Anaheim*, 343 F.3d 1052,

18  1056 (9th Cir. 2003); *Robinson v. Solano County*, 278 F.3d 1007, 1009 (9th Cir. 2002) (en

19  banc). "An objectively unreasonable use of force is constitutionally excessive and violates the

20  Fourth Amendment's prohibition against unreasonable seizures." *Torres v. City of Madera*,  648

21  F.3d 1119, 1124 (9th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 394–96 (1989); *see*

22  *also Arpin v. Santa Clara Falley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001)(The Fourth

23  Amendment provides an objective reasonableness standard in the excessive force context.")

24  Determining the reasonableness of an officer's actions is a highly fact-intensive task for

25  which there are no per se rules. *Scott*, 550 U.S. at 383 As the Supreme Court noted in *Graham*,

26  "police officers are often forced to make split-second judgments – in circumstances that are

27  tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a

28  particular situation," *Graham*, 490 U.S. at 397, and "these judgments are sometimes informed by

errors in perception of the actual surrounding facts." *Torres*, 648 F.3d at 1124. Thus, the *Graham* Court adopted "the perspective of a reasonable officer on the scene ... in light of the facts and circumstances confronting him." *Graham*, 490 U.S. at 396. "Standing in the shoes of the 'reasonable officer,' [the court asks] whether the severity of force applied was balanced by the need for such force considering the totality of the circumstances, including (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Torres*, 658 F.3d at 1124 (citing *Graham*, 490 U.S. at 396.) The most important of these factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). "[Courts] balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. Thus, the Fourth Amendment reasonableness standard requires a court to balance the amount of force applied against the need for the use of that force. *Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002).

In circumstances where the individual against whom the alleged excessive force was used is unable to testify because he has died, it is well-established that the court may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Rather, [i]t must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* Thus, "[t]he judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiffs, to determine whether the officers' stories is internally consistent and consistent with other known facts." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005)

As the *Torres* Court noted, "[t]he standard on summary judgment review requires that we "draw all reasonable inferences in favor of . . . the nonmoving party," and prohibits us from "substitut[ing] [our] judgment concerning the weight of the evidence for the jury." *Torres*, 648

F.3d at 1125 (quoting *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) "Because the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002) (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir.1997)).

### a.    Nature and Quality of Intrusion

The gravity of a particular intrusion on an individual's Fourth Amendment rights depends on the type and amount of force inflicted. *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Here, it is undisputed that Anastacio was unarmed, no contraband was found in his possession, and he was placed in handcuffs for all of the encounters with defendants except during his transport from the Processing Center to Whiskey 2. Taking as true that Ducoing kicked Anastacio's ankles, Anastacio told Finn about his medical needs which Ducoing and Krasielwicz were aware of, Ducoing and Krasielwicz permitted the intrusive beating of plaintiff by Piligrino and Narainesingh with batons even though moments earlier they indicated that all was well. Llewellyn also participated with Ducoing, Krasielwicz, Piligrino, and Narainesingh in beating and kicking Anastacio, and holding him on the ground with their body weight pressing on his back and neck. Vales then tasered Anastacio even though Anastacio remained handcuffed, face down, and as the video and civilian witnesses attest, passive but for crying out for help. Sauer and Bauer acknowledge that they restrained Anastacio's legs after he was tasered, and they then ziptied an unresponsive Anastacio's legs. The autopsy report of Dr. Glenn Wagner noted abrasion/contusions of face, forehead, abdomen, hands and lower legs, the paraspinal soft tissue of the neck showed acute muscular hemorrhage, and the anterior abdominal wall shows acute hemorrhage, and the soft tissue adjacent to the adrenal gland was also hemorrhagic. and listed manner of death, homicide. Dr. Pietruszka's autopsy report indicates Anastacio had five broken ribs, extensive hematomas, contusions and abrasions.

The type and amount of force used was a grave intrusion on Anastacio's Fourth Amendment rights.

### b.      Governmental Interests

#### 1.      Severity of the Crime

Plaintiffs contend that the crime of illegally crossing the border is a non-severe, non-violent crime. But defendants each argue that the actual crime to which they were responding was assault on an officer or officers, a felony crime. The officers all allege that Anastacio was an out-of-control individual who was, at all times, violent and unresponsive to their commands. The deposition testimony of Ashley Young and the video recordings she took, along with the depositions of Sergio Gonzalez-Gomez and Humberto Navarrete strongly counter the officers' testimony during the height of the altercation. A reasonable jury could find that Anastacio did not assault any of the officers but rather was reacting to the infliction of unwarranted and severe pain.

#### 2.      Immediate Threat to Safety

Although the officers all contend that Anastacio posed a great threat to the safety of officers, a reasonable jury could find that an unarmed, handcuffed man, who was face down on the ground, was not a threat to Ducoing, Krasielwicz, Piligrino, Narainesingh or Llewellyn or when Boutwell, Sauer or Vales arrived surrounding Anastacio. The sheer number of officers available at the scene demonstrates rather strongly that there was no objectively reasonable threat to the safety of any one other than Anastacio.

#### 3.      Actively Resisting Arrest or Attempting to Evade Arrest by Flight

Defendants contend that Anastacio was actively resisting arrest throughout his time at Whiskey 2. However, the video evidence submitted provides, at a minimum, that Anastacio was not resisting arrest or attempting to evade arrest.

#### 4.      Presence of a warning:  Presence of a warning

"[T]he giving of a warning or failure to do so is a factor to be considered in applying the *Graham* balancing test." *Dearly*, 272 F.3d at 1284. "[W]arnings should be given, when feasible, if the use of force may result in serious injury." *Id.*  Vales repeatedly told Anastacio to stop resisting but such a statement is not a warning to Anastacio that he would be tasered. Defendant

1   Narainesingh alone testified that Vales told Anastacio to "Stop resisting, I'm going to TASER

2   you." (Plfs' Exh. 8 at 55). Assuming that "stop resisting" can function as a warning or Vales

3   actually said "I'm going to TASER you," it was given to a man who was face down, on the

4   ground, was passive, was crying out "help me," with his hands cuffed behind his back. Taking

5   plaintiffs' allegations as true, a reasonable jury could find that the "warning" did not appear to

6   be based on seeking Anastacio's compliance or stopping an immediate threat to officers, but was

7   instead used to cover Vales' intent to use unnecessary and excessive intermediate force, the

8   Taser, on Anastacio.

9        Balancing the nature and quality of the intrusion and the governmental interest, the use of

10  force by each defendant was not objectively reasonable.

### 2.    Clearly Established

12       As discussed above, "[t]he relevant, dispositive inquiry in determining whether a right is

13  clearly established is whether it would be clear to a reasonable officer that his conduct was

14  unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)(quoting

15  *Saucier* 533 U.S. at 201–202). "The contours of the right must be sufficiently clear that a

16  reasonable official would understand that what he is doing violates that right." *Id*.

17       In the case of *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th

18  Cir. 2003), the Court held that some force was justified in restraining a mentally ill individual so

19  he could not injure himself or officers, but once he was handcuffed and lying on ground without

20  offering resistance, officers who knelt on him and pressed their weight against his torso and neck

21  despite his pleas for air used excessive force. As the *Drummond* Court further pointed out: "The

22  officers—indeed, any reasonable person—should have known that squeezing the breath from a

23  compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force

24  that is greater than reasonable." *Id*. In the present case, several years after *Drummond* was

25  announce, the officers here had notice that once Anastacio was on the ground, prone,

26  handcuffed, and not resisting the officers, they could not hold Anastacio down by pressing their

27  weight against him and when they did not remove the pressure, despite Anastacio's cries for

28  help, the force used was unreasonable. The right to be free from excessive force under facts

1   similar to the present case, was clearly established at the time of the incident.

2          Defendant Vale also argues, along with the other defendants, that the use of a Taser was

3   not clearly established in May 2010. Plaintiff contends that the controlling law at the time of the

4   incident was set forth in *Bryan v. MacPheron*, 630 F.3d 805 (9th Cir. 2010). In *Bryan*, the Court

5   concluded that the officer "used excessive force when, on July 24, 2005, he deployed his X26

6   Taser in dart mode to apprehend [plaintiff] for a seatbelt infraction, where Bryan was obviously

7   and noticeably unarmed, made no threatening statements or gestures, did not resist arrest or

8   attempt to flee, but was standing inert twenty to twenty-five feet away from the officer. *See*

9   *Bryan v. MacPherson*, 608 F.3d 614, 618 (9th Cir. 2010). The Court continued by noting that the

10  X26 taser and similar devices, when used in dart mode, constitute an "intermediate, significant

11  level of force that must be justified by the governmental interest involved." *Id.* at 622.

12  Nevertheless, the Court also concluded that defendant was entitled to qualified immunity

13  "because this principle was not clearly established in 2005 when defendant deployed his Taser

14  on plaintiff." *See id.* at 629. The *Bryan* Court also noted that "use of the X26 taser and similar

15  devices in dart mode constitutes an intermediate, significant level of force that must be justified

16  by the governmental interest involved." *Bryan*, 608 F.3d at 622.

17         As plaintiffs correctly note, the original *Bryan* decision was withdrawn and superseded on

18  denial of reh'g, 630 F.3d 805 (9th Cir. 2010). In the 2010 decision, which was issued shortly

19  after the death of Anastacio, the Court re-affirmed that defendant was entitled to qualified

20  immunity because the use of a Taser was not clearly established in 2005, when the defendant

21  used the Taser on plaintiff. As the 2010 *Bryan* decision further noted: "although we did not alter

22  our holding that Officer MacPherson used excessive force on Bryan, we concluded that, based

23  on "recent statements [in other circuit opinions] regarding the use of tasers, and the dearth of

24  prior authority," a "reasonable officer in Officer MacPherson's position could have made a

25  reasonable mistake of law regarding the constitutionality of the taser use in the circumstances

26  Officer MacPherson confronted in July 2005." *Id.* at 629. Therefore, the later *Bryan* decision did

27  not reverse that the use of the X26 taser and similar devices in dart mode constitutes an

28  "intermediate, significant level of force that must be justified by the governmental interest

1   involved." *Bryan*, 608 F.3d at 622. As a result, on May 28, 2010, the use of a Taser on a suspect

2   who was neither a flight risk nor a immediate threat to officers was clearly established.

3           Further, the testimony of defendants[4] supports that their training indicated that the use of

4   a Taser could likely subject a person to positional restraint asphyxia. (*See e.g.,* Plaintiffs' Exh.

5   52, Sauer Depo. at 44.) In *Drummond,* the Court noted that "[a]lthough such training materials

6   are not dispositive, we may certainly consider a police department's own guidelines when

7   evaluating whether a particular use of force is constitutionally unreasonable." *Id.* at 1059.

8           In sum, the record shows that Vales was on notice that the use of a Taser as a pain

9   compliance device on an individual who was already knocked to the ground, was handcuffed,

10  and compliant had a substantial risk of death or serious bodily injury. Viewing the evidence in

11  the light most favorable to Plaintiffs, Vales had "fair warning" that the force he used, multiple

12  deployments of the Taser, was constitutionally excessive even absent a Ninth Circuit case

13  presenting the same set of facts.

14                  **3.      Conclusion**

15          The Ninth Circuit has repeatedly cautioned lower courts to take care in deciding

16  excessive force cases at the summary judgment stage. The standard on summary judgment

17  review requires that the Court "draw all reasonable inferences in favor of plaintiffs', the

18  nonmoving party," and prohibits "substitut[ing] [our] judgment concerning the weight of the

19  evidence for the jury's." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th

20  Cir.2003). Because an excessive force claim almost always requires a jury to sift through

21  disputed factual contentions and police misconduct cases almost always turn on the jury's

22  credibility determinations, summary judgment in excessive force cases is granted sparingly.

23  Given the disputed issues of material fact addressed above, the Court will deny summary

24

25          [4]The Court notes that Vales declined to answer questions at his deposition on the basis of
    his Fifth Amendment right to avoid incrimination. During his deposition, Vales was asked about
26  a basic certification course in the use of the Taser and a test he took on November 19, 2008,
    entitled "United States Customs and Border Protection Electric Control Device Basic
27  Certification Courts." The question asked was whether Vales was taught as part of his Taser
    training that if the subject stops resisting an officer, the use of the Taser must stop. (Plaintiffs'
28  Exh. 51.)

1   judgment on the ground of qualified immunity.

2   **D.      Right of Association Claim**

3   Plaintiffs' fifth cause of action for familial association is asserted against all defendants

4   except the United States.

5   **1.      Violation of a Constitutional Right**

6   Plaintiffs allege that defendants' excessive use of force and deadly force deprived them of

7   the familial association with their father. The potential constitutional violation involves

8   Anastacio's children's Fourteenth Amendment due process right to associate with their father.

9   *See Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir.1991)("The Ninth Circuit

10  recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth

11  Amendment in the companionship and society of his or her child ...."); *see also Moreland v. Las*

12  *Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir.1998).

13  In order to address whether defendants committed a constitutional violation, the Court

14  must first decide the appropriate standard of culpability to apply to determine whether

15  defendants' conduct "shocks the conscience" under the Fourteenth Amendment's Due Process

16  Clause. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846(1998). Then, the Court must

17  determine whether each defendants' conduct meets that standard of culpability. "The level of

18  culpability required to meet the conscience-shocking standard depends on the context." *See id*. at

19  850 ("[d]eliberate indifference that shocks in one environment may not be so patently egregious

20  in another"). In determining whether "deliberate indifference" is sufficient to shock the

21  conscience, or whether the more demanding standard of "purpose to harm" is required, "the

22  'critical consideration [is] whether the circumstances are such that actual deliberation is

23  practical.'" *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)(quoting *Moreland v. Las*

24  *Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir.1998)). Where an officer faces "fast

25  paced circumstances presenting competing public safety obligations, the purpose to harm

26  standard must apply." *Id.* at 1139. At the other end of the continuum is the "deliberate

27  indifference" standard. This standard requires a meaningful opportunity for actual deliberation.

28  *Id.* at 1138; *see also Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

1   Defendants here argue they are not liable for a due process violation without plaintiffs

2   establishing the "purpose to harm" standard. But plaintiffs contend the deliberate indifference

3   standard is appropriate because the evidence shows that the situation was one in which "actual

4   deliberation [was] practical." *Porter,* 546 F.3d at 1137. "A court may determine at summary

5   judgment whether the officer had time to deliberate (such that the deliberate indifference

6   standard applies) or instead had to make a snap judgment because he found himself in a quickly

7   escalating situation (such that the purpose to harm standard applies), "so long as the undisputed

8   facts point to one standard or the other." *Chien Van Bui v. City and County of San Francisco*,

9   2014 WL 3725843, *14 (N.D. Cal. 2014) (quoting *Duenez v. City of Manteca*, 2013 WL

10  6816375, at *14 (E.D. Cal. Dec. 23, 2013).

11  Defendants acknowledge that approximately 20 minutes passed between the time

12  Anastacio arrived at Whiskey 2 and the time he was tasered and had his legs ziptied.

13  Narainesingh testified that after the handcuffs were placed on Anastacio and he was face down,

14  on the ground, Narainesingh, Krasielwicz, Piligrino and Ducoing held Anastacio down with their

15  knees and hands during this time. The video evidence shows that when Vales arrived, Anastacio

16  was continuing to cry out in pain and was seeking assistance but was inactive. Thus, this was a

17  situation that was de-escalating over a significant amount of time. This evidence supports a

18  finding that defendants had ample time to deliberate and plan how to deal with Anastacio.

19  Accepting plaintiffs' evidence as true, there was sufficient time for defendants to consider with

20  deliberation whether to continue to hold Anastacio forcefully face down, to taser him several

21  times, and to place his legs in zipties before finally turning him on his back. Because the

22  circumstances permitted the defendants time to fully consider the potential consequences of their

23  conduct, deliberate indifference is the appropriate standard.

24  "Deliberate indifference occurs when an official acted or failed to act despite his

25  knowledge of a substantial risk of serious harm." *Solis v. County of Los Angeles*, 514 F.3d 946,

26  957 (9th Cir. 2008). "Whether [the officers] had the requisite knowledge of a substantial risk is a

27  question of fact subject to demonstration in the usual ways, including inference from

28  circumstantial evidence, and a factfinder may conclude that [the officers] knew of a substantial

risk from the very fact that the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825 842 (1994), The Court therefore considers whether plaintiffs have alleged facts which, when taken as true, demonstrate that defendants created a substantial risk of serious harm by forcibly holding Anastacio down for an extended period of time while his hands were cuffed behind his back, and he was not resisting. And finding this situation, whether Vales tasered Anastacio several times despite his knowledge of a substantial risk of serious harm and whether the supervisory defendants, Avila, Caliri and DeJesus, failed to intervene in the tasering of a passive, handcuffed man who was faced down on the ground. Here, a jury could reasonably find that the defendants acted with deliberate indifference when Narainesingh and Piligrino used batons on Anastacio as he was being held by Ducoing and Krasielwicz; when Narainesingh, Piligrino, Ducoing and Krasielwicz, and Llewellyn took Anastacio to the ground and held him there; and when Sauer and Boutwell ziptied his legs while his arms were cuffed behind him.

A person deprives another of a constitutional right, where that person does an affirmative act, participates in another's affirmative acts, or omits to perform an act which that person is legally required to do that causes the deprivation of which complaint is made." *Dietzmann v. City of Homer*, 2010 WL 4684043, *18 (D. Alaska 2010) (quoting *Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007) (citing *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)). The "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013)(quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir.1978)).

Here, the appropriate standard to be applied is the deliberate indifference standard because the evidence, including video and deposition testimony of bystanders, shows that the situation was one in which "actual deliberation [was] practical. If the plaintiffs' allegations are believed, the events both before and at Whiskey 2 occurred over a 20 minute period where Anastacio was incapacitated for most of that time, the situation was not escalating, and Anastacio could not flee or harm anyone.

### 2.   Causation

Defendants contend that plaintiffs' Fifth Amendment claim must fail because plaintiffs cannot establish causation. Plaintiffs assert that they need to show that defendants' conduct was a substantial factor in causing Anastacio's death, *i.e.*, that evidence shows that the acts were so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury – in this case, Anastacio's death.

The substantial factor standard...has been embraced as a clearer rule of causation [than the "but-for" test] - one which subsumes the "but-for" test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact." *Sementilli v. Trinidad Corp.,* 155 F.3d 1130, 1136 (9th Cir. 1998) (Nelson, J., concurring), *quoting Rutherford v. Owens-Illinois, Inc.,* 16 Ca1.4th 953, 969 (1997).

Dr. Wagner's initial autopsy gave a diagnosis of anoxic encephalopathy due to resuscitated cardiac arrest, due to acute myocardial infarct, due to physical altercation with law enforcement officers and with contributing facts of hypertensive cardiomyopathy and acute methamphetamine intoxication. Based on Dr. Wagner's diagnosis, defendants contend there is no showing that their behaviors were a substantial factor in causing Anastacio's death. Further, defendants argue that plaintiffs' expert cannot demonstrate substantial factor causation and therefore, plaintiffs have failed to make a showing sufficient to establish an element essential to their case which entitles defendants to summary judgment.

Plaintiffs rely on the medical opinion of Dr. Pietruzka to show Anastacio's injuries and death, including but not limited to those from the Taser, were caused to a reasonable degree of medical probability by defendants' actions. Both Dr. Pietruszka's and Dr. Wagner's diagnoses suggests concurrent causes of fact. There is nothing in case law that suggests that when multiple factors are involved in injury or death, that a single cause must be asserted to meet the substantial factor test as defendants suggest here. Nevertheless, the Supervisory defendants point to Dr. Pietruzka's deposition testimony where he states that he is unable to opine to a reasonable degree of medical probability that the taser in this case caused Mr. Hernandez' [sic] death in the sense that it was a but-for cause of death. (Supervisory Defendants' Exh. 17.)

11cv522

Defendants overlook that Dr. Pietruszka, in his deposition, stated:

> [W]e don't know what would have happened had they just left him alone, not tasered him, gotten him to a hospital in enough time . . . . I think that is the cumulation of all the factors player – played a role, And I – it's difficult to – to eliminate or separate the factors completely. . . . And just as in many – many questions that deal with multiple – either multiple injuries or multiple complex physiologic processes, we cannot separate and remove any of those processes from the ultimate effect because they play some role, they – they cause some effect which may have been sufficient to – to cause the ultimate effect. So I – I believe that just cannot be separated.

(Dr. Pietruszka's Depo. at 171-172.)

As pointed out by plaintiffs, the Ninth Circuit recently found that the trial court erred by weighing the evidence and concluding that defendants' conduct was not a substantial factor in the decedent death. *Krechman v. County of Riverside*, 723 F.3d 1104 (9th Cir. 2013). In *Krechman*, defendants argued that plaintiff died of natural causes unrelated to plaintiff's interaction with police by presenting expert testimony. Plaintiff also provided expert testimony demonstrating that the decedent's death was caused by excessive force. There was evidence of blunt-impact injuries on the torso, head, arms, and legs; bleeding in an internal muscle of the victim's ear; and the victim's heart was enlarged, which put him at a higher risk for cardiac arrhythmia. He also testified that the confrontation itself was a stressor that contributed to the arrhythmia that caused the victim's death. Another expert for the plaintiffs testified that there are two ways the encounter with police could have led to the victim's death: depending on what the jury believed the facts to be, the officers' actions could have caused "restraint asphyxia, compressing the chest for too long with too much weight" or the altercation could have caused an "adrenaline increase causing a cardiac arrhythmia from the stress of the exertion and the fear and pain associated with the restraint process."

Here, the expert testimony is conflicting, as it was in *Krechman*. Because there is no undisputed evidence concerning Anastacio's cause of death or even the cause of his injuries, the Court cannot find that defendants' are entitled to summary judgment. Further, because plaintiffs have come forward with expert testimony concerning substantial factor causation, plaintiffs have made a showing sufficient to establish an essential element to their case.

///

### 3.   Conclusion

Based on the medical expert testimony, the Court concludes that plaintiffs have presented evidence that defendants' actions were a substantial factor in causing Anastacio's injuries and death sufficient to create a material issue of dispute. Therefore, defendants' motion for summary judgment on plaintiffs' associational claims are denied.

### E.   FAILURE TO SUPERVISE AND TO INTERVENE

Plaintiffs allege in their fourth cause of action that the Supervisory defendants Avila, Caliri and DeJesus failed to properly supervise and intervene when they arrive at Whiskey 2 and found Anastacio being tasered while face down, his hands cuffed behind him, and not resisting. "Liability under section 1983 [or *Bivens*] arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). "[O]fficers [nonetheless] have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir.2000). However, "officers can be held liable for failing to intercede only if they had an opportunity" to do so. *Id.*

The Supervisory defendants assert that when they arrived at the scene, they saw officers struggling with a suspect who was violently resisting arrest, "not for a minor border crossing violation, but for the serious federal felony of physically assaulting [Ducoing and Krasielwicz] when he struck at them and pinned [Ducoing] against the fence near the return gate." (Avila, Caliri and DeJesus MSJ Ps&As at 18.) There is no evidence that any of the Supervisor defendants had any knowledge of the earlier incident to which they refer.

In his declaration, Avila noted that his "role as supervisor was to observe and must sure that nothing too crazy happened." (Avila Decl.) As a result of his observation, he "believed that the officers were acting appropriately." (*Id.*) Caliri and DeJesus agree. But the videotape recording of the events along with civilian eye witnesses provide evidence that is directly contrary to the Supervisory defendants's contention that Anastacio was acting violently or aggressively. Further, it is undisputed that the Supervisory defendants had the opportunity to intervene.

As pointed out throughout this discussion, there are a multitude of factual issues in

11cv522

dispute in this action. The Court will not grant summary judgment to the Supervisory defendants in such a situation.

**IV.    Conclusion**

Based on the foregoing discussion, defendants' motions for summary judgment on the issue of qualified immunity are **DENIED** as follows:

1.    Re: Plaintiffs' First Amendment Retaliation claim, the motion is **DENIED** as to all individual defendants;

2.    Re: Plaintiffs' Fourth Amendment Excessive Force claim is **DENIED** as to the Ducoing, Krasielwicz, Piligrino, Narainesingh, Llewellyn, Vales, Boutwell, and Sauer;

3.    Re: Plaintiffs' Right of Association claim, the motion is **DENIED** as to Ducoing, Krasielwicz, Piligrino, Narainesingh, Llewellyn, Vales, Boutwell, and Sauer; and the Supervisory defendants, Avila, Caliri, and DeJesus.

4.    The Supervisory defendants' motion for summary judgment on the claim of failure to supervise and to intervene is **DENIED**.

It is further Ordered that the parties shall jointly contact the chambers of Magistrate Judge Bartick within three days of the filing of this Order to schedule a mandatory settlement conference.

**IT IS SO ORDERED.**


DATED:  September 29, 2014

_____
M. James Lorenz
United States District Court Judge


COPY TO:

HON. DAVID H. BARTICK
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL

27

11cv522